# FREEDOM COURT REPORTING

<u>TRAVEL TRANSCRIPT</u>

IN THE UNITED STATES DISTRICT COURT

FOR MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION

CASE NUMBER: 2:05-cv-00922-M

ANTHONY MILES,

    Plaintiff,

VS.

SOUTHEAST UNLOADING, LLC, AND IVEY CRUMP, JR.,

    Defendants.

\* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF

ARLENE BARKER

September 22nd, 2006

\* \* \* \* \* \* \* \* \* \* \* \* \*

TRAVEL TRANSCRIPT PREPARED BY

FREEDOM COURT REPORTING

RENA' MESSICK LANIER, CSR

(334) 300-3832

<u>www.freedomreporting.com</u>
<u>1-877-373-3660</u>

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

CASE NUMBER: 2:05-cv-00922-M
ANTHONY MILES,
    Plaintiff,
VS.
SOUTHEAST UNLOADING, LLC, AND IVEY CRUMP, JR.,
    Defendants.

S T I P U L A T I O N

IT IS STIPULATED AND AGREED by and between the parties through their respective counsel, that the deposition of ARLENE BARKER may be taken before RENA' MESSICK LANIER, Court Reporter and Notary Public for the State of Alabama at Large, at the offices of Maynard, Cooper & Gale at 201 Monroe Street, Suite 1600, Montgomery, Alabama 36104, on the 22nd day of September, 2006.

Page 2

IT IS FURTHER STIPULATED AND AGREED that the signature to and the reading of the deposition by the witness is waived, the deposition to have the same force and effect as if full compliance had been had with all laws and rules of Court relating to the taking of depositions.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions except as to form or leading questions, and that counsel for the parties may make objections and assign grounds at the time of the trial, or at the time said deposition is offered in evidence, or prior thereto.

IT IS FURTHER STIPULATED AND AGREED that the notice of filing of the deposition by the Commissioner is waived.

Page 3

I N D E X

EXAMINATION BY:    PAGE
MR. LIGHTFOOT    5
    114
    118
MR. WINSTON    102
    115

EXHIBITS    MARKED
DEX 1  Unauthorized Solicitation of  68
    Drivers document

Page 4

IN THE UNITED STATES DISTRICT COURT
FOR MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

CASE NUMBER: 2:05-cv-00922-M
ANTHONY MILES,
    Plaintiff,
VS.
SOUTHEAST UNLOADING, LLC, AND IVEY CRUMP, JR.,
    Defendants.

BEFORE:
    RENA' M. LANIER, Commissioner
APPEARANCES:
    WINSTON COOKS, by LEE WINSTON, The Penick Building, 319 17th Street North, Suite 200, Birmingham, Alabama 35203, appearing for the Plaintiff.
    MAYNARD, COOPER & GALE, P.C., by WARREN B. LIGHTFOOT, JR., 1901 6th Avenue North, Suite 2400, Birmingham, Alabama 35203, appearing for the Defendants.
    ALSO PRESENT: Anthony Miles

Page 5

1    I, RENA' MESSICK LANIER, a Court
2 reporter of Elmore County, Alabama, acting
3 as Commissioner, certify that on this
4 date, as provided by the Federal Rules of
5 Civil Procedure and the foregoing
6 stipulation of counsel, there came before
7 me at the offices of Maynard, Cooper &
8 Gale, P.C., 201 Monroe Street, Suite 1600,
9 Montgomery, Alabama 36104, beginning at
10 2:00 p.m., ARLENE BARKER, witness in the
11 above cause, for oral examination,
12 whereupon the following proceedings were
13 had:
14        ARLENE BARKER,
15 the witness, after having first been duly
16 sworn, was examined and testified as
17 follows:
18        THE COURT REPORTER: Do we
19 have usual stipulations?
20        MR. LIGHTFOOT: Sure.
21        MR. WINSTON: Yeah.
22        EXAMINATION
23 BY MR. LIGHTFOOT:

Page 6

1    Q.  Ms. Barker, my name is
2 Warren Lightfoot. I just met you. I
3 represent Southeast Unloading in this case
4 that Anthony Miles brought against it.
5        Thank you for coming in
6 today.
7    A.  Uh-huh.
8    Q.  Let's see. You got the
9 deposition notice, right, that was served
10 on you?
11   A.  Right.
12   Q.  Okay. And it told you to
13 show up here and at this time and all
14 that. I owe you a witness fee. So that
15 is yours. That is for -- we are required
16 to do that for your attendance and for
17 your mileage, okay?
18   A.  Okay.
19   Q.  So that's yours to cash, all
20 right, to reimburse you for coming here.
21   A.  Okay.
22   Q.  Now, on that deposition
23 notice -- well, let me get started.

Page 7

1    Q.  State your name for the
2 Record, please.
3    A.  Arlene Barker.
4    Q.  Barker?
5    A.  Uh-huh.
6    Q.  All right. What's your
7 address?
8    A.  79 Burston Drive, Tallassee,
9 Alabama 36078.
10   Q.  Okay. And has that been
11 your address for a period of time?
12   A.  About seven years.
13   Q.  Okay. Let's see. Have you
14 ever given a deposition before?
15   A.  No.
16   Q.  There's not much to it. I'm
17 just going to ask you a series of
18 questions, and you're going to answer
19 them. And you've sworn under oath to tell
20 the truth.
21        And she's going to take down
22 all the words that we say. And then when
23 I'm through, Lee may -- Mr. Winston may or

Page 8

1 may not have some questions for you, and
2 you'll do the same thing, okay?
3    A.  Okay.
4    Q.  Let me know at any time if
5 you do not understand what I'm asking, and
6 I'll be happy to keep asking or to clarify
7 until you do understand, okay?
8    A.  Okay.
9    Q.  Otherwise, if you answer my
10 question, I'll assume that you understood
11 what I was asking.
12   A.  Okay.
13   Q.  All right. Are you under
14 the influence of any medication or drugs
15 today that prohibit you from thinking
16 clearly or hearing me or understanding me?
17   A.  No.
18   Q.  All right. Let me know at
19 any time if you want to take a break.
20 That will be fine too.
21        Let's see. The deposition
22 notice that I sent you, it asked you to
23 come and appear for testimony.

