Page 77

1    Q.  Were you one of the
2  plaintiffs?
3    A.  Yes.
4    Q.  And there were about twenty
5  of you; is that correct?
6    A.  I have no idea how many it
7  was.
8    Q.  You're not aware of the
9  company retaliating against you because
10 you filed that lawsuit at any time, are
11 you --
12       MR. WINSTON:  Object to the
13 form.
14       MR. LIGHTFOOT:  I haven't
15 even finished my question, Lee.
16       MR. WINSTON:  You already got
17 to the objectionable part.
18    Q.  (BY MR. LIGHTFOOT) You're
19 not aware of the company retaliating
20 against you in any way based upon your
21 participating in that lawsuit, are you?
22       MR. WINSTON:  Object to the
23 form.

Page 78

1    A.  It depends on what you call
2  retaliation.
3    Q.  Okay.  Do you have any
4  reason to think that the company
5  retaliated against you specifically --
6    A.  Yes.
7    Q.  -- for participating in that
8  lawsuit?
9    A.  Yes.
10   Q.  What is that?
11   A.  I was threatened on a daily
12 basis why don't I just quit.
13   Q.  Who threatened you on a
14 daily basis?
15   A.  Ivey Crump, Jr.
16   Q.  How did he threaten you?
17   A.  You could look at him wrong,
18 and he'd come up to you and ask you what
19 your problem was.  I ain't got no problem.
20      If you don't like your job
21 here, why don't you leave?  He stayed mad
22 after the lawsuit was filed.
23   Q.  Okay.

Page 79

1    A.  Anybody -- anybody who was
2  on -- supposedly on this lawsuit, I
3  guarantee you he had something to say to
4  each and every one if they still worked
5  there on a daily basis.
6    Q.  Okay.  Now, he treated you
7  poorly well before that, didn't he?
8    A.  Oh, yeah.
9    Q.  Nothing changed.  I mean, he
10 treated you poorly before, and he treated
11 you poorly the whole time you were
12 employed, correct?
13      MR. WINSTON:  Object to the
14 form.
15   A.  Correct.
16   Q.  Okay.
17   A.  It just happened --
18   Q.  And it never got worse at
19 any time, did it?
20      MR. WINSTON:  Object to the
21 form.
22   A.  Well, it depends on what you
23 mean by worse.  Instead of --

Page 80

1    Q.  Well, just his nitpicking
2  with you.
3    A.  Instead of picking on you
4  from once a day, it went from once a day
5  to three or four times a day constantly.
6    Q.  Would that be --
7    A.  It got to the point where he
8  was telling you you would come to work or
9  you wouldn't have a job.
10   Q.  Did that happen in '03?
11   A.  Yes.  At one time I suppose
12 it did.
13   Q.  It got worse some time in
14 '03?
15   A.  Up until I left in '04.
16   Q.  All right.  So other than
17 him -- you said he picked on you on a
18 daily basis?
19   A.  Every day, yes.
20   Q.  All right.  And he never
21 mentioned the lawsuit, did he?
22   A.  No.
23   Q.  Other than picking at you,

## Page 81

1  is there any other way that you say he
2  retaliated against you --
3      A.  No.
4      Q.  -- for your participation in
5  the lawsuit?
6      A.  No.
7      Q.  Do you have any other
8  information from any source that suggests
9  to you that he was out to get you or
10 retaliate against you any more after the
11 lawsuit than he was before the lawsuit?
12         MR. WINSTON: Object to the
13 form.
14     A.  No. Because I was not there
15 long after the lawsuit.
16     Q.  Are you aware of him
17 retaliating against any other employee
18 that was a part of the lawsuit?
19         Or is it just this same
20 information you've been telling me?
21     A.  Same.
22     Q.  And you can't relate any of
23 that to a specific time frame or to the

## Page 82

1  lawsuit, can you?
2         MR. WINSTON: Object to the
3  form.
4      A.  No.
5      Q.  Do you even know whether he
6  knew that you had been a part of the
7  lawsuit?
8      A.  Yes. I knew that for a
9  fact.
10     Q.  How do you know that?
11     A.  Because after Mr. Crump
12 found out who all was involved with the
13 lawsuit, he started holding certain
14 people's checks.
15        We were getting paid our
16 checks on Wednesday. Then just certain
17 people he started holding their checks and
18 making them wait until the end of the day
19 on Friday before he would give them their
20 check.
21        Everybody else was getting
22 theirs Friday morning. Or some of them
23 were getting them Thursday. Some of them

