# FREEDOM COURT REPORTING

## TRAVEL TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT

FOR MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION

CASE NUMBER: 2:05-cv-00922-M

ANTHONY MILES,

      Plaintiff,

      VS.

SOUTHEAST UNLOADING, LLC, AND IVEY CRUMP,

JR.,

      Defendants.

\* \* \* \* \* \* \* \* \* \* \* \* \*

**DEPOSITION OF**

**KEN HIRNEISEN**

September 22nd, 2006

\* \* \* \* \* \* \* \* \* \* \* \* \*

TRAVEL TRANSCRIPT PREPARED BY

FREEDOM COURT REPORTING

RENA' MESSICK LANIER, CSR

(334) 300-3832

www.freedomreporting.com

1-877-373-3660

Page 1

1   IN THE UNITED STATES DISTRICT COURT

2   FOR MIDDLE DISTRICT OF ALABAMA

3       SOUTHERN DIVISION

4

5   CASE NUMBER: 2:05-cv-00922-M

6   ANTHONY MILES,

7       Plaintiff,

8       VS.

9   SOUTHEAST UNLOADING, LLC, AND IVEY CRUMP,

10  JR.,

11      Defendants.

12

13      S T I P U L A T I O N

14      IT IS STIPULATED AND AGREED by

15  and between the parties through their

16  respective counsel, that the deposition of

17  KEN HIRNEISEN may be taken before RENA'

18  MESSICK LANIER, Court Reporter and Notary

19  Public for the State of Alabama at Large,

20  at the offices of Maynard, Cooper & Gale

21  at 201 Monroe Street, Suite 1600,

22  Montgomery, Alabama  36104, on the 22nd

23  day of September, 2006.

---

Page 2

1       IT IS FURTHER STIPULATED AND

2   AGREED that the signature to and the

3   reading of the deposition by the witness

4   is waived, the deposition to have the same

5   force and effect as if full compliance had

6   been had with all laws and rules of Court

7   relating to the taking of depositions.

8       IT IS FURTHER STIPULATED AND

9   AGREED that it shall not be necessary for

10  any objections to be made by counsel to

11  any questions except as to form or leading

12  questions, and that counsel for the

13  parties may make objections and assign

14  grounds at the time of the trial, or at

15  the time said deposition is offered in

16  evidence, or prior thereto.

17      IT IS FURTHER STIPULATED AND

18  AGREED that the notice of filing of the

19  deposition by the Commissioner is waived.

20

21

22

23

---

Page 3

1       I N D E X

2   EXAMINATION BY:            PAGE

3   MR. LIGHTFOOT                  5

4                                 75

5   MR. WINSTON                   63

6                                 76

7   EXHIBITS              MARKED

8   DEX 1  Unauthorized Solicitation of    34

9       Drivers document

10  DEX 2  Southeast Unloading receipt    28

11  DEX 3  To Whom It May Concern doc.   49

12  DEX 4  11/22/04 To Whom It May Concern 39

13  DEX 5  Generic receipt               54

14  PEX 1  Daily Sign-In Sheet Unloading   69

15

16

17

18

19

20

21

22

23

---

Page 4

1   IN THE UNITED STATES DISTRICT COURT

2       FOR MIDDLE DISTRICT OF ALABAMA

3           SOUTHERN DIVISION

4

5   CASE NUMBER: 2:05-cv-00922-M

6   ANTHONY MILES,

7       Plaintiff,

8       VS.

9   SOUTHEAST UNLOADING, LLC, AND IVEY CRUMP,

10  JR.,

11      Defendants.

12  BEFORE:

13      RENA' M. LANIER, Commissioner

14  APPEARANCES:

15      WINSTON COOKS, by LEE WINSTON,

16  The Penick Building, 319 17th Street

17  North, Suite 200, Birmingham, Alabama

18  35203, appearing for the Plaintiff.

19      MAYNARD, COOPER & GALE, P.C., by

20  WARREN B. LIGHTFOOT, JR., 1901 6th Avenue

21  North, Suite 2400, Birmingham, Alabama

22  35203, appearing for the Defendants.

23      ALSO PRESENT: Anthony Miles

---

1  I, RENA' MESSICK LANIER, a Court
2  reporter of Elmore County, Alabama, acting
3  as Commissioner, certify that on this
4  date, as provided by the Federal Rules of
5  Civil Procedure and the foregoing
6  stipulation of counsel, there came before
7  me at the offices of Maynard, Cooper &
8  Gale, P.C., 201 Monroe Street, Suite 1600,
9  Montgomery, Alabama  36104, beginning at
10  3:50 p.m., KEN HIRNEISEN, witness in the
11  above cause, for oral examination,
12  whereupon the following proceedings were
13  had:
14          KEN HIRNEISEN,
15  the witness, after having first been duly
16  sworn, was examined and testified as
17  follows:
18          THE COURT REPORTER:  Do we
19  have usual stipulations?
20          MR. LIGHTFOOT:  Yes.
21          MR. WINSTON:  Yeah.
22          EXAMINATION
23  BY MR. LIGHTFOOT:

1      Q.  Mr. Hirneisen, my name is
2  Warren Lightfoot.  First, will you spell
3  your name for me, please?
4      A.  H-I-R-N-E-I-S-E-N.
5      Q.  How do you say it?
6      A.  Hirneisen.
7      Q.  Hirneisen.  Great.  All
8  right.  Have you ever been in a deposition
9  before?
10     A.  No.  Not that I'm aware of.
11     Q.  Okay.  There's not a lot to
12  it.  I'll be asking you a lot of questions
13  today.  You'll be answering all the
14  questions.
15          You understand you're sworn
16  to tell the truth?
17     A.  Right.
18     Q.  She will be taking down all
19  the words that we both say.  And then if
20  Mr. Winston has some questions, she'll
21  take those down as well.
22     A.  Okay.
23     Q.  Let me know at any time if I

1  ask you a question and you don't
2  understand what I'm asking.  And then I'll
3  be happy to clarify it until you do.
4      A.  Right.
5      Q.  So any time you answer a
6  question, I'll assume that you understood
7  what I was asking, okay?
8      A.  Right.
9      Q.  If you'll answer every
10  question out loud.  For instance, if it's
11  a yes or no question, if you'd say yes or
12  no instead of nodding or saying uh-huh or
13  huh-uh, it makes for a clean Record, okay?
14     A.  Okay.
15     Q.  Are you on any drugs or
16  medication today that prevent you from
17  hearing me or thinking clearly or
18  understanding me?
19     A.  No.
20     Q.  Okay.  And let me know if
21  you want to take a break at any time.
22  That will be fine.
23     A.  Okay.

1      Q.  I owe you.  The Court tells
2  us that we are to pay you a witness fee
3  for your attendance here and for your
4  mileage.  So that is yours.
5      A.  Thank you.
6      Q.  All right.  You've already
7  stated your name for the Record.
8          What is your current address,
9  please?
10     A.  9275 River Road, Selma,
11  Alabama  36703.
12     Q.  And how long have you lived
13  at that address?
14     A.  I just came back from
15  Pennsylvania.  So I'm just there three
16  weeks.
17     Q.  Okay.  And how long were you
18  gone in Pennsylvania?
19     A.  We were up there a couple of
20  months, me and my wife.  We were up for my
21  in-laws.  My father-in-law passed away
22  from cancer.
23     Q.  I'm sorry to hear that.  Is

Page 9

1  Selma your home?
2      A.  Well, we were living in
3  Prattville before we went up to
4  Pennsylvania.
5      Q.  Okay.
6      A.  I was working at the
7  Southeast Unloading at the time when I
8  left.
9      Q.  You were living in
10  Prattville when you worked at Southeast
11  Unloading?
12     A.  Right.
13     Q.  Okay.  Now, you worked at
14  Southeast Unloading from approximately
15  when to when, please?
16     A.  That's hard to say.  I don't
17  even remember the dates.
18     Q.  All right.  When did you
19  leave Southeast Unloading?
20     A.  It was like -- we were up
21  there about three months, I guess.  Two or
22  three months.  And I -- I just came back.
23     Q.  Were you terminated?  Or did

Page 10

1  you just quit?
2      A.  No.  I gave him a notice
3  that I'm going to be going to
4  Pennsylvania.
5      Q.  Oh, okay.  So it's fairly
6  recent.  So you quit maybe in July of this
7  year?
8      A.  Somewhere around there,
9  yeah.
10     Q.  Now, we're in September.
11  August, July.  Do you think it was June or
12  July?
13     A.  Somewhere around June or
14  July, I believe.
15     Q.  June or July is when you
16  quit.  All right.  Had you worked there
17  two years?
18     A.  It might have been longer
19  than two years.
20     Q.  You think it was three
21  years?
22     A.  It would be between two and
23  three years, I think.