Page 9:

1  It also attached a document
2 request. It just said please bring any
3 documents with you that you have that may
4 relate to this lawsuit.
5      Do you have any documents
6 that relate to this lawsuit?
7   A.  No.
8   Q.  Okay. Did you even look for
9 any? Or did you know you didn't?
10  A.  I'll be honest with you. I
11 didn't even read the deposition. I just
12 looked at the date and the time I was
13 supposed to be here. That's it.
14  Q.  Well, let me ask you now.
15 What it basically was: Do you have any
16 documents? And it says if you have any
17 documents that in any way relate to
18 Mr. Miles' claims against Southeast
19 Unloading to please bring them in.
20      Do you have any such
21 documents?
22  A.  No.
23  Q.  Where are you currently

Page 10:

1 employed?
2   A.  I'm not.
3   Q.  And how long have you not
4 been employed?
5   A.  Twelve hours.
6   Q.  Okay. Where were you last
7 employed?
8   A.  Impact Resources.
9   Q.  Impact Resources?
10  A.  Right.
11  Q.  What do they do?
12  A.  We -- we put together
13 bicycles, wheelbarrows, patio furniture.
14      Do store in-service. We
15 service stores. Do anything they may need
16 as far as displays and stuff like that
17 goes.
18  Q.  Was that in Tallassee?
19  A.  Auburn.
20  Q.  In Auburn. Are you from
21 Tallassee?
22  A.  Uh-huh.
23  Q.  That address you just gave

Page 11:

1 me was a Tallassee address?
2   A.  Right.
3   Q.  And so what happened a few
4 hours ago? Were you terminated?
5   A.  No. I quit.
6   Q.  You quit. All right. How
7 long were you there approximately?
8   A.  Two and a half months.
9   Q.  All right. Where were you
10 employed prior to that?
11  A.  MSC Communications.
12  Q.  All right. From when to
13 when?
14  A.  December of 2005 until July,
15 2006.
16  Q.  Okay. And what did you do
17 for them?
18  A.  Installed satellites.
19  Q.  Okay. And where were you
20 employed before that?
21  A.  I don't remember.
22  Q.  All right. You worked for
23 Southeast Unloading from when to when

Page 12:

1 approximately?
2   A.  I'd say two thousand -- the
3 end of 2001, beginning of 2002. And I was
4 there almost three years.
5   Q.  All right. Did you quit or
6 resign from there?
7   A.  Yeah, I quit.
8   Q.  You quit. And approximately
9 when did you quit? You said you were
10 there about three years.
11      Does that mean somewhere
12 early '04? Or late '04?
13  A.  Yeah. Late '04. Because I
14 quit in October of 2004.
15  Q.  Okay. Did you say late
16 October?
17  A.  Uh-huh.
18      THE COURT REPORTER: If you
19 could say yes or no instead of uh-huh or
20 huh-uh, that would be great.
21  Q.  (BY MR. LIGHTFOOT) That's a
22 great point. If you'll do that for both
23 yeses and nos.

Page 13

1 Even though we all know that
2 we all talk like that and we all nod our
3 heads and shake our heads, she needs
4 words, please. Yeses and nos for yes and
5 no questions, please.
6      A.   Okay.
7      Q.   So late October of '04. All
8 right. Was it after Mr. Miles had been
9 terminated?
10     A.   No.
11     Q.   Was it before?
12     A.   Yes.
13     Q.   Okay. How soon before?
14     A.   I have no idea.
15     Q.   He was terminated on -- do
16 y'all know? Was it the 25th? Or was
17 it --
18          MR. MILES: The final
19 decision should have been on the 1st.
20          MR. LIGHTFOOT: Of November?
21 Okay.
22          MR. MILES: (Nodding head.)
23     Q.   (BY MR. LIGHTFOOT)

Page 14

1 Somewhere around November 1st. So you
2 think you were just late October; you're
3 not sure when?
4      A.   Right.
5      Q.   Not mid October but
6 somewhere in the latter part?
7      A.   Right.
8      Q.   All right. And why did you
9 quit?
10     A.   Didn't feel like working for
11 Southeast Unloading any more.
12     Q.   Did you leave for another
13 opportunity?
14     A.   Yes.
15     Q.   For a better job?
16     A.   That was part of it.
17     Q.   You found a better job?
18     A.   Yeah. That was part of it.
19     Q.   Okay. Where was the better
20 job?
21     A.   Brewster and Associates.
22     Q.   That does --
23     A.   Satellites.

Page 15

1      Q.   -- the DirecTV?
2      A.   Uh-huh.
3      Q.   Is that a yes?
4      A.   Yes.
5      Q.   So did you go straight from
6 Southeast to Brewster?
7      A.   No. I was -- it was
8 actually maybe a week, week and a half.
9      Q.   All right. Did you ever
10 file for unemployment?
11     A.   No.
12     Q.   Okay. So maybe a week or a
13 week and a half you were off, and then you
14 went straight to Brewster?
15     A.   Yes.
16     Q.   How long were you at
17 Brewster approximately?
18     A.   Three months.
19     Q.   All right. And where did
20 you go after that?
21     A.   Satellites Unlimited.
22     Q.   How long were you there?
23     A.   Four months.

Page 16

1      Q.   All right. Where did you go
2 after that? We're getting close to MSC,
3 right, I guess? Maybe there's one other.
4      A.   Well, I don't know what year
5 that was.
6      Q.   We should be in '05 now --
7      A.   Okay.
8      Q.   -- if you went three months
9 with Brewster and then four months with
10 Satellites Unlimited.
11     A.   Okay.
12     Q.   We should be getting close
13 to MSC, but I'm not the one to tell you.
14     A.   Well, see, I worked
15 temporary with a temporary service in-
16 between that before I went to MSC.
17     Q.   Okay. Do you think there
18 were any other employers in that time
19 period?
20     A.   No.
21     Q.   Okay. Tell me what jobs you
22 did at Southeast Unloading please
23 beginning with your first.

Page 17

1   A. I was a lumper, or an
2 unloader. And then I ran the books. I
3 collected money and priced the trucks. I
4 assigned trucks to the other employees
5 that they had to do.
6   Q. All right. You ran the
7 books. You collected the money. You
8 priced the -- what did you say -- priced
9 the trucks?
10   A. Uh-huh.
11   Q. Yes?
12   A. Yes. And I assigned the
13 trucks to the different employees for
14 whoever come up next had to do the next
15 truck.
16   Q. Okay. That is when you
17 first started?
18   A. Shortly after I first
19 started. I was there maybe a month and a
20 half. And that's what -- when I first
21 started, I was a lumper. All I did was
22 unload.
23   Q. Someone else was telling you

Page 18

1 what to unload?
2   A. Exactly.
3   Q. Okay. And was that a
4 supervisor?
5   A. Well, it was -- it was the
6 guy who was running the books at the time.
7   Q. Do you remember who that
8 was?
9   A. I believe it was David
10 Gilbert.
11   Q. Okay. You don't know if he
12 was a supervisor or not, but he was
13 running the books?
14   A. Right.
15   Q. Do you think he reported up
16 to Ivey Crump, Jr.?
17   A. I have no idea.
18   Q. Are you aware of anybody in-
19 between him and Ivey Crump, Jr., in terms
20 of supervisors?
21   A. No.
22   Q. Did Ivey Crump, Jr., run the
23 whole facility at the time you started?

Page 19

1   A. I don't know if you call him
2 running it or not. You very rarely seen
3 him at all.
4   Q. Did he have the title -- did
5 he have the highest-ranking title at the
6 facility?
7   A. Yes.
8   Q. And what was that?
9   A. Owner's son.
10   Q. Did he have a title like
11 V.P. or general manager or anything like
12 that?
13   A. No.
14   Q. He was just the owner's son
15 who ran the facility?
16   A. Right.
17   Q. Okay. All right. And then
18 David was under him. Which side was this?
19 Was this the grocery side?
20   A. Right.
21   Q. So you were never on the
22 perishables side?
23   A. Yes, I was.