## Page 83

1  were still even getting them on Wednesday.
2      Q.  Who had their check held?
3      A.  Mine, Anthony Miles, Chris
4  Morman on occasions. And if I remember
5  correctly, I believe it was Ken.
6         And there was probably -- I
7  don't know. We have a guy there. His
8  name is Brother. He called him
9  Brother-In-Law. He sometimes would get --
10 he would hold his check until late Friday
11 evening.
12        Because by the time he would
13 let us go home, banks would be closed. We
14 couldn't get our checks cashed until
15 Monday.
16     Q.  Is Brother-in-Law an
17 employee with you?
18     A.  He is for them.
19     Q.  Is he white or black?
20     A.  He's black.
21     Q.  You don't know his name?
22     A.  I have no idea what his real
23 name is. Ernest Hall I think is his name.

## Page 84

1  Ernest Hall? I have no idea. I think
2  that's it.
3      Q.  All right. Were there times
4  that he held your check in 2003?
5      A.  No. I don't think so.
6      Q.  How about in early 2004?
7      A.  Yes.
8      Q.  Okay. How about mid 2004?
9      A.  Oh, yes.
10     Q.  How about late 2004?
11     A.  Definitely.
12     Q.  All right. So did it just
13 happen every so often when your check
14 would be held?
15     A.  No.
16     Q.  How often did it happen?
17     A.  It started about --
18 actually, it started being on a regular
19 basis about March of 2004 up until I
20 actually quit.
21     Q.  All right. And you don't
22 know all the employees whose checks were
23 held on various occasions, right?

Page 85

1  A. Right.
2  Q. You would just sometimes
3 hear people complain about it?
4  A. Well, I mean, not really
5 complain about it. I mean, you'd go up
6 and get your check when your day is over
7 with. And there would be three or four
8 people standing out there waiting to get
9 their check too.
10    But it was never really the
11 same people every week or every payday.
12 So, I mean, it's not -- there were some
13 people who got their checks early.
14 Some -- most of us had to wait until
15 Friday. It just depended on who would do
16 what Mr. Crump wanted done.
17  Q. Were some of the people
18 whose checks held people who had not
19 participated in the lawsuit but --
20  A. No.
21  Q. -- for some reason had
22 angered Mr. Crump?
23  A. No.

Page 86

1  Q. You're not saying that every
2 time you saw someone late or having their
3 check held was people that were in the
4 lawsuit, are you?
5  A. Yes, I am. Because I can
6 tell you the three Mexicans that we had
7 working with us, they were not in that
8 lawsuit. They got their check every
9 Wednesday -- every payday.
10    Whenever it was payday week,
11 they got their check on Wednesdays. No
12 questions asked.
13  Q. And the difference was you
14 expected to get your pay check on
15 Wednesday, but you would get them on
16 Friday when you're saying he held them; is
17 that correct?
18  A. That's right.
19  Q. Was Ken in the lawsuit?
20  A. I have no idea.
21  Q. Was Chris Morman?
22  A. Yes.
23  Q. Was Brother-In-Law?

Page 87

1  A. I have no idea.
2  Q. And you really noticed it
3 for everybody's around March of 2004 is
4 when it began?
5  A. Right.
6  Q. Did it go back to 2003 at
7 all in terms of holding checks?
8  A. Sometimes he would.
9 Sometimes he wouldn't. It just depended
10 on his mood.
11  Q. So y'all's checks were held
12 in 2003 on occasion?
13  A. Yes. But like I said, that
14 may have been maybe once every three or
15 four months. But after it hit 2004, it
16 was an every payday thing. You didn't get
17 your check until Friday. Don't ask for
18 it.
19    Everybody else -- like I
20 said, certain people could get their
21 checks on Wednesdays. But you didn't dare
22 ask for yours. If you knew he was holding
23 your check, you didn't dare ask for it on

Page 88

1 Wednesday. Because he would be just cruel
2 enough to hold it until Monday.
3  Q. You didn't like Mr. Crump,
4 Jr., did you?
5  A. Oh, no.
6  Q. You did like him? Or you
7 didn't?
8  A. No, I didn't.
9  Q. And you still don't?
10  A. And I still don't, no.
11  Q. And you were friends with
12 Anthony Miles, correct?
13  A. Sure.
14  Q. And you still are?
15  A. Sometimes.
16  Q. Well, you talk to him on
17 occasion, don't you?
18  A. On occasion, yeah.
19  Q. Y'all don't work together,
20 right?
21  A. No.
22  Q. When did he ask you to be a
23 witness for him?