Page 11

1      Q.  Do you think it was four
2  year?  I actually don't know.  I was
3  trying to get your best memory.
4      A.  I'm not even sure myself.
5      Q.  What job did you have before
6  Southeast Unloading?
7      A.  Before Southeast, I was on
8  unemployment I believe.  I was working at
9  a die house in Pennsylvania.
10         Then when we came down here,
11  I think that was the first job I got.
12     Q.  Okay.
13     A.  And I stayed with that job
14  the whole time we was down here.
15     Q.  So do you remember when you
16  came back from Pennsylvania that time?
17         Do you think it was '02?  Or
18  '03?  Or '04?  It definitely would have
19  been before '04, I think.
20     A.  Yeah.  Before that.  About
21  '02 -- '01 or '02.
22     Q.  Was it after September,
23  9/11?

Page 12

1      A.  I think it was February when
2  I started.
3      Q.  Do you think it was February
4  after 9/11?  September 11, 2001 when the
5  terrorist attack occurred?
6      A.  Yeah.  We were in
7  Pennsylvania when that happened.
8      Q.  So you said --
9      A.  It was after that when I
10  came down here.
11     Q.  You think it was the
12  February after that?
13     A.  Right.
14     Q.  Okay.  So that's February of
15  '02.  That's when you think you may have
16  started?
17     A.  Right.
18     Q.  So that would mean you
19  worked you worked there over four years?
20     A.  I've -- I've been with them
21  for a while.
22     Q.  Okay.  All right.  What
23  positions did you hold at Southeast

1  Unloading?  Or was it just one position?
2      A.  Just the one position.
3  Unloader.
4      Q.  You were an unloader.
5          Were you ever the person who
6  was in charge of giving out the
7  assignments and running the books?
8          Or was that other people?
9      A.  That was other people.  I
10 was --
11     Q.  You were just an unloader,
12 or a lumper?
13     A.  I was basically a lumper,
14 yeah.
15     Q.  Paid by the truck?
16     A.  Right.
17     Q.  Okay.  And were you always
18 on the grocery side?
19     A.  I was on the dry side first.
20 And then I was -- went over to the
21 freezer.
22     Q.  Okay.  The dry side is the
23 perishable side?

1      A.  No.  I stayed over on the
2  perishable side until I left --
3      Q.  Okay.
4      A.  -- for Pennsylvania.
5      Q.  Okay.  So if you left in
6  June of '06, maybe the year before that.
7          So maybe June of '05, that
8  would have been the year that you were on
9  the perishable side?
10     A.  Uh-huh.
11     Q.  Is that a yes?
12     A.  Yes.
13     Q.  All right.  During the time
14 that you were on the grocery side, was
15 Mr. Miles, Mr. Anthony Miles, always there
16 employed the same time you were?
17     A.  I believe Mr. Miles was
18 employed there before I was.  So he was
19 there before me.
20     Q.  Okay.  Maybe you weren't
21 hired then until February of '03.  Anyway,
22 I guess -- okay.
23          And during the entire time

1          MR. WINSTON:  Grocery, I
2  think.
3      A.  The dry side is groceries.
4      Q.  Dry side is grocery.
5      A.  And then perishable would be
6  the one in Hope Hull.
7      Q.  All right.  So you worked at
8  both?
9      A.  Right.
10     Q.  Did you work at one more
11 than the other?
12     A.  Yeah.  I was in the grocery
13 side the longest.
14     Q.  The grocery side the
15 longest.  All right.  Is that where you
16 were first?
17     A.  Right.
18     Q.  And do you know when it was
19 that you went over to the perishable side?
20     A.  I was over there about a
21 year.
22     Q.  And then were you back on
23 the grocery side?  Or did you stay there?

1  that you were on the grocery side when you
2  were in the Montgomery facility, not the
3  Hope Hull facility, who was the person in
4  charge of running the books and the
5  receipts and the assignments?
6      A.  That was a couple of them.
7      Q.  Okay.  Who were they?
8      A.  There was David.  I don't
9  remember his last name.
10     Q.  David Barnes?  Was it David
11 Gilbert?
12     A.  Gilbert, yeah.  He ran the
13 book for a while.
14     Q.  All right.  Who was after
15 that?
16     A.  There was a Keith.
17     Q.  Keith ran the books for a
18 while?
19     A.  And Ivey had some other guy
20 over there.  I forget what his name was.
21     Q.  Did Arlene ever run the
22 books when you were there?
23     A.  Yeah.  Arlene I think ran

1 the books for a while too.
2     Q.  Did Anthony Miles ever run
3 the books while you were there?
4     A.  Not that I know of.
5     Q.  Did Wayne ever run the
6 books, the dock supervisor?  Wayne G?
7     A.  As far as I know, he did the
8 books over on the perishable side.  But --
9     Q.  He was in Hope Hull?
10     A.  Right.  Wayne was in Hope
11 Hull.
12     Q.  He was in Hope Hull the
13 whole time?
14     A.  I don't think Wayne was over
15 on the grocery side.
16     Q.  Okay.  All right.  So for
17 the year 2004, where were you working?
18          I guess you told me that that
19 whole time you were on the grocery side,
20 right?
21     A.  I was on the grocery side.
22     Q.  So in '04, you were on the
23 grocery side.  And was Mr. Miles over

1 there with you in '04 on the grocery side?
2     A.  I believe he was at that
3 time.  I'm not certain.  Because I guess
4 he was transferred over to the
5 perishables.
6     Q.  Was he?
7     A.  But I don't know when --
8 when that took place.
9     Q.  And is the reason you left
10 the company was to go to care for the
11 family of your wife?
12     A.  Right.  That's -- that's why
13 I left, because I was going to
14 Pennsylvania.  The whole family was moving
15 up to Pennsylvania for that.
16     Q.  All right.  And have you
17 applied to come back to work at Southeast?
18     A.  I haven't even contacted
19 him.
20     Q.  Okay.  So you've not ever
21 tried to return since you quit?
22     A.  No.
23     Q.  And are you employed now in

1 Alabama?
2     A.  I will be starting Monday.
3     Q.  Where are you going to be
4 working?
5     A.  I'm going to be working at
6 Russell's Knitting in Wetumpka.
7     Q.  What do they do there?
8     A.  It's -- I guess they make
9 raw materials and they dye it and finish
10 materials.
11     Q.  Okay.  Ivey Crump, Jr., ran
12 the facilities where you worked when you
13 worked at Southeast Unloading, correct?
14     A.  Yes.
15     Q.  He was the highest-ranking
16 person the whole time, correct?
17     A.  Yes.
18     Q.  Did he treat the employees
19 under him as a whole pretty poorly --
20          MR. WINSTON:  Object to the
21 form.
22     Q.  -- in your opinion?
23     A.  He had his own type of

1 attitude.  It was like he was the boss,
2 and he let you know it.  He did it his
3 way, and that was it.
4     Q.  Okay.  Do you have any
5 reason to think that Mr. Crump was racist
6 in any way?
7     A.  I don't think he was racist.
8 He didn't have any racial remarks that I
9 know of.
10     Q.  You're never aware of him
11 treating black employees worse than white
12 employees, are you?
13     A.  Not really.
14     Q.  And you said you're not
15 aware of him ever making any racial
16 comments or slurs?
17     A.  None that -- none that I
18 heard.
19     Q.  And none that anybody else
20 relayed to you, right?
21     A.  No.
22     Q.  You're not aware of
23 Mr. Crump treating Mr. Miles worse than he

1  treated anybody else, are you?
2     A.  I'm not aware of anything.
3     Q.  You're not aware of
4  Mr. Crump treating any employees -- well,
5  first, let me ask you this:  Are you aware
6  of some employees filing a lawsuit against
7  the company for unpaid wages at some point
8  in 2004?
9     A.  I'm aware of it.  I was
10 called in to receive a check about the
11 unpaid wages, and I accepted the check.
12        And then I found out later
13 that I shouldn't have accepted the check
14 because there's a lawsuit about it --
15 going on about it.  But I had already
16 accepted the check.
17    Q.  Okay.  So did you join that
18 lawsuit?  Is that what you got the check
19 for?
20    A.  No.  The check was for
21 the -- supposedly to be for the unpaid
22 wages.
23    Q.  So you got a check for that?