Page 20

1   Q. Oh, you were on that side as
2 well?
3   A. Yeah.
4   Q. All right. And this is the
5 Montgomery facility?
6   A. Yes.
7   Q. So you started out as a
8 lumper, or an unloader. And David Gilbert
9 was doing the assign -- ran the books.
10      Did he do all these things --
11 he ran the books, collected the money,
12 priced the --
13   A. Yes.
14   Q. -- truck, did the
15 assignments?
16   A. Yes.
17   Q. And then a month or so after
18 you got there, did you take over for
19 David?
20   A. Yes, I did.
21   Q. Where did David go?
22   A. He went back just to
23 unloading trucks.

Page 21

1  Q. He went back to unloading.
2  All right. How many folks were unloading
3  at the time you started approximately?
4  A. When I first started, I was
5  on a second shift, and there was only
6  three of us there.
7     And then they closed out
8  second shift, and everybody moved to first
9  shift.
10  Q. And then how many were on
11  the first shift after they closed the
12  second shift?
13  A. Probably anywhere from
14  fifteen to twenty-five.
15  Q. Did that grow over the years
16  to a bigger number?
17  A. No. Not at the grocery side
18  it didn't.
19  Q. Not on the grocery side.
20  All right. So at some point, you took
21  over for running the books, collecting the
22  money, pricing the trucks and giving out
23  the assignments?

Page 22

1  A. Right.
2  Q. Was that a promotion?
3  A. I thought it was.
4  Q. Did you get more money?
5  A. No.
6  Q. Okay. You got more duties?
7  A. Right.
8  Q. And you don't have to unload
9  as much?
10  A. Right.
11  Q. Did you have to unload at
12  all to cover at times? Or not much?
13  A. Sometimes, yes. But most of
14  the time I wasn't supposed to do it at
15  all.
16  Q. Most of the time you were
17  supposed to be doing these other things?
18  A. Right.
19  Q. So you took over for David,
20  and you were telling all the other
21  employees -- you were pricing the trucks,
22  assigning, collecting the money and
23  running the books?

Page 23

1  A. Exactly.
2  Q. Did the book, was it an
3  official Southeast Unloading book that had
4  receipts in it?
5  A. It wasn't actually a book.
6  What it was, it was a sheet of paper put
7  on a clipboard.
8     You'd fill out the
9  information that it called for in each
10  block. And then when the driver paid you
11  whether it be by com. check or cash, then
12  you had a book of receipts that you kept
13  in the clipboard.
14     You wrote the driver a
15  receipt. Then you left a copy in there.
16  The driver got a copy. And that was the
17  end of it.
18  Q. So you had one clipboard
19  which was a sheet of paper. And you said
20  what was on that?
21  A. They wanted to know the
22  date, what door it was on.
23  Q. Date, door.

Page 24

1  A. The trucking company that
2  had the product on there.
3  Q. Right.
4  A. Who was assigned to that
5  truck.
6  Q. Right.
7  A. And what had to be done to
8  that truck, whether it was a floor load;
9  if it was on pallets, if they were
10  sideways, anything like that, then you had
11  a put a description of what had to be
12  done.
13     And then you put the price of
14  what the truck was, how much you charged
15  for the truck.
16  Q. Okay. And then you had a
17  separate book of receipts where you would
18  just write down the amount paid and tear
19  it off so that it could be given back to
20  the driver?
21  A. No. The driver would always
22  be standing there right in front of me as
23  I'm writing out the receipt.

Page 25

1   So once I write out the
2 receipt, I hand the receipt to the driver.
3 The driver gets his paperwork from Winn-
4 Dixie. And then he's gone.
5   Q. Okay. Are you saying you
6 didn't give them the receipt directly?
7   A. Yes, I gave the driver the
8 receipt. What I'm saying is the driver is
9 standing right there in front of me.
10   Q. As you fill it out?
11   A. As I fill out the receipt.
12 Then I hand the receipt to him. He picks
13 up his paperwork. And that's the end of
14 that.
15   Q. Okay. In the receipt book,
16 did the receipts have a little Southeast
17 Unloading sort of address on one end of
18 it?
19   A. Yes.
20   Q. Okay. All right. So for
21 how long did you do this job of sort of
22 the coordinating all of those things you
23 said?

Page 26

1   A. I'd say almost a year.
2   Q. All right. You said you
3 started somewhere around, did you say
4 early 2001?
5   A. Actually, it was late 2001.
6 I'd say probably in November.
7   Q. Is when you were hired?
8   A. Right.
9   Q. Okay. So you did almost a
10 year. That takes you into late 2002.
11 What changed?
12   A. We got a new district --
13 well, I'll say general manager there.
14   Q. Who was that?
15   A. Danny Young.
16   Q. Danny Young. All right.
17 Does that mean he came in and started
18 doing what you were doing?
19   A. No.
20   Q. Or he was involved with you?
21   A. He was over -- he was kind
22 of the middleman between me and Ivey
23 Crump, Jr.

Page 27

1   Q. I see. Okay.
2   A. So everything had to be run
3 through him.
4   Q. So he took over for both
5 sides?
6   A. No. Just the one.
7   Q. Just on the grocery side?
8   A. At this time, yes, just for
9 the grocery side.
10   Q. So did that change what you
11 were doing? Or not really?
12   A. Well, it didn't change what
13 I was doing to start with.
14   Q. Okay. Did he implement some
15 changes, different policies or ways to do
16 things or something? What changed?
17   A. What changed? I got sent
18 from there to perishable, to the frozen
19 warehouse.
20   Q. You got sent over to the
21 other side?
22   A. Right.
23   Q. Okay. To be a lumper over

Page 28

1 there?
2   A. Right.
3   Q. To be the assigner person as
4 well? Or --
5   A. No.
6   Q. -- just the lumper?
7   A. No. Just a lumper.
8   Q. Why is that?
9   A. Because I was told that they
10 were missing money. And I was accused of
11 missing money, or I was accused of taking
12 money. Put it that way.
13   And then I was out for two
14 days. They sent me home for two days.
15 And then I got a call from Ivey Crump,
16 Jr., who said if I wanted to keep my job I
17 would go to the perishable warehouse. So
18 that's where I went.
19   Q. All right. And was your
20 boss Danny Young at the time this
21 happened?
22   A. Yes.
23   Q. How long had he been your

Page 29

1 boss?
2     A. Three months.
3     Q. And how did you learn that
4 you had been accused of taking money?
5     A. Danny Young pulled me to the
6 side one evening. I had left to go get me
7 something for supper. I come back. And
8 he called me to the office and said he
9 needed to talk to me.
10    Q. Okay. What did he say?
11    A. And his words were he wanted
12 to know where such and such money was for
13 a truck that had been unloaded.
14       And I told him I had no idea
15 what he was talking about. He said, well,
16 it's right here on the sheet, but the
17 money is not here. So where is the money?
18 You're short.
19    Q. Okay. And did you have --
20    A. But there --
21    Q. Go ahead. Did you have the
22 money?
23    A. No.