Page 89

1    A. He didn't.
2    Q. Well, he certainly asked you
3 if you'd testify for him, didn't he?
4    A. No.
5    Q. He never did?
6    A. No. He told me I was. Then
7 I got a processor at my door ten minutes
8 till seven.
9    Q. He told you that you would
10 be a witness for him?
11    A. That's what I was told.
12    Q. Mr. Miles told you that?
13    A. Uh-huh.
14    Q. Is that a yes?
15    A. Yes.
16    Q. When was it that he told you
17 that?
18    A. Last week.
19    Q. Have you talked to Mr. Miles
20 since both of y'all's employment ended in
21 November of '04, somewhere in October or
22 November of '04?
23    A. A lot.

Page 90

1    Q. Once a week?
2    A. Yeah. That's -- that's
3 about right.
4    Q. What is the nature of
5 y'all's relationship?
6    A. Friends.
7    MR. WINSTON: Object to the
8 form.
9    Q. (BY MR. LIGHTFOOT) Are
10 either of you married?
11    A. I'm not.
12    Q. Is he married?
13    A. I have no idea.
14    Q. And how often do y'all see
15 each other?
16    A. Maybe once or twice every
17 two weeks.
18    Q. And what do y'all do
19 together?
20    MR. WINSTON: Object to the
21 form.
22    A. Nothing.
23    Q. I mean, what's the nature of

Page 91

1 you seeing him?
2    A. We're friends.
3    Q. So do y'all go out to eat?
4    A. No.
5    Q. Do y'all go to social events
6 together?
7    A. No.
8    Q. Tell me where you see him.
9    A. Just in passing. Or I talk
10 to him on the telephone. May see him out
11 in town or something.
12    Q. You live in Tallassee?
13    A. Yes.
14    Q. Where does he live?
15    A. He lives in Tallassee now
16 too.
17    Q. Are you romantically
18 involved with him?
19    A. No.
20    MR. WINSTON: Object to the
21 form.
22    Q. (BY MR. LIGHTFOOT) Okay.
23 So you see him I think you said every week

Page 92

1 or every other week, something like that?
2    A. Something like that. On
3 occasion. I don't see him every day.
4    Q. Do you eat meals with him?
5    A. Sometimes I do.
6    Q. What other activities do you
7 do with him?
8    A. Nothing.
9    Q. You've known he's filed this
10 lawsuit for some time, correct?
11    A. Yeah. Yes. Yes. Yes.
12    Q. You knew he had filed the
13 EEOC charge, and then he had filed the
14 lawsuit, right?
15    MR. WINSTON: Object to the
16 form.
17    A. I guess.
18    Q. And do you know what he's
19 claiming in this lawsuit?
20    A. No, I'm not.
21    Q. You know he's claiming that
22 he was discriminated against on the basis
23 of his race, right?

## Page 93

1  A. Okay.
2     MR. WINSTON: Object to the
3  form.
4     Q. (BY MR. LIGHTFOOT) Did you
5  know that?
6     A. I do now.
7     Q. You didn't know that until
8  just now?
9     A. Well, I mean, what you
10 assume, whatever you think it's about is
11 one thing. But what you're being told
12 it's about is something else.
13    I probably assumed that's
14 what it was about. But I was never
15 actually told that until probably today.
16    Q. But y'all have talked about
17 the lawsuit --
18    A. No.
19    Q. -- haven't you?
20    You've never talked about the
21 lawsuit?
22    A. Not this lawsuit, no.
23    Q. Have you ever talked with

## Page 94

1  him about what he's seeking to do, what
2  his claims are in this lawsuit?
3     A. Yes. I know of things that
4  he's told me that Ivey Crump has done to
5  him or said to him or whatever.
6     But as far as it being a
7  lawsuit for discrimination or whatever
8  over his race, no.
9     Q. Have you ever talked with
10 his lawyer?
11    A. Not until today.
12    Q. Not until you met him today?
13    A. That's right.
14    Q. Have you talked with any
15 other representative of Mr. Miles, be it
16 his lawyer or his investigator?
17    A. No.
18    Q. Have you talked with anyone
19 else about this lawsuit other than
20 Mr. Miles?
21    A. No.
22    Q. You've never mentioned it to
23 anybody else?