---

1  you?
2        MR. WINSTON:  Object to the
3  form.
4     Q.  (BY MR. LIGHTFOOT)  You can
5  still answer.  I'm happy to repeat it.
6  That may confuse you.
7        He's allowed to do that.
8  He's allowed to object if there's
9  something about my question he doesn't
10 like, but you still need to answer the
11 question.
12        Would you like me to ask it
13 again?
14    A.  Yeah.
15    Q.  Because he'll probably
16 object again.  All right.  You're not
17 aware of Mr. Crump, Jr., trying to get
18 back at, or retaliate, any employees
19 because they participated in that lawsuit
20 for unpaid wages, are you?
21        MR. WINSTON:  Object to the
22 form.
23    A.  I'm not aware of it.

---

1     A.  I got a certain amount.
2     Q.  Okay.  And did you
3  understand that you were joining into the
4  lawsuit to --
5     A.  No.  That wasn't for the
6  lawsuit.
7     Q.  That wasn't for the lawsuit?
8     A.  No.
9     Q.  Okay.
10    A.  That was from the company
11 for the unpaid wages.
12    Q.  I see.  Are you aware of
13 Mr. Crump, Jr., treating any employees
14 differently or worse that participated in
15 that lawsuit as opposed to any other
16 employees?
17    A.  He kept his business in his
18 office.  And whatever went on in the
19 office I'm not aware of.
20    Q.  Okay.  So you're not aware
21 of Mr. Crump, Jr., retaliating or, you
22 know, trying to get back at any employees
23 that participated in that lawsuit, are

---

1     Q.  Were you aware -- I mean, on
2  occasion did Mr. Crump, Jr., not give some
3  employees their checks as quickly as they
4  wanted them?
5     A.  Pay was given out on a
6  certain day to everybody as far as I know.
7     Q.  Was Wednesday the day that
8  y'all got y'all's checks?  Or do you
9  remember?  Or was there a set day?
10    A.  Usually Thursday, I believe.
11    Q.  Usually Thursday.  Are you
12 ever aware of any employees being upset
13 that they didn't get their check on either
14 the Wednesday or the Thursday because it
15 wasn't given to them until like Friday?
16    A.  Well, sometimes we would be
17 told that the checks didn't come in and
18 had to wait until Friday to -- before we
19 could get them.
20    Q.  I see.
21    A.  There are times that I had
22 to come back to get my check myself.
23    Q.  I see.  Like times they'd be

---

1  late getting in from Florida --
2      A.  Right.
3      Q.  -- where the home office
4  was?
5      A.  Right.
6      Q.  Okay.  Are you aware of
7  Mr. Crump ever holding on to the checks as
8  a means of being mean to the employees,
9  anything like that?
10     A.  Yeah, that's been done.
11 He'd hold the checks until like Friday.
12 Because a lot of people was -- once they
13 got their check, they'd take the next day
14 off.  So he'd hold the check.
15     Q.  To make sure that they'd --
16     A.  They'd come to work.
17     Q.  -- come to work?
18     A.  Right.
19     Q.  Okay.  But he wouldn't do it
20 just to retaliate at somebody or to sort
21 of --
22         MR. WINSTON:  Object to the
23 form.

Page 27

1  lawsuit totally.
2      Q.  Did Mr. Crump ever tell you
3  that he thought you were working too slow?
4      A.  Oh, I was told I needed to
5  pick up the pace.
6      Q.  Did he ever make a statement
7  to you like you're one of the slowest
8  white men I know or something like that?
9      A.  No.
10     Q.  Because that could be
11 interpreted as a racist statement,
12 couldn't it?
13     A.  Right.
14     Q.  So he never said anything
15 like that to you?
16     A.  (Shaking head.)
17     Q.  Is that correct?
18     A.  Right.
19     Q.  Are you ever aware of any
20 employees stealing money from the company
21 in terms of money from drivers?
22     A.  The only one that was
23 handling the monies and books was the

Page 26

1      Q.  -- get even with somebody as
2  far as you know, would he?
3      A.  Not that I know.  He'd hold
4  all the checks as far as I know.
5      Q.  As far as you could tell,
6  did Mr. Crump always treat all the
7  employees the same regardless of their
8  race?
9      A.  I didn't see him treating
10 anybody different because of their race.
11     Q.  As far as you could tell,
12 did Mr. Crump always treat everybody the
13 same whether they participated in that
14 lawsuit or not?
15         MR. WINSTON:  Object to the
16 form.
17     A.  As far as I could tell.
18 Because I wasn't aware of the lawsuit and
19 what was going on with it, who was
20 involved with the lawsuit.
21         So I really didn't know who
22 he would be retaliating against.  Because
23 I didn't know who was involved in the

Page 28

1  person doing the books.
2      Q.  Okay.  So are you aware of
3  any employee ever stealing money from the
4  company?
5      A.  No.  Because we'd be -- we'd
6  collect the money, but then we would have
7  to take it to the person running the book.
8  They'd have to give us a receipt in order
9  to take to the driver.
10     Q.  Okay.
11     A.  So you'd have to give them
12 the money in order to get the receipt.
13     Q.  And every time you got a
14 receipt from the company, would it be an
15 official company receipt?
16     A.  Usually, yeah.  We had a
17 receipt book.
18         (Whereupon, Defendants' Exhibit No.
19 2 was marked for identification purposes
20 by Mr. Lightfoot.)
21     Q.  (BY MR. LIGHTFOOT)  And I'll
22 show you what I'm marking as Defendants'
23 Exhibit 2.

Page 29

1   I'm not showing these for any
2  any particular reason, but what I've
3  marked as Defendants' Exhibit 2 shows some
4  receipts.
5      Do these look like the
6  receipts you used while you were at
7  Southeast Unloading?
8      A.  Yeah.
9      MR. WINSTON:  I was going to
10 let him see them.
11     MR. LIGHTFOOT:  Good point.
12     Q.  (BY MR. LIGHTFOOT)  Do you
13 see how at the end of each of the receipts
14 it has the Southeast Unloading address at
15 the end?
16     A.  Right.
17     Q.  So you recognize these,
18 right?
19     A.  Right.
20     Q.  Are these the receipts you
21 were talking about that were contained in
22 the receipt -- and I don't mean these
23 exact ones, but is this the type of

Page 31

1  Unloading address on it?
2      A.  None that I know of.
3      Q.  Okay.  Like, they were never
4  just blank receipts that didn't have that
5  on it?
6      There never were receipts
7  that looked different, were there?
8      A.  No.  He had a regular
9  receipt book like that.
10     Q.  And they always looked just
11 like this, right?
12     A.  As far as -- as far as I
13 know of.
14     Q.  And when I say this, look
15 like the ones on Defendants' Exhibit 2?
16     A.  Right.
17     Q.  That was the same form?
18     A.  Uh-huh.
19     Q.  Yes?
20     A.  Yes.
21     Q.  Are you aware of any
22 employees ever using a fake, or a bogus,
23 receipt?