Page 30

1     Q. Did you know where it was?
2     A. No. Because on that sheet
3 that truck had been marked out because the
4 driver ended up doing it himself.
5     Q. Tell me what that means, the
6 driver had done it himself. He had
7 unloaded himself --
8     A. Right.
9     Q. -- instead of getting
10 Southeast employees --
11    A. Exactly.
12    Q. -- to unload him?
13    A. Instead of hiring us to do
14 it. I had given him a price, filled
15 everything out on the sheet for us to do
16 the truck.
17       Before we started the truck,
18 the driver come back to us and -- come
19 back to me and said no, I don't want you
20 to do that truck. I'm going to do it
21 myself because my company won't pay y'all
22 to do it. I'm going to do it myself.
23       He unloaded himself. A line

Page 31

1 was drawn through it. But apparently it
2 wasn't dark enough for Mr. Young to see
3 it. So he assumed I stole money.
4     Q. I see. Did you tell me that
5 the driver told you at first he did want
6 you to unload it, and that's why you
7 started writing up the ticket?
8     A. Right. Right.
9     Q. All right. Then he changed
10 his mind?
11    A. Right.
12    Q. So then you drew a line
13 through it like you'd almost write void
14 across a check or something?
15    A. Right.
16    Q. But the line you think
17 wasn't dark enough maybe? Or for some
18 reason Mr. Young couldn't tell?
19    A. Exactly.
20    Q. Did you try to give that
21 explanation?
22    A. I wasn't fixing to argue
23 with him about anything.

Page 32

1     Q. So you didn't even give an
2 explanation?
3     A. No.
4     Q. He just made his decision?
5     A. I mean, I told -- he asked
6 me where it was at. I told him I had no
7 idea. And he sent me home.
8        And then the next thing, I
9 got a call from Ivey Crump, Jr., to come
10 to the warehouse. I come out there. He
11 told me I was going to be sent home for
12 two days without pay and that he would
13 call me and let me know what their
14 decision was.
15       Two days later he calls me
16 and tells me I will be at the perishable
17 warehouse if I want to go back to work.
18    Q. So you didn't tell Mr. Young
19 about the explanation for why that ticket
20 was written up, and there wasn't
21 corresponding money?
22    A. Not to that extent, no.
23    Q. Did you tell him to some

## Page 33

1 extent?
2   A.  Yes.  I told him, I said, if
3 you can see it right there, it's got a big
4 star, asterisk, by it.  Because we put
5 asterisks by it, and then we put a line
6 through it.
7       But, see, the thing was it's
8 different when I do it.  But when he does
9 it, it's never supposed to be anything
10 said about it.
11   Q.  Did he have -- did Mr. Young
12 have a way of kind of, whenever he had
13 written one out that didn't need to be
14 written out, did he have a way of kind of
15 scratching it out so he would know not to
16 expect there to be corresponding money?
17   A.  There's been times when
18 Mr. Young had changed the paperwork
19 altogether.
20   Q.  Okay.
21   A.  After we had been paid for
22 the truck, two days later you could go
23 back and look at the paperwork and he's

## Page 34

1 changed it and changed the amount we got
2 paid for doing it and changed it.  And
3 then that affects the rest of the
4 employees' checks.
5       So I've seen that on numerous
6 occasions.  That's why I was not fixing to
7 argue with him about anything.
8   Q.  Okay.  So you were able to
9 give him your explanation, but you just
10 weren't willing to argue about it?
11   A.  That's right.
12   Q.  Okay.  Did you do the same
13 thing with Ivey Crump, Jr.?  Give him your
14 explanation but not argue about it?
15   A.  Right.
16   Q.  Okay.  All right.  So did
17 you then start working over on the
18 perishable side --
19   A.  Yes.
20   Q.  -- as a lumper?
21   A.  Yes.
22   Q.  All right.  Were you doing
23 the assignments over there?

## Page 35

1   A.  Not at the beginning, no.
2   Q.  Okay.  So once again you
3 started out over there doing just
4 unloading?
5   A.  Right.
6   Q.  At some point did you take
7 on the assignment responsibilities like
8 you had on the other side?
9   A.  Yes, I did.
10   Q.  Okay.  And did your pay
11 remain the same when you were transferred
12 over to the perishable side?
13   A.  Yes.  Well, I mean, I wasn't
14 getting paid for doing the paperwork and
15 assigning the trucks and stuff any more.
16       I went straight to lumper pay
17 which is getting paid for whatever I
18 unloaded.
19   Q.  The person that does the
20 assigning and the books and all that gets
21 paid differently?
22   A.  Yes.
23   Q.  How do they get paid?

## Page 36

1   A.  They get paid a straight
2 salary.
3   Q.  Okay.  All right.  But when
4 you're just a lumper, you are paid by the
5 truck?
6   A.  Exactly.
7   Q.  All right.  And so was it
8 after a couple of months that you became
9 the assignment person over on the
10 perishable side?
11   A.  It was longer than two
12 months.  It was probably closer to eight
13 months.
14   Q.  All right.  And did you do
15 that for the rest of your employment at
16 Southeast Unloading?
17   A.  No.
18   Q.  All right.  Where else did
19 you go?  Or what other jobs did you do?
20   A.  That was it.
21   Q.  Oh, so you did do that for
22 the rest of your employment?
23   A.  Well, no.  At Southeast

Page 37

1  Unloading, yes.
2     Q.  That's what I mean.
3     A.  But as far as collecting the
4  money and stuff like that, no, I didn't do
5  that until I left.
6     Q.  You've lost me on that.
7  When you first went over to the perishable
8  side, you told me you were doing unloading
9  at first?
10    A.  Right.
11    Q.  You told me that maybe eight
12 months or so later you started doing the
13 assignment duties again?
14    A.  Right.
15    Q.  And are those the duties you
16 did up until the time you left Southeast?
17    A.  No.
18    Q.  You went back to being a
19 lumper?
20    A.  That's right.
21    Q.  Why did you go back to being
22 a lumper?
23    A.  Because Mr. Crump decided he

Page 38

1  did not want to pay me for doing David
2  Barnes' job when I had taken over doing
3  the assignments and stuff.
4     Q.  David Gilbert?
5     A.  No.  David Barnes.
6  Different guy.
7     Q.  Oh, you had taken over David
8  Barnes' job when you went over to the
9  perishable side?
10    A.  Perishable side.
11    Q.  When you took over the
12 assignments?
13    A.  When I took over the
14 assignments, okay, he was not paying me
15 for doing his job and my job too.
16       So yes, that kind of upset
17 me.  I told him, I said, well, I'm not
18 doing it no more.  If you're not going to
19 pay me for it, I'm not going to do it.
20       Then he handed it off to
21 Mr. Miles.  And I went back to lumping
22 trucks.
23    Q.  Are you saying that

Page 39

1  Mr. Miles worked on the perishable side as
2  well?
3     A.  Yes.
4     Q.  Okay.  When was that that
5  Mr. Miles worked on the perishable side?
6        And what was your position at
7  the time?
8     A.  My position at the time when
9  Mr. Miles first come over, I was a lumper.
10    Q.  Right.  On the perishable
11 side?
12    A.  On the perishable side.
13    Q.  Okay.  Then at some point
14 you became the assignment person on the
15 perishable side?
16    A.  Right.
17    Q.  And then based upon that pay
18 issue you just told me, you went back to
19 being a lumper, and Mr. Miles took over
20 the assignment job --
21    A.  Right.
22    Q.  -- on the perishable side?
23    A.  Right.