## Page 95

1  A. No.
2     Q. Do you have any information
3  that you have not told me here today so
4  far that you think supports Mr. Miles'
5  lawsuit?
6     MR. WINSTON: Object to the
7  form.
8     A. No. Nope.
9     MR. LIGHTFOOT: What's your
10 objection for?
11    MR. WINSTON: I was making an
12 objection to form. You haven't actually
13 shown her the lawsuit to go over what the
14 allegations are to say that -- you sort of
15 put the question, do you know about the
16 lawsuit.
17    She's already told you that
18 she really doesn't know what he's claiming
19 other than what Mr. Miles said to her.
20    Q. (BY MR. LIGHTFOOT)
21 Mr. Miles is claiming that he was
22 discriminated against on the basis of
23 race; that he wasn't paid some wages that

## Page 96

1  he was due; and that he was retaliated
2  against for participating in the unpaid-
3  wage lawsuit.
4     Did you know some of those
5  things? Or did you know all of those
6  things?
7     A. Not for sure until today.
8     Q. Okay. Now, knowing that, do
9  you have information that supports
10 Mr. Miles' claims in this lawsuit that
11 you've not already told me about?
12    A. No.
13    Q. What witnesses are you aware
14 of that Mr. Miles has that support his
15 claims in this lawsuit other than you?
16    A. None.
17    Q. Have you spoken with
18 Mr. Miles about any other people that
19 worked with you two that might be helpful
20 to his case?
21    A. No. Like I said, he hasn't
22 said anything to me about the case. So
23 why is he going to tell me about somebody

Page 97

1 else?
2    Q.  How many times have y'all
3 talked about the case, you and Mr. Miles?
4    A.  Zero.
5    Q.  Did you speak to Mr. Miles
6 about the lawsuit in July of this year?  I
7 guess that would be mid summer.
8        MR. WINSTON:  Object to the
9 form.
10   A.  Not as far as I can
11 remember, no.
12   Q.  Okay.  Have you spoken with
13 Mr. Miles at least five times about this
14 lawsuit?
15   A.  No.  Not that I know of.
16   Q.  How many times would you say
17 you've spoken to him about the lawsuit or
18 about the claims he's making in this
19 lawsuit?
20   A.  Maybe a half dozen times.
21 He starts talking.  I tell him I don't
22 want to hear it.  I don't want to know
23 nothing about it.

Page 98

1        And that's as far as my
2 conversation goes with it.  So I don't
3 consider that having a conversation about
4 a lawsuit.
5    Q.  Did you share with him about
6 what had happened with you about being
7 accused --
8    A.  I didn't have to.
9    Q.  -- of taking money?
10   A.  No.  He already knew.
11       MR. WINSTON:  Do you want to
12 take a break at all?
13   A.  No.  Just getting sleepy.
14   Q.  I'm almost through.  Do you
15 have any information one way or the other
16 as to whether Mr. Miles or any other
17 employees were not paid properly once the
18 lawsuit was settled after that time?
19   A.  What do you mean any other
20 information?
21   Q.  Well, were corrections made
22 in terms of how pay was done --
23   A.  No, it was.

Page 99

1    Q.  -- after that time?
2        Well, are you aware of the
3 company paying Mr. Miles incorrectly?
4    A.  No.
5    Q.  Paying Mr. Miles or paying
6 anybody else incorrectly after the lawsuit
7 was settled?
8    A.  Yes.
9    Q.  Who is that you are aware of
10 being paid uncorrectly?
11   A.  Everyone.
12   Q.  I'm talking about after the
13 lawsuit was settled.
14   A.  Oh, okay.  After it was
15 actually settled?
16   Q.  That's right.
17   A.  Okay.  Yes.  Well, no.
18 Because I wasn't there after it was
19 settled.
20   Q.  Well, you actually were a
21 couple of months, weren't you?
22   A.  Okay.  Well, when was it
23 settled?  Was it settled --