Page 30

1  receipt that was in the book?
2      A.  Yes.  Yes.
3      Q.  And so at times whoever it
4  is that would get the money from the
5  driver would hand it to whoever was
6  running the books --
7      A.  And they'd write out a
8  receipt.
9      Q.  -- and they'd write out a
10 receipt?
11     A.  Right.
12     Q.  And that receipt would be
13 given back to you to give to the driver?
14     A.  Right.
15     Q.  Or sometimes the driver
16 would be standing right there?
17     A.  We could either take it out
18 to the driver.  Or if the driver was
19 inside, we'd give it to the driver, and
20 he'd get his bills and his receipt.  And
21 he'd be on his way.
22     Q.  Okay.  And were receipts
23 ever used that didn't have this Southeast

Page 32

1      A.  No.
2      Q.  If an employee used a bogus
3  receipt, like a receipt that didn't have
4  the Southeast Unloading on it, would you
5  think that would be the potential for
6  stealing money if a bogus receipt were
7  used?
8      MR. WINSTON:  Object to the
9  form.
10     A.  Yes.
11     Q.  Would you see how that could
12 happen if a fake receipt were used?
13     A.  If it wasn't a receipt out
14 of the receipt book.
15     Q.  But you're not aware of any
16 employees ever -- you never saw any
17 receipts used other than this kind of
18 form?
19     A.  That's the only receipts
20 I've seen.
21     Q.  During the entire time you
22 worked there?
23     A.  That's what I -- I received

1  those receipts from the bookkeeper, and
2  that's what was given to the driver.
3      Q.   For a period of time, were
4  unloaders allowed to actually solicit the
5  drivers?
6          Let me start over.  For a
7  period of time, were unloaders allowed to
8  talk to the drivers about pricing
9  themselves?
10     A.   Yes.  Yes.
11     Q.   Was that the whole time you
12 were there?
13     A.   We'd let the driver know
14 what the price was for unloading the
15 merchandise, and he'd tell us to unload
16 it.
17     Q.   At some time, did the
18 company say unloaders should no longer
19 talk to customers about pricing unless
20 they have the prior permission of their
21 supervisor?
22     A.   I was never told that.
23     Q.   Okay.  At some point, were

1  similar policy in January of '04?
2      A.   I may have, and I just don't
3  recall it.
4      Q.   You don't recall?
5      A.   (Shaking head.)
6      Q.   And do you recall this being
7  talked about at all, this subject matter?
8      A.   No.  Over in the produce
9  side, Wayne was the only bookkeeper at the
10 time.
11         And he was running the whole
12 dock from one end to the other.  And he
13 couldn't get down in the freezer.  So we
14 were still -- we had to see the drivers
15 ourselves at the freezer department.
16     Q.   Okay.  So it was with
17 Wayne's permission that you were allowed
18 to do that?
19     A.   Yeah.  Because we had to let
20 the driver know what we were going to
21 charge to do the truck.
22         And he'd tell us to do the
23 truck.  We'd get him the receipt, and he'd

1  the unloaders told that only the
2  supervisors were to negotiate prices with
3  the drivers?
4      A.   No one told me that.
5      (Whereupon, Defendants' Exhibit No.
6  1 was previously marked for identification
7  purposes by Mr. Lightfoot.)
8      Q.   (BY MR. LIGHTFOOT)  Okay.
9  Do you ever recall -- I'll show you what's
10 been marked as Defendants' Exhibit 1 to
11 the previous deposition.
12         And I'll just let you have a
13 chance to look at it and read it.  First,
14 I'll just let you read it, and then I'll
15 ask you a couple of questions about it.
16     (Brief pause.)
17     A.   I never received any of that
18 that I know of.
19     Q.   Okay.  You see that
20 Mr. Miles, or at least it looks like
21 Mr. Miles' signature in January of '04?
22     A.   Right.
23     Q.   Do you know if you signed a

1  pay for the job.
2      Q.   Would every transaction,
3  every unloading transaction have to go
4  through Wayne?
5      A.   As far as the receipts, yes.
6      Q.   Okay.  So if an unloading
7  transaction didn't go through Wayne, it
8  was done improperly, correct?
9      A.   Most likely.  But as far as
10 I know, all -- all the receipts were
11 gotten through Wayne.
12     Q.   And Wayne always had the
13 official receipts, right?
14     A.   Right.  He had the receipt
15 book.
16     Q.   Wayne never had blank
17 receipts?
18     A.   Not that I -- not that I
19 know of.  It was all just that type of
20 receipt.
21     Q.   Were you aware that
22 Mr. Miles was terminated?
23     A.   Yes.

1    Q.  How did you learn that?
2    A.  I was working there in the
3 same department.
4    Q.  And did somebody tell you
5 that he had been fired?
6    A.  Yeah.
7    Q.  And who told you?  Do you
8 remember?
9    A.  Not -- I don't remember who
10 let me know.
11    Q.  Did they tell you why he was
12 fired?
13    A.  Illegally soliciting a
14 truck.  Which that's what we were supposed
15 to do is let the driver know what the job
16 was going to cost.  And he'd agree or
17 disagree to do the job.
18    Q.  Did you --
19    A.  We were doing what we were
20 told to do.
21    Q.  Did you know that he had
22 been a part of a deal with a bogus, or a
23 fake, receipt?

Page 38

1        MR. WINSTON:  Object to the
2 form.
3    Q.  (BY MR. LIGHTFOOT)  Did you
4 know that?
5    A.  I didn't know anything about
6 no bogus receipts.
7    Q.  Did you know that the
8 company had determined that he had
9 actually taken money from the company as
10 well?
11        MR. WINSTON:  Object to the
12 form.
13    Q.  (BY MR. LIGHTFOOT)  Did you
14 know that?
15        MR. WINSTON:  Object to the
16 form.
17    A.  No.
18    Q.  Did you know that
19 Mr. Dobbins was involved in this deal?
20        MR. WINSTON:  Object to the
21 form again.
22    A.  I didn't know --
23    Q.  Did you know that --

Page 39

1    A.  -- Anthony was involved.  So
2 I wouldn't know who else would have been
3 involved.
4    Q.  Well, you knew Mr. Miles was
5 terminated, right?
6    A.  Right.
7    Q.  Did you know there was
8 another employee named Mr. Dobbins who was
9 terminated for the same incident?
10        MR. WINSTON:  Object to the
11 form.
12    Q.  (BY MR. LIGHTFOOT)  I may be
13 getting the name wrong.  Did you know
14 there was another employee terminated?
15    A.  I believe -- I believe it
16 was, yeah.  But I was under the impression
17 it was for illegally soliciting a truck,
18 which we weren't illegally soliciting
19 because that's what we were told to do is
20 let the driver know what the job is going
21 to cost.
22        Then when we were finished
23 with the job, he'd give us the money.

Page 40

1 We'd get the receipt.  He'd get his bills,
2 and he'd be on his way.
3    Q.  If Mr. Miles and Mr. Dobbins
4 were a part of a deal where money was
5 taken from a driver and that money was not
6 given to the company and a fake receipt
7 was given to the driver, you wouldn't have
8 a problem with them being terminated for
9 that, would you?
10        MR. WINSTON:  Object to the
11 form.  Hypothetical question.  We object
12 to the relevance of it.
13    A.  I wasn't aware of any of
14 that.
15    Q.  Right.  But I'm telling you:
16 If you knew those facts, you wouldn't have
17 any problem with them being terminated for
18 that, would you?
19        MR. WINSTON:  Object to the
20 form.
21    A.  That's the company's
22 discretion.
23    Q.  You would think that

Page 41

1 stealing from the company would be wrong,
2 wouldn't you?
3    A.  Yes.
4    Q.  And using a fake receipt
5 would be wrong, wouldn't it?
6    A.  Yes.
7    Q.  And not giving money to the
8 company that had been gathered from a
9 driver would be wrong, wouldn't it?
10   A.  Yes.
11   Q.  Are you aware of the company
12 ever discriminating against Mr. Miles on
13 the basis of his race?
14      MR. WINSTON:  Object to the
15 form.
16   A.  Not because of his race.
17 No, I don't think so.
18   Q.  Did you ever know that that
19 lawsuit for unpaid wages that some of the
20 employees had that we've talked about a
21 little earlier, you knew that lawsuit was
22 resolved at some point, right?
23   A.  No.

Page 42

1    Q.  You didn't?
2    A.  I didn't know if that was
3 ever resolved or not.
4    Q.  Are you aware of your pay
5 not being handled correctly?  You not
6 being paid for all the time that you
7 worked after the time of that lawsuit?
8      In other words, do you have
9 any complaints about your pay after the
10 time of that lawsuit?
11   A.  Well, I think that's when
12 the pay went to every two weeks or
13 something.  And I had problems with that.
14   Q.  Yeah.  You would rather it
15 have been every week?
16   A.  Yeah, weekly pay.  Which
17 considering the pay, we were already weak.
18   Q.  I understand.  But my
19 question goes more to being paid for the
20 time you actually worked.
21      Do you think you were paid
22 correctly from '04 until you quit in '06
23 as far as you know?