Page 40

1     Q.  And is that the way things
2  were at the time you left?
3     A.  No.
4     Q.  Did y'all both go over to
5  the grocery side?
6     A.  No.  Didn't go back to the
7  grocery side.  They had shut grocery side
8  down before I left.  So the only thing
9  open was perishable.
10    Q.  Were you a lumper on the
11 perishable side --
12    A.  Yes.
13    Q.  -- at the time you quit?
14    A.  Yes.
15    Q.  All right.  You said you
16 quit -- one reason you quit was for a
17 better opportunity?
18    A.  Right.
19    Q.  Was there any other reason
20 you quit?
21    A.  Tired of dealing with the
22 headache.
23    Q.  With the headache of what?

Page 41

1  A. Constantly having to fight
2 about my check being wrong.
3  Q. Anything else?
4  A. Well, that's about it.
5 Other than having to listen to him
6 threaten me with my job if I didn't come
7 to work and do what I was supposed to do.
8  Q. Was that Ivey Crump, Jr.?
9  A. That would be correct.
10  Q. Do you feel that he
11 mistreated you?
12  A. Oh, of course.
13  Q. Did you feel he treated you
14 unfairly?
15  A. Of course.
16  Q. In which ways did he treat
17 you unfairly?
18  A. He's a pig.
19  Q. Okay. But in which ways did
20 he treat you unfairly?
21  A. Well, he talked to you like
22 you were nobody. I mean, he talked down
23 to you like you had no common sense.

Page 42

1    And he would tell you that if
2 you thought you could do better than what
3 he was paying you you were more than
4 welcome to walk out the door.
5  Q. Did he talk to you like
6 that?
7  A. Oh, yeah.
8  Q. Did you hear him talk to a
9 lot of employees like that?
10  A. Everybody like that.
11  Q. He talked to everybody like
12 that. Anybody ever stand up to him?
13  A. Oh, yes.
14  Q. Who was that?
15  A. You had -- Chris Morman
16 would sometimes. Mr. Anthony Miles would
17 more than most folks. And on occasion,
18 yes, I stood up to him on occasion. But I
19 wouldn't say there was too many more
20 people.
21  Q. I believe Mr. Miles
22 started -- do you know when he started?
23  A. I have no idea. I'd say

Page 43

1 probably January the following year.
2  Q. January of '04?
3  A. Started, January of '02
4 maybe.
5  Q. Oh, January of '02?
6  A. I think. I'm not sure. I
7 couldn't tell you.
8    MR. LIGHTFOOT: Do y'all know
9 off the top of your heads?
10    MR. WINSTON: Yes.
11    MR. LIGHTFOOT: Do you know,
12 Lee?
13    MR. WINSTON: The year he
14 started I think was November of '02.
15  Q. (BY MR. LIGHTFOOT) So
16 around the same time as you?
17  A. Well, I started November of
18 '01.
19  Q. You started November, '01?
20    MR. MILES: Mine was --
21  A. Well, did you start in
22 November or December?
23    MR. WINSTON: I've got his

Page 44

1 file right here.
2    MR. LIGHTFOOT: You got his
3 personnel file?
4    MR. WINSTON: The redacted
5 version. 11/6/01.
6    MR. LIGHTFOOT: So they
7 started almost exactly the same time.
8 Actually, worked almost the exact same,
9 start and stop.
10  Q. (BY MR. LIGHTFOOT) So tell
11 me the times when Mr. Miles was working in
12 the same -- or was he working in the same
13 area as you the whole time?
14  A. Yes. I mean, he was
15 actually one of the employees that I
16 handed out assignments to at times.
17    And before that, he was
18 handing out assignments to us. So, I
19 mean, we were basically at the grocery
20 side for about a year.
21    And then after that I went to
22 perishable. He stayed at grocery. And
23 then he come to perishable.

Page 45

1 And then maybe a year and a
2 half, year and -- almost two years later I
3 left. And then when he left, I have no
4 idea.
5    Q. When the two of you were on
6 the grocery side together, were you the
7 assignment person and he was an unloader?
8 Or was it --
9    A. At one point, yes.
10   Q. -- both ways?
11   A. It was both ways.
12   Q. So at one time you were
13 doing the assignment sort of position, and
14 he was doing the unloading; and then it
15 also was vice-versa where he was doing the
16 assigning and you were doing the
17 unloading?
18   A. Right.
19   Q. That was on the grocery
20 side?
21   A. Right.
22   Q. What about on the perishable
23 side?

Page 46

1    A. Now, on the perishable side,
2 I had started out, you know, assigning the
3 trucks and the doors and stuff.
4        And then like I said with the
5 money issue that I had discussed with
6 Mr. Crump, then it got handed -- and, see,
7 Ivey never asked him specifically to do
8 it. It always went through Wayne which
9 was our dock supervisor.
10       In the morning times, he
11 would come in and ask me, Arlene, can you
12 do the books for me? No. Why not?
13 You're not paying me for it.
14       I'm not doing his job and my
15 job too. Mr. Miles would be the next
16 person in line. There was only three of
17 us down there in that freezer dock.
18       So it was me or him at that
19 time because half the time David Barnes
20 never showed up for work.
21       So he's the one that ended up
22 doing the pricing and the assigning when I
23 wouldn't do it.

Page 47

1    Q. Okay. With regard to the
2 time that you told me about earlier when
3 you were accused of taking money --
4    A. Yes.
5    Q. -- do you know if any other
6 employees or any other drivers were ever
7 interviewed about that or any statements
8 taken about what had happened one way or
9 the other?
10   A. No. There wasn't no one
11 else.
12   Q. There was no one else?
13   A. It was just me.
14   Q. It was just Danny Young who
15 talked to you that first time?
16   A. Yes.
17   Q. And then Ivey Crump, Jr.,
18 the second time?
19   A. Right.
20   Q. You're not aware of Ivey
21 Crump, Jr., discriminating against any
22 employees on the basis of race, are you?
23       MR. WINSTON: Object to the

Page 48

1 form. You can answer.
2    Q. (BY MR. LIGHTFOOT) You can
3 answer.
4    A. Yeah.
5    Q. On the basis of race?
6    A. Yes.
7    Q. Who is that?
8    A. Several people. We have
9 Anthony Miles for one. I've seen him do
10 it to Chris Morman.
11   Q. Okay. I want to go through
12 each one. Or would you rather tell me
13 them first?
14   A. It doesn't matter.
15   Q. You said Anthony Miles. You
16 said Chris Morman.
17   A. Yes.
18   Q. Anybody else that you can
19 think of?
20   A. Myself.
21   Q. Okay.
22   A. Ken. I couldn't tell you
23 how to pronounce his last name.