Page 100

1    Q.  I think it was settled in --
2    A.  I have no idea.
3        MR. WINSTON:  I think August
4 or end of September is what he said.
5    Q.  (BY MR. LIGHTFOOT)  He said
6 August or September, something like that.
7    A.  Okay.  Well, yeah.  Because
8 we were still supposed to be paid for
9 sitting around.
10       If we had to sit around and
11 had nothing to do, we were supposed to be
12 paid for that.  And we weren't.
13       If we were spending more than
14 eight hours there at the warehouse, we
15 were supposed to be getting paid for that.
16 And we weren't.
17       And that wasn't just me.
18 That was everyone.  Because nobody's check
19 reflected it.  Because everyone was told
20 that they were going to be getting paid
21 for that, and it never happened.
22       Because it was supposed to
23 show up on our check stubs, and it never

1  did.
2      Q.  Do you have any specific
3  information about Mr. Miles' claim that he
4  wasn't paid for time that he worked?
5          In other words, you didn't
6  keep track of his time --
7      A.  No.
8      Q.  -- so that you could say on
9  this day he was paid fairly and on this
10 day he wasn't paid fairly?  You can't say
11 that with any specificity with Mr. Miles'
12 pay, can you?
13     A.  No, I can't.  Or anybody
14 else's.  Just mine.
15     Q.  You said you resigned
16 because you were tired of the headache.
17         Was a part of that just
18 because you didn't like Ivey Crump, Jr.?
19         MR. WINSTON:  Object to the
20 form.
21     A.  That was the majority of it.
22     Q.  Do you know anybody that
23 liked him that worked there?

Page 102

1      A.  Nope.
2      Q.  No further questions.
3          MR. WINSTON:  I just have a
4  few questions.
5              EXAMINATION
6  BY MR. WINSTON:
7      Q.  You said that you --
8  Mr. Lightfoot was just asking you about
9  some of the reasons you resigned.
10         You said you didn't like
11 Mr. Crump.  That's correct, isn't it?
12     A.  Yes.
13     Q.  At the time you were
14 being -- at the time that you left, was
15 your pay being properly -- were you being
16 properly paid?
17     A.  No.
18     Q.  And so if that lawsuit was
19 settled in August or September, you didn't
20 see any changes being implemented?
21     A.  No.
22     Q.  And you're aware that you
23 yourself were not paid properly?

1      A.  Right.
2      Q.  Did you have any
3  conversations with -- and did that factor
4  into your decision to leave the company?
5      A.  Not really.  I had already
6  made plans to leave before this -- that
7  lawsuit was ever settled.
8      Q.  Did you have any
9  conversations with anybody from the
10 company about any changes that should have
11 been made after the lawsuit was settled?
12     A.  Well, I wouldn't call it
13 conversation.  I mean, you have a bunch of
14 people sitting around carrying on a
15 conversation.  Look.  See, they're still
16 not paying us what they said they were
17 going to pay us for.
18     Q.  Did you ever attend some
19 sort of meeting about -- in Mr. Miles'
20 deposition, he testified about a meeting
21 at the gazebo with someone named Rester?
22     A.  Yes.
23     Q.  Who is Rester?

Page 104

1      A.  He is -- oh, Lord.  I don't
2  know his exact title.  But I know he has
3  more pull than Ivey Crump, Jr.
4      Q.  Is he someone that is based
5  in Alabama?  Or someone that's in Florida?
6      A.  Florida.
7      Q.  You don't know what his
8  exact job title is?
9      A.  No, I don't.
10     Q.  Did you hear him make some
11 comments about how employees should be
12 paid at the company?
13         MR. LIGHTFOOT:  Objection.
14     A.  Yes.
15     Q.  And can you recall for the
16 jury what he said, or the Court?
17     A.  He had -- he had come in --
18         MR. LIGHTFOOT:  Objection.
19     A.  -- one afternoon.  I don't
20 know exactly what day it was or the date.
21         But we were all sitting there
22 talking.  He come up.  Started talking to
23 everyone.

Page 105

1    And someone brought up the
2 question I thought we were supposed to be
3 getting paid if we are just sitting here.
4    He said you are. He says,
5 well, we're not. And he said, is that
6 true? And he went around and asked
7 everybody that was sitting there. Yes.
8 We're still not getting paid for sitting
9 here.
10    Rester made the
11 conversation -- made the comment that Ivey
12 knows he cannot do that. He can go to
13 jail for that if he does not pay y'all.
14    I will try to see what I can
15 do to get that straightened out. And it
16 never happened.
17    Q. And so at the time -- by the
18 time you left though, you were still not
19 being paid for waiting around time?
20    A. No.
21    Q. And the way I understand how
22 this worked is that you couldn't -- you
23 could not leave; is that right? You had