Page 43

1    A.  As far as I know.  I really
2 didn't calculate my checks.
3    Q.  Okay.  Are you aware of the
4 company not paying anybody else properly
5 from '04 until '06?
6    A.  That's why the -- we were
7 called in for the pay adjustment or
8 something.  The checks were given out
9 because of the unpaid wages as far as I
10 was aware of.
11   Q.  Right.  I think that was in
12 August or September of '04.  I'll just
13 represent that to you.  I think that's
14 about when that happened.
15      Since that time, are you
16 aware of any employees not being paid
17 properly or being paid the full amount at
18 Southeast Unloading?
19   A.  Well, everybody had
20 different rates that they were getting
21 paid by.
22   Q.  I got you.  As far as you
23 know, was anybody not paid --

Page 44

1    A.  As far as I know, they were
2 getting what they were supposed to be
3 getting.  I don't know.
4    Q.  Okay.  That's my question.
5 And that would include Mr. Miles, right,
6 as far as you know?
7      MR. WINSTON:  Object to the
8 form.
9    A.  As far as I know.  I'm not
10 aware of their rates and what they were
11 getting paid.
12   Q.  I can't remember if I've
13 asked this or not.  I think I have, but
14 just bear with me.
15      Are you aware of the company
16 retaliating against any employees or
17 trying to get back at any employees
18 because they were a part of that lawsuit?
19   A.  No.
20   Q.  Have you ever spoken to
21 Mr. Miles or his lawyer or an investigator
22 for him about this lawsuit?
23   A.  I talked to someone a while

1 back.
2    Q. Who was it?
3    A. But I don't even remember
4 who that was. It was about the lawsuit.
5    Q. Was it Mr. Miles?
6    A. No. It was an attorney.
7 But I don't know where that ever went.
8    Q. Was it about this lawsuit?
9 Or was it about that unpaid-wage lawsuit?
10    A. I believe it was the unpaid
11 wages back then is who I talked to.
12      But I don't know where that
13 ever went. Because I had signed for the
14 check and accepted the amount that they
15 had given me and never got involved in
16 that lawsuit.
17    Q. Did you ever hear Mr. Crump,
18 Jr., talk in a condescending way to any
19 employees?
20    A. What do you mean?
21    Q. Talked to them like children
22 or to kind of be mean to employees in an
23 excessive way?

1    A. No.
2    Q. That would include
3 Mr. Miles, wouldn't it? You didn't hear
4 him talk to Mr. Miles in that way?
5    A. He'd take -- if he had
6 somebody he wanted to talk to, he'd take
7 them outside or somewhere else. He
8 wouldn't do his business in front of the
9 rest of the floor.
10    Q. Did you think that Mr. Crump
11 always treated all the employees that
12 worked under him with respect?
13    A. Not fully.
14    Q. There were times that he
15 didn't?
16    A. Yeah. There are times that
17 he'd disrespect me too.
18    Q. So sometimes he disrespected
19 you, and sometimes he disrespected other
20 employees?
21    A. I'm sure he did.
22    Q. Were you in contact with
23 Mr. Crump on a daily basis?

1    A. No.
2    Q. Weekly basis?
3    A. Every weekly. Get my
4 paycheck. And if I had a problem, that
5 would be it. I wouldn't -- I'd deal with
6 the bookkeeper and do my job.
7    Q. You didn't actually witness
8 any of the events that led to Mr. Miles'
9 or Mr. Dobbins' termination, did you?
10    A. Bogus check, no.
11    Q. Did you ever hear Mr. Miles'
12 or Mr. Dobbins' side of the story?
13      Did you ever talk to them
14 about it?
15    A. Not really. Because I
16 just -- with that truck coming in,
17 everybody had their own truck to do.
18 Like, I'd be working on this truck. He'd
19 be working down the dock on another truck.
20      So what was going on down
21 there, I wasn't aware of because I was
22 busy working on my truck.
23    Q. Did you ever write the

1 receipt yourself?
2    A. There was a time that I was
3 filling in until he could get a regular
4 bookkeeper.
5    Q. So the general rule was
6 what? That Wayne always filled out the
7 receipts?
8    A. Whoever was the --
9    Q. Or whoever --
10    A. Whoever was doing the books
11 would have the receipt book and the list
12 of trucks that were being done.
13    Q. And it was just one person
14 who would be in charge?
15    A. Usually, one person was
16 running the whole dock, yeah.
17    Q. On any given day?
18    A. Yeah.
19    Q. Well, was anybody else ever
20 allowed to do receipts, to fill out the
21 receipts themselves?
22    A. The bookkeeper had the
23 receipt book with the books.

Page 49

1  (Whereupon, Defendants' Exhibit
2  Nos. 3 & 4 were marked for identification
3  purposes by Mr. Lightfoot.)
4     Q. (BY MR. LIGHTFOOT) Let me
5  show you these two documents, Defendants'
6  Exhibit 3 and 4. What I'm marking as
7  Defendants' Exhibit 3 and Defendants'
8  Exhibit 4 are, it looks like statements.
9        If you want to take a minute
10 and read both of them, please.
11    (Brief pause.)
12       MR. LIGHTFOOT: I didn't
13 bring you a copy. I assume you've seen
14 them many times.
15       MR. WINSTON: Once anyway.
16    A. I remember that. This I'm
17 not sure about.
18    Q. Yeah. I can hardly
19 understand that one.
20       MR. WINSTON: Object.
21    Q. (BY MR. LIGHTFOOT) But you
22 can take your time.
23    A. I don't even remember him

Page 50

1  making a statement about the threats. But
2  we were authorized to -- through Wayne to
3  talk to the drivers.
4     Q. Because Wayne couldn't cover
5  all fifty-three doors?
6     A. Right. He couldn't.
7     Q. So he would let you --
8     A. Right.
9     Q. -- or let some of the
10 unloaders do his job?
11    A. Right. Since he couldn't be
12 down -- down in the freezer and up on the
13 produce dock at the same time, he had
14 to -- he'd let us talk to the drivers,
15 give them a price and go from there.
16    Q. All right. Let me ask you
17 about the one you do recognize.
18    A. I agree with that.
19    Q. Okay. What I've marked as
20 Defendants' Exhibit 4 is a statement.
21 It's dated November 22nd, 2004 and it
22 starts off with To Whom it May Concern.
23        And it talks about how

Page 51

1  several unloaders were authorized to
2  solicit drivers, correct?
3     A. Right.
4     Q. And you signed this,
5  correct?
6     A. Right.
7     Q. Who wrote this? Who
8  presented it to you?
9     A. I believe that was given to
10 me by Anthony Miles.
11    Q. All right. And where were
12 you?
13    A. I believe he met us at the
14 job.
15    Q. Okay. Did he call you and
16 Chris Morman together?
17    A. He might have talked to us
18 at separate times. But he showed me the
19 paper. I read the paper.
20        And yes, I was authorized by
21 Wayne to solicit the driver or talk to the
22 price over with the driver.
23    Q. Okay. And so --

Page 52

1     A. So I agreed that yeah,
2  that's true. So I signed it.
3     Q. That's a true statement so
4  you signed it. This was after Mr. Miles
5  had been terminated, correct?
6     A. Yes.
7     Q. Did he come back onto the
8  site and ask you to sign this? Where were
9  y'all?
10    A. I was over at the produce
11 section.
12    Q. All right. So he came back
13 onto the site?
14    A. Not in the -- on the
15 property but probably to the parking lot
16 and met me. I'm not sure if that's where
17 he presented it to me.
18        I agreed that yeah, I was
19 authorized and he was authorized to do the
20 same thing. Because he was down in the
21 freezer department with me.
22    Q. Had he told you he would be
23 asking -- had he called you before and

Page 53

1  told you he would be asking to sign this
2  statement?
3      A.  Concerning that, yes, he
4  talked to me.
5      Q.  Was Chris Morman with y'all?
6      A.  He worked in the freezer
7  department also, yes.
8      Q.  I mean, was he kind of with
9  y'all when he was getting you to sign
10  this?
11     A.  I don't remember if he was
12  there at the same time or if it was done
13  at a different time.
14     Q.  Okay.  Did Mr. Miles ask you
15  if you would be a witness for him?
16     A.  Yes.
17     Q.  Did he tell you he was going
18  to file a lawsuit?
19     A.  Yes.
20     Q.  Okay.  And he never talked
21  with you about fake, or bogus, receipts,
22  did he?
23     A.  No.  Because like I said,