Page 49

1  Q. Okay.
2  A. But Ken.
3  Q. Okay. Is that it?
4  A. There's probably some
5  others, but they were your -- come and
6  gone. And I couldn't tell you. They
7  never stayed very long because of the way
8  he treated them.
9  Q. What race is Chris Morman?
10 A. He's black.
11 Q. What race is Ken?
12 A. He's white.
13 Q. What race are you?
14 A. I'm white.
15 Q. Okay. Are those the four
16 people that you saw Mr. Crump discriminate
17 against on the base of race?
18     MR. WINSTON: Object to the
19 form again.
20 A. Most of the time, yes.
21 Q. Okay. Tell me when you saw
22 him discriminate against, or when you're
23 aware of Mr. Crump, Jr., discriminating

Page 50

1  against Anthony Miles on the basis of
2  race.
3  A. There's times when he made
4  comments as to why most black men felt
5  like they needed handouts and such
6  comments as that.
7      And then every time something
8  went wrong, he never went to a white guy
9  to say who started the problem. He always
10 went to him. He always went to Anthony
11 Miles. That was the first person he went
12 to.
13 Q. All right. Hang on. Before
14 you said that, you said something about
15 why does a black man need a handout.
16     Will you tell me what you
17 said again?
18 A. Ivey Crump has made the
19 comment to other employees.
20 Q. Did he make it to you?
21 A. No, not directly.
22 Q. Did you hear it?
23 A. Yes.

Page 51

1  Q. You heard him making it to
2  someone else?
3  A. In general conversation,
4  yes. With a bunch of people around. So,
5  I mean, it's like --
6  Q. I only want to hear about
7  comments that you actually heard.
8  A. Okay.
9  Q. So did you hear him make
10 that comment?
11 A. No.
12 Q. You just sort of heard
13 hearsay from other people that he had said
14 that?
15     MR. WINSTON: Object to the
16 form.
17 A. Yeah.
18 Q. Do you remember any of the
19 people that told you that they heard him
20 say that statement?
21 A. Everybody.
22 Q. So you can't remember
23 anybody specifically that told you that?

Page 52

1  A. Brother-in-law, Chris
2  Morman, Ken, Ron Johnson, the dock
3  supervisor, Wayne.
4  Q. So those people told you
5  that they heard Mr. Crump, Jr., on one
6  occasion say whatever that statement you
7  just said about why is it that black
8  people need handouts? Is that about
9  the --
10 A. Why black men think they
11 need handouts.
12 Q. Why black men think they
13 need handouts. Okay.
14     Do you know when that was?
15 A. No, I don't.
16 Q. Do you know any other
17 specifics about where he said it or what
18 the context was or anything?
19 A. It was in the break room on
20 the perishable side.
21 Q. All right. Did he say it to
22 a group of white and black employees?
23 A. Yeah.

Page 53

1  Q. And you said -- you listed
2 for me the people you think heard it?
3  A. I listed -- I listed the
4 name of people who was sitting in the
5 group that Ivey was sitting with having
6 this conversation with.
7  Q. And then someone shared it
8 with you later you think --
9  A. Yeah.
10  Q. -- or you don't even know?
11  A. Yes.
12  Q. Okay. Are you aware of him
13 making any other statements that are
14 negative towards race at any time or that
15 are racist?
16  A. Not directly to me.
17  Q. Okay. Are you aware of him
18 making any other racist statements at all
19 whether it was directly to you or to
20 anybody else, even this sort of hearsay?
21  A. On occasion. I mean, I
22 couldn't tell you exactly what it was.
23 This is just the type of person Ivey Crump

Page 54

1 was.
2      He didn't care what he said
3 or who he said it to. He just said what
4 was on his mind.
5  Q. Okay. But you can't tell me
6 any other specific racist statements that
7 you're aware of?
8  A. I know he doesn't like black
9 people. I've heard -- he's told me that
10 himself in his office.
11  Q. He said to you that he
12 doesn't like black people?
13  A. Exactly.
14  Q. What were the words he used?
15  A. At one time I was having a
16 conversation with him about my dad who had
17 fallen ill.
18      And something was said to the
19 effect of the only reason why he hires
20 black people is so he doesn't get sued for
21 being discrim -- or so he does not get
22 sued for discriminatory or whatever you
23 want to call it.

Page 55

1     He has to hire black folks.
2 He said he would rather hire Mexicans and
3 white people because they do what they
4 want -- they do what he wants them to do
5 with no arguments.
6  Q. When was that that he told
7 you that?
8  A. That had to be -- exact time
9 I couldn't tell you. I know it was
10 probably around September, but I don't
11 know when in September.
12  Q. September of what year?
13  A. Possibly right after I got
14 to the perishable dock.
15  Q. So is that -- you left in
16 November of '04. So it must have been in
17 '03? Is that what you're saying?
18  A. Yeah. That would probably
19 be right. Around that time sometime.
20     I don't want to pinpoint it
21 in September. It could have been August.
22 It could have been October.
23  Q. Did anybody else hear him

Page 56

1 say it?
2  A. No. Because I was the only
3 one in the office with him.
4  Q. Did you tell him you were
5 offended by it?
6  A. No.
7  Q. Were you?
8  A. Maybe. Maybe not.
9  Q. You didn't do anything about
10 it, right?
11  A. No.
12  Q. I mean, you didn't complain
13 to anybody?
14  A. No.
15  Q. You didn't tell anybody that
16 you had just heard him say words to that
17 effect, did you?
18     MR. WINSTON: Object to the
19 form.
20  A. No.
21  Q. Why is it that you said your
22 dad had fallen ill? Why is it that you
23 say -- what makes you think he said that

Page 57

1  during that conversation?
2     A.  Because that's the only time
3  I ever sat in Ivey Crump's office and
4  talked to him one-on-one.
5     Q.  Okay.  All right.  Did you
6  ever hear him say any other statements
7  that you thought were racist or negative
8  towards race?
9     A.  No.
10    Q.  Are you aware of him making
11 any other statements to anybody else that
12 you perceived as being negative towards
13 race or racist?
14    A.  No.
15    Q.  All right.  You were telling
16 me that you thought that Anthony Miles --
17 that he discriminated against Anthony
18 Miles.
19       How is it that you think he
20 discriminated on the basis of race against
21 Anthony Miles?
22    A.  Anthony Miles is not a
23 person who keeps things to himself.  He's