Page 106

1 to be on the premises?
2    A. Correct.
3    Q. And if you left, you would
4 lose your job?
5    A. Correct.
6    Q. And you're paid to unload
7 the trucks, right?
8    A. Correct.
9    Q. So there would be times
10 though when the trucks couldn't get into
11 the facility, or what would cause you to
12 have to be waiting?
13    A. Ivey Crump wouldn't let us
14 leave, I mean, period. We could be -- all
15 of the trucks that would be scheduled for
16 the freezer would have come in.
17    The Winn-Dixie personnel that
18 worked down there would be gone home. And
19 we would have to sit there until the
20 perishable dock got caught up or until
21 they got done before we could be let go.
22    And if we left, that was
23 considered walking off the job, and you

Page 107

1 lost your job.
2    Q. And at the time you left,
3 your job title was a lumper; is that
4 correct?
5    A. Yes.
6    Q. And at the time you left,
7 were you pricing trucks to be unloaded I
8 think you testified earlier?
9    MR. LIGHTFOOT: Objection.
10    A. Not at the time I left.
11    Q. But as a lumper though, from
12 time to time, did you price the trucks and
13 collect the money from drivers?
14    A. Sure.
15    Q. And did other lumpers do
16 that?
17    A. Yes.
18    Q. And do you know if Mr. Miles
19 did that?
20    A. Mr. Miles did that. Robert
21 Dobbins did that. I did that.
22    Q. You understood though then
23 that -- that it was part of the company

Page 108

1 policy? They wanted you to do that? They
2 wanted the trucks to be processed out of
3 the facility?
4    A. Correct.
5    Q. And from your testimony
6 earlier, am I correct that there was just
7 no way for Wayne to cover fifty-three
8 doors?
9    A. That's correct.
10    MR. WINSTON: And can I see
11 Exhibit 1?
12    MR. LIGHTFOOT: Yes.
13    Q. (BY MR. WINSTON) And you
14 said you had signed a bunch of papers, and
15 we looked at Exhibit 1. This is
16 Mr. Miles' paper.
17    But do you remember signing
18 some papers? Mr. Crump wanted you to sign
19 a packet of papers with the Southeast
20 Unloading title.
21    A. Uh-huh.
22    Q. It was my understanding from
23 your earlier testimony, he didn't say take

Page 109

1 these home and review them or give you an
2 opportunity to study them; you were just
3 told to sign them?
4     A. Exactly. And when I told
5 him that I could not read, he said here.
6 And he went through and X'd and then
7 highlighted what sheets I was supposed to
8 sign.
9         And then I went through, and
10 I signed them. That's how that was taken
11 care of.
12        Because the first packet when
13 I first got hired, the logo on top said
14 First Coast Pallets. And then later it
15 got changed to Southeast Unloading. We
16 had to fill out that packet all over
17 again. Or I don't know even know that it
18 was the same packet. Like I said, I
19 didn't read it.
20        I didn't want to sign no more
21 papers. I wasn't in the mood to read
22 nothing. I wasn't going to read nothing.
23 And I told him I couldn't read. He

Page 110

1 highlighted. I signed. That was it.
2     Q. Did you see or have an
3 opportunity to observe how Mr. Ivey Crump,
4 Jr., spoke to Mr. Miles?
5     A. Yes.
6     Q. Did he use any different
7 tone of voice with Mr. Miles than he would
8 with some of the other employees?
9         MR. LIGHTFOOT: Objection.
10    A. Oh, yes.
11    Q. And could you describe what
12 tone of voice you heard him use towards
13 Mr. Miles?
14    A. He just -- it's more of a --
15 I don't even know how to put it. It's
16 kind of a condescending tone I guess. He
17 just -- he talked down to him all the
18 time.
19    Q. Do you know -- you testified
20 earlier that Mr. Miles was known to sort
21 of not -- if he thought something was
22 wrong, he would, you know, not sort of go
23 along; if he perceived something was not