Page 55

1      Q.  You never saw a receipt used
2  like this though, like in Defendants'
3  Exhibit 5, did you?
4      A.  I'm not sure of that.  I'm
5  more familiar with the ones that's stamped
6  Southeast Unloading.
7      Q.  Which are on Defendants'
8  Exhibit No. 2?
9      A.  Right.
10     Q.  In fact, didn't you say
11  you've never seen receipts used other than
12  the type that's here on Defendants'
13  Exhibit 2?
14         MR. WINSTON:  Object to the
15  form.
16     Q.  (BY MR. LIGHTFOOT)  Correct?
17     A.  When I was covering the
18  books, those are the receipts I used.
19     Q.  Yeah.  And even when you
20  weren't covering, when Wayne was doing
21  them and was giving them to you and
22  sometimes you'd give them to the
23  drivers --

Page 54

1  all the receipts were gotten through
2  Wayne.
3      Q.  And he never talked with you
4  about stealing money from the company, did
5  he?
6      A.  No.
7         (Whereupon, Defendants' Exhibit No.
8  5 was marked for identification purposes
9  by Mr. Lightfoot.)
10     Q.  (BY MR. LIGHTFOOT)  What I'm
11  marking as Defendants Exhibit 5, does that
12  look like a bogus, or fake, receipt to
13  you --
14         MR. WINSTON:  Object to the
15  form.
16     Q.  -- in terms of what a
17  Southeast Unloading receipt is opposed to
18  look like?
19     A.  They could have used --
20  well, there's times that the books were --
21  they didn't have a receipt book.  And they
22  may have used a receipt like that.  I'm
23  not sure.

Page 56

1      A.  He'd have a receipt book.
2      Q.  -- it was always an official
3  receipt?
4      A.  Right.  But if they were out
5  of receipt books at the time, they could
6  have used it.  I don't know.
7      Q.  Well, you're guessing now,
8  right?
9      A.  Right.
10     Q.  So all you know is that the
11  receipt here on Defendants' Exhibit 5 is
12  not anything you've ever seen used at
13  Southeast Unloading, correct?
14     A.  No.
15     Q.  I mean, that is correct,
16  right?
17     A.  Right.
18     Q.  All right.  Now, the
19  statement that's on Defendants' Exhibit 3,
20  you don't recognize that, correct?
21         MR. WINSTON:  Object to the
22  form.
23     A.  I do.  But there's parts of

1  it that --
2     Q.  You don't have any knowledge
3  of?
4     A.  As far as started threats
5  or --
6     Q.  You don't know anything
7  about that?
8     A.  I -- I don't know of him
9  starting threats or making threats.
10    Q.  All right.  But you were
11  saying that the part that you can agree
12  with is basically the same thing that's on
13  this statement --
14    A.  Right.
15    Q.  -- which is about
16  soliciting?
17    A.  We were -- we were told to
18  talk to drivers, give them the prices and
19  they'd agree or disagree for us doing the
20  job.
21    Q.  Right.  Where it says here
22  he asked us and other employees to help
23  with pricing trucks, collecting checks and

1     A.  I remember signing it.  But
2  there are certain parts on there that I
3  don't remember him making threats.
4     Q.  Okay.  All right.  And when
5  was it that you signed this statement, the
6  one that's on Defendants' Exhibit 3?
7     A.  Probably it was more than
8  likely with the same -- with the other
9  one.
10    Q.  That one is dated November
11  22nd, 2004.  This one, it appears that a
12  notary signed it on November 21st, and I
13  guess that's 2004.
14         So do you remember signing a
15  second statement?
16    A.  I signed it.  So -- but it
17  was basically about the same thing as far
18  as soliciting a driver, or giving a driver
19  the price of the trucks and all that.
20    Q.  Are you aware of any
21  information at all other than what we've
22  talked about here today that would in any
23  way support -- let me start over.

1  cash as well as giving out receipts which
2  today Ken Hirneisen not only does but
3  writes in the tax identification number as
4  well --
5     A.  Right.
6     Q.  -- where is the tax
7  identification?
8         Is that written in somewhere?
9  Do you know what they're talking about
10  here?  Don't know?
11    A.  The tax ID number wasn't on
12  the receipt.
13    Q.  Okay.  So you don't know
14  what this is talking about?
15    A.  I don't think it was on the
16  receipt.  No.  I know the tax ID number.
17  That was written in the receipt book, but
18  it wasn't on the receipt unless the driver
19  specifically asked for the tax ID number.
20    Q.  Okay.  You say you don't
21  recall signing this statement?
22    A.  No.  I --
23    Q.  You recall signing it?

1         Do you know exactly what
2  Mr. Miles' lawsuit is against the company
3  for?
4     A.  Being fired for soliciting a
5  truck illegally is what I was under the
6  knowledge of.
7         He was fired illegal, or not
8  illegal but wrongfully fired for the same
9  thing that we were told to do.
10    Q.  Okay.  And he's made a claim
11  related to his termination saying he was
12  discriminated against based on the basis
13  of race relating to his termination like
14  you're talking about.  He also made a
15  claim for unpaid wages.
16         He's also made a claim for --
17  he claims he was retaliated against for
18  participating in that unpaid-wage lawsuit.
19  All right.  So those are the claims in his
20  lawsuit generally speaking.
21         Are you aware of any
22  information from any source other than
23  what we've talked about here today that

Page 63

1 supports Mr. Miles' claims?
2    A.  I don't know what all of his
3 claims are.
4    Q.  Okay.  I just told you sort
5 of the short version of what his claims
6 are.
7    A.  Right.
8    Q.  Do you have any other
9 information --
10    A.  No.
11    Q.  -- relating to those in any
12 way that you can think of?
13    A.  No.
14    Q.  The deposition notice that
15 was served on you a few days ago also
16 mentioned any documents that you have.
17        Do you have any documents
18 that relate to the claims made in this
19 lawsuit at all?
20    A.  I don't think so.
21    Q.  Do you think you've signed
22 any other statements other than the two
23 that I've shown you here today?

1 is tell the driver what the price is of
2 the truck and do the job.
3    Q.  Okay.  And do you know where
4 Mr. Morman lives now?
5    A.  Where he lives?
6    Q.  Yes.
7    A.  I have no idea.
8    Q.  Does he still work for the
9 company?
10    A.  I'm not -- I haven't been in
11 contact with Chris since I left the place.
12    Q.  Okay.
13        MR. LIGHTFOOT:  No further
14 questions.
15        MR. WINSTON:  I just have a
16 few follow-up questions.
17        EXAMINATION
18 BY MR. WINSTON:
19    Q.  First, do you know if you
20 were being paid -- at the time you left
21 the company, do you know if the company
22 was paying you for times that you were
23 waiting and not unloading trucks?

Page 62

1    A.  I don't think so.  Just what
2 I'm aware of as far as the solicitation of
3 the trucks.
4    Q.  Do you recall whether you
5 talked with -- who did you talk with at
6 Southeastern about the reason for his
7 termination, Mr. Miles?
8    A.  It was probably Chris
9 Morman.
10    Q.  So when you heard what he
11 had been fired for, it was hearing it from
12 Chris Morman?
13    A.  Probably, yeah.  Because
14 that's who was working down in the freezer
15 was me.  Chris at the time.
16    Q.  And he said something like
17 Mr. Miles was fired yesterday?  Or
18 something like that?
19    A.  Well, he said he was fired
20 for soliciting a truck.  I said, well, we
21 all do that.
22    Q.  Okay.
23    A.  That's what we're told to do

Page 64

1    A.  As far as --
2    Q.  In 2006?
3    A.  As far as I know, we were
4 getting paid by what we were unloading.
5    Q.  Do you ever recall any of
6 your paychecks in the year 2006 reflecting
7 any time for wait time?
8        MR. LIGHTFOOT:  Objection.
9    A.  I don't know of any wait
10 time.
11        MR. LIGHTFOOT:  That's
12 irrelevant to this lawsuit.
13    Q.  (BY MR. WINSTON)  Do you
14 still retain -- do you have any paychecks
15 retained?
16        MR. LIGHTFOOT:  Objection.
17 Irrelevant to this lawsuit.
18    A.  I may.
19    Q.  Do you know what was
20 required as part of the settlement of the
21 other lawsuit?
22    A.  What do you mean what was
23 required?