Page 58

1  a very outspoken person.
2        If you piss him off, he will
3  let you know.  And Mr. Crump does not like
4  that.  He likes to be able to tell you
5  what to do, and you're not to say anything
6  about it.  You're not to talk back to him.
7  You're not to question what he says.
8        And Anthony Miles is one of
9  those people, he will not stand back and
10 just let you talk to him anyway without
11 saying something.
12       And when it first started
13 that way, from that point on Mr. Crump had
14 a problem with Anthony Miles.
15    Q.  He had a problem with him
16 because he mouthed off and didn't just
17 take it?
18       MR. WINSTON:  Object to the
19 form.
20    A.  Exactly.
21    Q.  Because he's like you say
22 the kind of person who will talk back?
23       MR. WINSTON:  Object to the

Page 59

1  form.
2     A.  Well, he's not the type of
3  person to talk back.  He's not going to
4  bite his tongue and let you talk to him
5  anyway you want to.
6     Q.  All right.  And so is that
7  the way you believe Mr. Crump, Jr.,
8  discriminated against him on the basis of
9  race?
10    A.  Yes.
11    Q.  Because he didn't like him
12 mouthing off?
13       MR. WINSTON:  Object to the
14 form.
15    A.  Yes.
16    Q.  Any other way that you're
17 aware of Mr. Crump, Jr., discriminating
18 against Mr. Miles on the basis of his
19 race?
20    A.  No.  I don't think so.
21    Q.  Okay.  Any way that you're
22 aware of that Mr. Crump, Jr.,
23 discriminated against Chris Morman on the

Page 60

1  basis of his race?
2     A.  Same thing.
3     Q.  Because Mr. Morman spoke his
4  mind as well?
5     A.  That's right.
6     Q.  Mr. Crump didn't like that?
7     A.  No, he did not.
8     Q.  All right.  What about you?
9  How did he discriminate against you?
10    A.  Because I would just as soon
11 cuss the man out.
12    Q.  Same thing with you?
13    A.  Right.
14    Q.  You weren't afraid to mouth
15 off either?
16       MR. WINSTON:  Object to the
17 form.
18    A.  He's even gone so far as to
19 call me a bitch to my face.  So --
20    Q.  All right.  Is this the same
21 thing with Ken?
22    A.  Yeah.  Yes.
23    Q.  He didn't like that he would

Page 61

1  mouth off as well?
2      MR. WINSTON: Object to the
3  form.
4      A. His problem with Ken was he
5  was the slowest white man he had ever seen
6  work.
7      Q. All right. And why do you
8  say that?
9      A. Because that's what he said.
10 He said he moves too slow to be a white
11 man.
12     Q. Who said that?
13     A. Mr. Crump.
14     Q. Mr. Crump said that Ken
15 moves too slow to be a white man?
16     A. Exactly.
17     Q. When did he say that?
18     A. Shortly after he first hired
19 Ken. When I was actually doing the
20 assignments and stuff over on the
21 perishable side. Or I'm sorry. The
22 grocery side.
23     Q. All right. Who did he say

Page 62

1  that to?
2      A. Me.
3      Q. You heard him say it?
4      A. Yes. He was talking
5  directly to me.
6      Q. Was anybody else around?
7      A. No.
8      Q. You're the only one that
9  heard it again?
10     A. That's right.
11     Q. Did you think that Ken moved
12 slow?
13     A. Not as slow as some of the
14 others we've had come and go.
15     Q. Both black or white?
16     A. Yeah. Exactly.
17     Q. Were you offended by
18 Mr. Crump, Jr.'s statement?
19     A. Yeah, I was. Because I said
20 something to him. At least - at least he
21 works steady. He's not constantly wanting
22 to take a break or whatever like some --
23 some of the other employees that you had

Page 63

1  and then you fired because they don't want
2  to do what you want them to do.
3      Q. Did Ken also mouth off to
4  him?
5      MR. WINSTON: Object to the
6  form.
7      A. Not in the beginning, no.
8      Q. Toward the end did he?
9      A. Towards the end, closer to
10 when I got close to leaving, then Ken
11 started standing up to him and, you know,
12 voicing his opinion like everybody else.
13     Q. All right. So you've told
14 me those are the four people that you're
15 aware of that Mr. Crump, Jr., you believe
16 discriminated against on the basis of
17 race?
18     A. Well, I know there's more
19 than that, but I couldn't tell you their
20 names because it's been so long ago.
21     Q. There were more black
22 employees as unloaders than there were
23 white unloaders, correct?

Page 64

1      A. At times, yes.
2      Q. And Mr. Crump in general
3  didn't treat the black employees any worse
4  than the white employees, did he?
5      A. No, he didn't.
6      Q. Did he treat the white
7  employees worse than he treated the black
8  employees in some way?
9      A. No, he didn't.
10     Q. He treated them all bad?
11     A. Yeah.
12     Q. Do you have any reason to
13 believe that his poor treatment of
14 anybody, whether it be these four people
15 or anybody else, was based on race or just
16 based on that's the way he was?
17     MR. WINSTON: Object to the
18 form.
19     A. Both. There were certain
20 people he seemed to pick on every day. It
21 was an every day thing. If something ever
22 went wrong, he had a bad day, he went to
23 certain people and then he started

Page 65

1  accusing.
2     Q.  Some were white; some were
3  black?
4     A.  Some were white.  Most were
5  black.  But, I mean, like I said, he's
6  come to me several times and accused me of
7  doing something.
8     Q.  So these are the people he
9  kind of picked on?
10    A.  Exactly.
11    Q.  So you would be one of them?
12    A.  Yes.
13    Q.  Anthony Miles would be one
14 of them?
15    A.  Most of time.
16    Q.  Okay.  And who else would be
17 some of the people he would just kind of
18 pick on when he was having a bad day?
19    A.  Ken.
20    Q.  Okay.
21    A.  I can't even think.  Closer
22 to the end, it kind of got switched over
23 to the three Mexicans that we had working

Page 66

1  with us.
2     Q.  He started picking on the
3  three of them?
4     A.  He started getting at them,
5  too.
6     Q.  So it didn't seem to matter
7  what the race was; he would just pick
8  whoever he wanted to get on to and get on
9  to them.  Is that right?
10       MR. WINSTON:  Object to the
11 form.
12    A.  No.  There were certain
13 people if it -- if you rubbed -- if you
14 rubbed Ivey Crump wrong, he would not let
15 you go day-to-day without starting in on
16 you about something.  It's always
17 something.
18    Q.  Right.  It didn't matter
19 what your race was; if you rubbed him
20 wrong, he was all over you.  Right?
21       MR. WINSTON:  Object to the
22 form.
23    A.  Not necessarily.  Not

Page 67

1  necessarily.  He probably picked at me
2  three or four times out of the whole time
3  I was there.  That's because at that
4  particular time maybe I upset him for
5  whatever reason.
6         And then yes, for a couple of
7  days he would pick at me.  After that, he
8  didn't bother me any more until for some
9  reason I might have upset him.
10        He normally -- I won't even
11 say normally -- he always stayed on
12 Mr. Anthony Miles all the time.
13    Q.  Okay.  Did he also stay on
14 Ken a lot?
15    A.  In the end, yes.
16    Q.  At some point, the company
17 instituted a policy that the unloaders, or
18 lumpers, were not supposed to solicit the
19 driver, correct?
20       MR. WINSTON:  Object to the
21 form.
22    Q.  (BY MR. LIGHTFOOT)  Remember
23 that?