Page 111

1 done correctly, he would speak up?
2     A. Exactly.
3     Q. And do you know if Mr. Crump
4 held that against Mr. Miles --
5         MR. LIGHTFOOT: Objection.
6     A. Oh, yes.
7     Q. -- from what you saw?
8     A. Oh, yes.
9     Q. Why do you say that?
10    A. Because every time Mr. Miles
11 would speak up about something or speak
12 his mind about something, it always -- it
13 always turned out that Ivey Crump would
14 always come back on him even harder with,
15 I mean, he just -- he just kept riding him
16 all the time.
17    Q. Did you ever hear Mr. Crump
18 say something about calling Florida or not
19 to call Florida?
20    A. Yes.
21    Q. What does calling Florida
22 mean?
23    A. Florida was the main office,

Page 112

1 their head office for First Coast Pallet
2 or Southeast Unloading, whatever you want
3 to call it.
4     Q. Was it your understanding
5 that Mr. Crump didn't want any employees
6 calling Florida?
7     A. Exactly.
8     Q. And did you ever hear him
9 say anything to Mr. Miles about calling
10 Florida?
11    A. Oh, yes.
12    Q. What do you recall him
13 saying?
14    A. A phone call was made to
15 Florida by a different employee. We were
16 all sitting outside around the gazebo.
17        And Ivey Crump come racing
18 through the parking lot. Flying through
19 the parking lot in his car. Pulled right
20 up next to the gazebo where me and several
21 other employees along with Anthony Miles
22 were sitting there talking.
23        He rolled the window down.

## Page 113

1  And the only person that he asked was
2  Anthony Miles. Did you call Florida?
3      But his exact words was who
4  in the hell called f'ing Florida.
5      Q. That's what Mr. Crump said?
6      A. Exactly. But his whole
7  thing was towards Mr. Miles and -- because
8  he answered, he said no, I didn't call.
9  And he got mad. He threw the car in
10 reverse, and he pulled off.
11     Q. And do you know when this
12 was?
13     A. Oh, Lord. Not exactly, no.
14 I know it was -- I can't even think of
15 that boy's name that actually made the
16 call. But it was right before he got
17 fired. I think his name was Reggie.
18     Q. And it's my understanding
19 from your testimony that Wayne himself
20 asked you to help with the pricing of
21 trucks and the collection of money?
22     A. Correct.
23     Q. And you said -- it's my

## Page 114

1  understanding from your earlier testimony
2  that although Mr. Crump picked on you a
3  lot, you thought he picked on you at least
4  some time more after you joined that
5  lawsuit?
6      MR. LIGHTFOOT: Objection.
7      A. Yes. It seemed to be a
8  little bit more frequent.
9      MR. WINSTON: That's all I
10 have.
11     EXAMINATION CONTINUED
12 BY MR. LIGHTFOOT:
13     Q. Mr. Crump, Jr., talked in a
14 condescending way to you a lot of times,
15 didn't he?
16     A. Oh, yeah.
17     Q. He talked in a condescending
18 way to Ken a lot of times, didn't he?
19     A. Yes.
20     Q. On the times when you would
21 speak up, he would hold that against you,
22 wouldn't he?
23     A. Sure. Sometimes. Most of

## Page 115

1  the time rather.
2      Q. On the times when Ken would
3  speak up, he would hold it against him,
4  wouldn't he?
5      A. Oh, yeah.
6      MR. LIGHTFOOT: Nothing
7  further.
8      MR. WINSTON: I have a
9  follow-up question.
10     EXAMINATION CONTINUED
11 BY MR. WINSTON:
12     Q. You said he called you bitch
13 to your face to once?
14     A. Uh-huh. Yes.
15     Q. Can you tell me about that?
16     A. We were having a
17 conversation in the break room. I was
18 having a conversation with someone else.
19     Apparently, Mr. Crump got
20 upset about something that he overheard or
21 that someone had told him.
22     He come into the break room
23 and pulled me aside. Pulled me outside

## Page 116

1  and wanted to know what was going on.
2      And I told him I had no idea
3  what he was talking about. And he said,
4  why do you have to be a bitch about
5  everything that goes on out here? Why do
6  you have to be a bitch about -- when I ask
7  you to do something, you got to be -- his
8  words exactly is defiant towards him. Why
9  can't I just do what he asks?
10     And I just let him know, I
11 said, well, if you think I'm a bitch,
12 that's fine.
13     Q. Were you aware if the
14 company had any kind of Equal Employment
15 Opportunity policy?
16     A. Say that again.
17     Q. Were you aware if the
18 company had any kind of Equal Employment
19 Opportunity policy?
20     A. This is an at-will state.
21     Q. So Mr. Crump never told you
22 that they were some sort of Equal
23 Employment Opportunity company?