1    Q. Did you know -- did you ever
2 see any -- you said you got one check.
3 That the company came to you and said we
4 haven't done your pay right, right?
5 That's what you said from your earlier
6 testimony.
7    A. One check was given to me
8 for unpaid wages.
9    Q. Do you recall how much that
10 check was for?
11    A. Like six hundred dollars.
12    Q. And after that time, did you
13 ever get any other checks from the
14 company?
15    A. No. Just my regular
16 paycheck.
17    Q. Did the company explain to
18 you what was unpaid about your wages that
19 they come and give you another check for
20 six hundred dollars?
21    A. No. They just said that it
22 was -- they explained something, but I'm
23 not sure how it was explained or what.

1    MR. LIGHTFOOT: Objection.
2 Irrelevant to this lawsuit.
3    A. Probably. Sometimes we had
4 to wait for a truck to come in.
5    Q. And explain what does it
6 mean to wait for a truck to come in.
7    A. Well, they'd be running
8 late.
9    Q. Okay.
10    A. And we had to sit there and
11 wait until they got there.
12    Q. What time would you
13 typically start?
14    A. Like six in the morning.
15    Q. Six in the morning. If the
16 truck was -- how late could you stay?
17    How late do you ever recall
18 staying there to wait for a truck?
19    A. We'd stay as long as
20 Winn-Dixie would stay.
21    Q. Okay. Which is at --
22    A. If Winn-Dixie says wrap it
23 up, they're not waiting, then we could

1    Q. And you said -- are you the
2 type of person that sits there and
3 examines your paycheck?
4    A. Not usually.
5    Q. You take it to the bank,
6 cash it and move on?
7    A. I try to figure out what --
8 we were getting paid by the load.
9    Q. Okay.
10    A. So I was keeping track of
11 each truck of what I did and how much I
12 should have got.
13    Q. Okay.
14    A. But as far as hourly or wait
15 time, I don't -- I don't recall getting
16 any pay for wait time.
17    Q. What about being paid for
18 overtime?
19    A. As far as I know, it was
20 just paid by the truck.
21    Q. Well, in 2006, were you
22 there for more than forty hours in any
23 given week?

1 leave. We had to wait until Winn-Dixie
2 gave us the okay to leave.
3    Q. Do you ever recall staying
4 there as late as five or six at night?
5    A. Yes.
6    Q. And you had started at six
7 in the morning?
8    A. Yes.
9    Q. And at the time you left,
10 just so I understand your testimony, you
11 don't recall receiving any time for wait
12 time; just simply --
13    A. I was getting paid by the
14 load.
15    Q. Was there -- at the time you
16 left, was a time clock to clock in and out
17 on?
18    A. No.
19    Q. Did you sign any log book
20 when you got there in the morning?
21    A. We had -- at the -- when I
22 left, we were working -- you had to sign a
23 sheet for a load.

Page 71

1    Q.   Okay.
2    A.   They went who was next in
3 line to do a load. You'd sign your name
4 as soon as you got there.
5    Q.   As soon as you got there?
6    A.   To get -- to get on the
7 load -- load list.
8    Q.   Okay.
9    A.   When you came in, you signed
10 the sheet for a load.
11    (Whereupon, Plaintiff's Exhibit No.
12 1 was marked for identification purposes
13 by Mr. Winston.)
14    Q.   (BY MR. WINSTON) Let me
15 show you what I'm going to mark which has
16 previously been marked as Southeast
17 Unloading Document 92. It's just an
18 example.
19       Do you recall signing
20 something called the Daily Sign-in Sheet
21 Unloading where you were just sort of like
22 clocking in and how long you had worked
23 there that day?

1    A.   Yes.
2    Q.   And it's your understanding
3 that you were authorized to solicit
4 drivers?
5    A.   Talk to the driver, give
6 them a price, yes.
7    Q.   And get the money from the
8 driver and turn it in?
9    A.   Right.
10    Q.   And you weren't terminated
11 for that?
12    A.   No.
13    Q.   In fact, that was what -- as
14 you testified, that was part of your daily
15 job duties?
16    A.   Right.
17    Q.   Looking at Defendants'
18 Exhibit No. 3, is that your signature
19 there?
20    A.   Yes.
21    Q.   Do you ever recall going to
22 a law office and meeting with anyone about
23 signing a document?

Page 70

1    A.   Okay. Yeah. Yeah. We'd
2 sign the time we came in.
3    Q.   Was the time you left on
4 there? Or would you just sign when you
5 got there?
6    A.   The time you left.
7    Q.   So when you signed the
8 document, was it completed? Or had it
9 only been partially filled out? Or do you
10 recall?
11    A.   It would be the time in and
12 time out.
13    Q.   Okay. And did you sign this
14 every day in the year 2006, do you know,
15 that you worked?
16    A.   Yeah. I believe I did.
17       MR. LIGHTFOOT: Same
18 objection.
19    Q.   (BY MR. WINSTON) Now, it's
20 my understanding you were a lumper,
21 correct?
22    A.   Yes.
23    Q.   And your race is white?

Page 72

1    A.   Yes, I did. But I -- I
2 don't remember the office or who it was at
3 the time.
4    Q.   And you said you don't
5 recall the first part of this statement
6 but you recall the second part?
7    A.   As far as us being given
8 authorization to talk to drivers, yes, I
9 remember that. As far as Mr. Crump --
10    Q.   Saying something to the
11 effect --
12    A.   -- and Anthony Miles and
13 making threats, I never heard him make a
14 threat. If it was said, it wasn't said in
15 front of me.
16    Q.   And how is -- do you recall
17 your start date?
18       How would you characterize
19 your memory? Would you say it's very
20 good? You forget things from time to
21 time? Or --
22       MR. LIGHTFOOT: Objection.
23    A.   Forgetful.

Page 73

1  Q.  Forgetful?
2  A.  (Nodding head.)
3  Q.  You would characterize
4 yourself as forgetful?
5  A.  (Nodding head.)
6      MR. LIGHTFOOT:  Objection.
7  Q.  (BY MR. WINSTON)  And you
8 need to answer out loud.
9  A.  Yes.
10  Q.  Let me ask you this:  Did
11 Robert Dobbins ever hand you receipts to
12 give to drivers?
13  A.  Not that I'm aware of.
14 Unless it was he -- he -- he got a receipt
15 from Ivey -- from Wayne and told me to
16 take it out to the driver.
17  Q.  Okay.  Do you ever recall an
18 occasion when you would have given any
19 money to Robert or asked him to go get the
20 receipt from Wayne and then he give you
21 the receipt and then you give it to the
22 driver?
23  A.  I -- if I did a truck, I

Page 74

1 collected the money.  I'd take it to Wayne
2 myself.  I always took the money up, got
3 the receipt, took it out to the driver
4 with his bills.
5  Q.  Do you ever recall Mr. Crump
6 or anybody saying anything to Mr. Miles
7 about calling Florida?
8  A.  About Miles calling Florida?
9  Q.  Yes.  Miles calling Florida.
10  A.  I didn't hear Ivey say
11 anything about Miles calling Florida.
12  Q.  Did you ever hear any
13 employee, either Mr. Crump or --
14  A.  I called Florida.
15  Q.  You called Florida?
16  A.  Because I had a problem with
17 Ivey at a time.  But at this time, I can't
18 recall what it was about.  But I've called
19 Florida on a disagreement with Ivey.
20  Q.  And how did it get resolved
21 if you can recall?
22  A.  Someone came up from Florida
23 and had a talk with Ivey.  And the next

Page 75

1 day Ivey was talking real nice to me.
2  I don't know what was said
3 between the person that came up from
4 Florida.  But they came up from Florida
5 and had a talk with Ivey about what was
6 going on or what my dispute was about.
7  But the next day Mr. Crump
8 was back to talking respectful to me
9 again.  It's like I wasn't wrong for what
10 was going on.  And I called Florida about
11 a dispute I had with Ivey.
12      MR. WINSTON:  That's all I
13 have.
14      EXAMINATION CONTINUED
15 BY MR. LIGHTFOOT:
16  Q.  Just a quick question.  Any
17 question that you've answered that I've
18 asked you, if you recalled it, you
19 answered to the best of your recollection,
20 correct?
21  A.  Right.
22  Q.  And if you didn't, then you
23 said I didn't recall, right?