Page 68

1     A.  I have no idea.
2     Q.  You don't remember that
3  policy?
4     (No response.)
5     Q.  (BY MR. LIGHTFOOT)  I'll
6  show you the policy.
7     A.  Okay.
8     Q.  Now, do you remember the
9  policy?
10    A.  No but okay.
11       MR. WINSTON:  If she's looked
12 at it, I would say you should go on and
13 mark it.
14       MR. LIGHTFOOT:  We can mark
15 it.
16    (Whereupon, Defendants' Exhibit No.
17 1 was marked for identification purposes
18 by Mr. Lightfoot.)
19    Q.  (BY MR. LIGHTFOOT)  We'll
20 call it Defendants' Exhibit 1, and this is
21 the Unauthorized -- and it's misspelled --
22 but the Unauthorized Solicitation of
23 Drivers, that policy you just saw.  That's

Page 71

1 what I'm marking as Defendants' Exhibit 1,
2 okay?
3   A.  Yes.
4   Q.  All right. You have not --
5 you're not familiar with that policy?
6   A.  I can't say that I am.
7   Q.  Do you know whether you
8 signed one or not?
9   A.  Well, I can tell you when I
10 got over to the perishable warehouse, I
11 was told I needed to fill out a whole new
12 batch of papers that said Southeast
13 Unloading instead of First Coast Pallet
14 from my original packet that I filled out.
15 All of this stuff was done.
16       And I had a conversation with
17 Mr. Crump that let me do it when I got
18 finished. And he went through, and what
19 he did, he highlighted every sheet that I
20 needed to sign. And that's what I signed.
21 I didn't read nothing.
22   Q.  In January of '04, would
23 that have been when you -- were you ever

Page 71

1 having to fill out all of these papers.
2   Q.  Is it right though that at
3 some point around January of '04 that the
4 company made it clear that unloaders, or
5 lumpers, were not supposed to solicit
6 drivers?
7   A.  I have no idea. Nothing was
8 ever said to us verbally. Like I said, I
9 didn't read none of that. So I couldn't
10 tell you.
11   Q.  Did the company ever tell
12 you as an assignment person that only the
13 person coordinating assignments is
14 supposed to solicit drivers and not the
15 actual unloaders themselves?
16   A.  Yes.
17   Q.  Was that sort of the deal
18 the whole time? Or just part of the time?
19   A.  No. I was -- it was brought
20 to my attention that Wayne, our dock
21 supervisor, was to come back and forth to
22 the freezer and price these trucks and
23 bring receipts and collect the money and

Page 70

1 on the perishable side then --
2   A.  Yes.
3   Q.  -- if you left in November
4 of '04?
5   A.  No. No. Yes. Yes. Yes.
6 Yes. I was there January of '04.
7   Q.  Would that have been right
8 around the time you went back over to the
9 perishable side, or you went over to the
10 perishable side?
11   A.  Actually, that was -- that
12 was shortly after I had gotten over there.
13   Q.  Yeah. That's what I
14 thought.
15   A.  Yes.
16   Q.  Okay. And you just don't
17 recall one way or the other whether you --
18   A.  No. Because I never read
19 any of that paperwork. Half the time I
20 didn't sign anything.
21       Half the time we didn't get
22 it unless he was having a problem with
23 somebody, with someone. Then we started

Page 72

1 everything else like that.
2       (Whereupon, at this time, someone
3 interrupted the deposition, and we took a
4 break.)
5   Q.  (BY MR. LIGHTFOOT) I'm
6 sorry. Go ahead.
7   A.  I forgot what I was saying
8 now.
9   Q.  Well, that's my fault. We
10 got interrupted. You were telling me
11 that --
12   A.  Oh, okay.
13   Q.  -- about Wayne, about the
14 dock supervisor.
15   A.  Yeah. He is the one who
16 told me, not Ivey Crump. Wayne told me I
17 was not -- that according to Ivey I'm not
18 supposed to be pricing the trucks. I'm
19 not supposed to be writing anything up.
20 He's supposed to do it.
21       But he come to me and asked
22 me if I could do it because I'm down there
23 all day long. We get the same trucks that

Page 73

come in day in and day out.
    I know how much the trucks go for. And I know what has to be done to them. So I know how to price the trucks. I know how to write them up.
    When I collect the money from them, I bring him the money down on the other end. He'll write me a receipt. I take the receipt back to the driver.
    And that's the way -- that changed too. There was no more of us writing the receipts, me writing the receipts.
    It was carrying Wayne the money. Wayne wrote the receipt out of the Southeast Unloading receipt book. He'd tear the receipt off. And then we would carry it back to the driver. And that's how that was taken care of there at the end.
    Q. Did Wayne ever take over one of the assignment positions? Or was he above the assignment position?

Page 74

    A. No. He was supposed to be the only person running that entire dock. But he could not run fifty-three doors by himself.
    So they broke off the freezer section of the perishables and put one person in charge there, which was David Barnes. And when he finally quit, it just got handed to whoever was willing to do it.
    Q. Okay. Did you just read this when I --
    A. Part of it.
    Q. The first sentence says: "Unloaders are not allowed to approach drivers, dispatchers, customers or potential customers without prior authorization from management."
    Was that the way things were run in 2004?
    A. Towards the end, yeah.
    Q. And the next sentence says: "Only supervisors are no negotiate rates

Page 75

or prices for the unloading services."
    Is that the way things were run in 2004?
    A. No.
    Q. All right. Who was allowed to negotiate rates or prices?
    A. Whoever was down there on that end of dock on that particular day. Whichever lumper knew what had to be done to that truck, he quoted the price. That's the way it worked.
    Q. Are you aware of any employee at Southeast during the whole time you were there stealing money from the company?
    A. Not firsthand, no.
    Q. Okay. Are you aware of any employee working for Southeast that gave a bogus receipt to a driver?
    A. No.
    Q. When Mr. Miles was terminated, I believe you said you think you already were gone?

Page 76

    A. I know I was gone.
    Q. So you don't know anything about the circumstance of his termination, correct?
    A. Correct.
    Q. I mean, other than maybe what he's told you, right?
    A. Yes.
    Q. I think I asked you this earlier, but you're not aware of any receipts being used by anybody at Southeast other than the official receipts which have the Southeast address down at one end of the receipts?
    A. As far as I know, that's the only receipts that we used.
    Q. And no receipts without this address at the end would ever be used or would ever be legitimate, correct?
    A. Exactly.
    Q. Were you a part of the lawsuit that was filed over unpaid wages?
    A. Yes.