Page 117

1    A.  Not personally.  Well, if he
2  did, I didn't pay it no mind.  Because
3  like I said, this is an at-will state.
4    Q.  And did Mr. Crump make that
5  clear to you in telling you that if you
6  didn't like the job you could leave?
7    A.  Oh, yeah.  Several
8  occasions.
9    Q.  Did anyone give you any
10 training in what to do if you thought you
11 were being a victim of harassment?
12   A.  No.  Because I was the only
13 female out there.
14   Q.  Were you aware of any
15 training given to any of the other
16 employees about Equal Opportunity?
17   A.  I was -- I know there was a
18 conversation held with all the men.  He
19 held it with all the men before I ever
20 come over there to perishable.
21   Q.  Do you know what the
22 conversation was about?
23   A.  No.  Because I wasn't a part

Page 118

1  of that conversation.  I was the
2  conversation.
3    Q.  You mean the conversation
4  was about you coming over there?
5    A.  Exactly.  And how they were
6  supposed to act.
7    Q.  Were you aware if there
8  was -- did you ever attend any meeting
9  like that based on -- where the people
10 talked about race?
11   A.  No.
12   Q.  And treating people equally
13 because -- not discriminating because of
14 race?
15   A.  No.
16     MR. WINSTON:  That's all I
17 have.
18     EXAMINATION CONTINUED
19 BY MR. LIGHTFOOT:
20   Q.  Do you know whether you ever
21 got an employee handbook?
22   A.  No.
23   Q.  Like the papers you signed,

Page 119

1  do you know if you ever signed for an
2  employee handbook?
3    A.  No.
4    Q.  You may have; you just don't
5  know?
6    A.  Well, if I signed for an
7  employee handbook, I never got an employee
8  handbook.
9    Q.  Did you say earlier that you
10 can't read?
11   A.  I can read.  I told him I
12 couldn't read because I didn't feel like
13 reading the paperwork.  I didn't even want
14 to sign the paperwork.
15   Q.  I got you.  You just said to
16 him --
17   A.  I can't read.
18   Q.  -- I can't read, but you
19 could?
20   A.  Right.
21   Q.  You just meant I'll sign it;
22 I don't want to have to read through it?
23   A.  That's it.

Page 120

1      MR. LIGHTFOOT:  No further
2  questions.
3      MR. WINSTON:  Done.
4      MR. LIGHTFOOT:  All right.
5  Thank you.  That check is yours.
6  Appreciate you coming in.
7  * * * * * * * * * * * * * *
8      FURTHER DEPONENT SAITH NOT
9  * * * * * * * * * * * * * *
10     REPORTER'S CERTIFICATE
11 STATE OF ALABAMA:
12 MONTGOMERY COUNTY:
13     I, Rena' Messick Lanier, Court
14 Reporter and Commissioner for the State of
15 Alabama at Large, do hereby certify that
16 the above and foregoing transcript of the
17 proceedings in the matter of:
18 ANTHONY MILES,
19 Plaintiff,
20 VS
21 SOUTHEAST UNLOADING, LLC, AND IVEY CRUMP,
22 JR.,
23 Defendants,

```
 1  CASE NUMBER:
 2  2:05-cv-00922-M
 3  was reported by me on the 22nd day of
 4  September, 2006.
 5       I further certify that the
 6  foregoing one hundred and twenty
 7  computer-printed pages contain a true and
 8  correct transcript of the proceedings held
 9  in this matter.
10       I further certify that I am
11  neither of kin nor of counsel to the
12  parties to said cause, nor in any manner
13  interested in the results thereof.
14       This the 25th day of September,
15  2006.
16
17       _____
18       Rena' M. Lanier, Court
19       Reporter and Commissioner
20       for the State of Alabama
21       at Large
22
23
```



# UNAUTHOTIZED SOLICITATION OF DRIVERS

Unloaders are not allowed to approach drivers, dispatchers, customers or potential customers without prior authorization from management. Only supervisors are to negotiate rates / prices for the unloading services or any other service that Southeast Unloading L.L.C. provides or may provide.

Any employee in violation of this policy will be subject to disciplinary action and/or termination from the company.

By signing below, I fully understand and agree to abide by the above policy.

_Anthony R Miles_  _[signature]_  _1-15-04_
Employee Name    Employee Signature    Date

**DEFENDANT'S EXHIBIT**
Barker 1

SEUL 0036