Page 76

1  A.  Right.
2  Q.  Okay.
3      MR. LIGHTFOOT:  No further
4 questions.
5      MR. WINSTON:  I just have
6 one.
7      EXAMINATION CONTINUED
8 BY MR. WINSTON:
9  Q.  Are you taking any medicines
10 today that affect your ability to recall
11 anything?
12  A.  No.
13      MR. WINSTON:  That's all I
14 have.
15
16  * * * * * * * * * * * * * * * *
17  FURTHER DEPONENT SAITH NOT
18  * * * * * * * * * * * * * * * *
19
20
21
22
23

Page 77

1  REPORTER'S CERTIFICATE
2
3  STATE OF ALABAMA:
4  MONTGOMERY COUNTY:
5
6      I, Rena' Messick Lanier, Court
7  Reporter and Commissioner for the State of
8  Alabama at Large, do hereby certify that
9  the above and foregoing transcript of the
10  proceedings in the matter of:
11  ANTHONY MILES,
12  Plaintiff,
13  VS
14  SOUTHEAST UNLOADING, LLC, AND IVEY CRUMP,
15  JR.,
16  Defendants,
17  CASE NUMBER:
18  2:05-cv-00922-M
19  was reported by me on the 22nd day of
20  September, 2006.
21      I further certify that the
22  foregoing seventy-six computer-printed
23  pages contain a true and correct

Page 78

1  transcript of the proceedings held in this
2  matter.
3      I further certify that I am
4  neither of kin nor of counsel to the
5  parties to said cause, nor in any manner
6  interested in the results thereof.
7      This the 25th day of September,
8  2006.
9
10      _____
11      Rena' M. Lanier, Court
12      Reporter and Commissioner
13      for the State of Alabama
14      at Large
15
16
17
18
19
20
21
22
23

 

**SOUTHEAST UNLOADING**

# UNAUTHOTIZED SOLICITATION OF DRIVERS

Unloaders are not allowed to approach drivers, dispatchers, customers or potential customers without prior authorization from management. Only supervisors are to negotiate rates / prices for the unloading services or any other service that Southeast Unloading L.L.C. provides or may provide.

Any employee in violation of this policy will be subject to disciplinary action and/or termination from the company.

By signing below, I fully understand and agree to abide by the above policy.

_Anthony R Miles_ _____ _1-15-04_
Employee Name          Employee Signature          Date

DEFENDANT'S EXHIBIT
Barker 1

SEUL 0036

**DEFENDANT'S EXHIBIT**

2-miles

**RECEIPT**

SOUTHEAST UNLOADING, LLC
11934 W. BEAVER STREET
JACKSONVILLE, FL 32220-1743
T:904-786-2886 F:904-786-4023
MONTGOMERY DIVISION

DATE: 8-6-04          009404

RECEIVED FROM: Nelson

ADDRESS:

DOLLARS $ 100

FOR: One hundred +

| ACCOUNT | | HOW PAID | | |
|---|---|---|---|---|
| AMT. OF ACCOUNT | | CASH | 100 | 00 |
| AMT. PAID | | CHECK | | |
| BALANCE DUE | | MONEY ORDER | | |

BY: WS

---

**RECEIPT**

SOUTHEAST UNLOADING, LLC
11934 W. BEAVER STREET
JACKSONVILLE, FL 32220-1743
T:904-786-2886 F:904-786-4023
MONTGOMERY DIVISION

DATE: 8-6-04          009405

RECEIVED FROM: Clark Farms

ADDRESS:

DOLLARS $ 40

FOR: Forty +

| ACCOUNT | | HOW PAID | | |
|---|---|---|---|---|
| AMT. OF ACCOUNT | | CASH | | |
| AMT. PAID | | CHECK | | |
| BALANCE DUE | | MONEY ORDER | | |

BY: WS

---

**RECEIPT**

SOUTHEAST UNLOADING, LLC
11934 W. BEAVER STREET
JACKSONVILLE, FL 32220-1743
T:904-786-2886 F:904-786-4023
MONTGOMERY DIVISION

DATE: 8-6-04          009406

RECEIVED FROM: Carnell

ADDRESS:

DOLLARS $ 80

FOR: Eighty +

| ACCOUNT | | HOW PAID | | |
|---|---|---|---|---|
| AMT. OF ACCOUNT | | CASH | | |
| AMT. PAID | | CHECK | 80 | 00 |
| BALANCE DUE | | MONEY ORDER | | |

BY: WS

---

**RECEIPT**

SOUTHEAST UNLOADING, LLC
11934 W. BEAVER STREET
JACKSONVILLE, FL 32220-1743
T:904-786-2886 F:904-786-4023
MONTGOMERY DIVISION

DATE: 8-6-04          009407

RECEIVED FROM: Ore Murry

ADDRESS:

DOLLARS $ 40

FOR: Forty +

| ACCOUNT | | HOW PAID | | |
|---|---|---|---|---|
| AMT. OF ACCOUNT | | CASH | 40 | 00 |
| AMT. PAID | | CHECK | | |
| BALANCE DUE | | MONEY ORDER | | |

BY: WS

**DEFENDANT'S EXHIBIT**

2 Hineisen

SOUTHEAST   UNLOADING
/ EEOC   00204



DEFENDANT'S EXHIBIT

*8 - Miles*

To whom it may concern:

This document is to affirm that upon signing the law suit filed for unpaid wages Mr. Ivey crump JR not only started threats " I'll get you miles etc." but managed to fire all employee's listed on law suit . Since the settlement of this law suit for unpaid wages all employee's that have contact with law suit employee's have been meet with unfair requests. According to southeast unloading supervisor Rester a dock supervisor gets more money for doing the books which is a privilege. (The books meaning asking truck drivers if they would like the service To unload their truck for a price or do the truck themselves.) Wayne the dock Supervisor asked myself as well as the other employee's to help with pricing trucks collecting checks and cash as well as giving out receipts which today Ken Himaisen not only does but writes in the tax Identification number as well. He does this for no pay as a reasonable request as Anthony Miles , Robert Dobbins, Christopher Morman were doing as per Wayne the dock supervisor Requested the day Anthony Miles was suspended. Wayne travels to the freezer dock 8 to 10 times a day to collect cash ,checks from the above mentioned employee's which is 10 to 12 hours or more a work day for Wayne dock supervisor.

DEFENDANT'S EXHIBIT

Hirneisen 3

Kenneth Hirneisen

ANTHONY R. MILES

Christopher Morman

NOTARY: Wanette T Booky
Commission Date : 11-21-2007



November 22, 2004

To Whom It May Concern,

This letter is to inform you that Anthony Miles, Chris Morman, Kenneth Hirnaisen and Robert Dobbins were authorized to solicit drivers. The company supervisor Wayne Geinweinhardt is the one who would authorize the above employees to collect cash, checks and write up trucks on TI x HI sheets. Wayne Geinweinhardt gave each of the above employees receipts to give to the truck drivers on a daily basis, as well as give to other employees in reference to trucks collected on.

*Chris Morman*

*Kenneth Hirneisen*

*Anthony K Miles*




DEFENDANT'S
EXHIBIT
5 - Miles

No. _____                                    10/25 20 04

Received from ___ Winn Dixie Lumber _____

___ Seventhy _____ Dollars
                                              100

| Amt of Account | | |
|---|---|---|
| Amt Paid | 70 | 00 |
| Balance Due | | |

420-31-91.18

$ 70 00    Charles shaw


DEFENDANT'S
EXHIBIT
Himeisen 5

PLAINTIFF'S EXHIBIT

Himeisen

## SOUTHEAST UNLOADING

### DAILY SIGN-IN SHEET
### UNLOADING

RECEIPTS USED _____

LOGS USED _____

DEPARTMENT: **PERISHABLE** _____

DATE: 10-1-04 _____

| M T W T F S S | NAME | TIME IN | LUNCH | TIME OUT | TOTAL HOURS | DAILY TOTAL | SIGNATURE |
|---|---|---|---|---|---|---|---|
| | ANTHONY MILES | 7:00 | 11:00 12:00 | 4:45 | 8.75 | | |

| | | | | INV | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | CASH/CHECK | | | | | |
| | | | | TOTAL | | | Total | | |

COMMENTS

_____

_____

_____

SEUL 0092