# FREEDOM COURT REPORTING

Page 1

```
 1      UNITED STATES DISTRICT COURT
        MIDDLE DISTRICT OF ALABAMA
 2           SOUTHERN DIVISION

 3   ANTHONY MILES,

 4      Plaintiff,

 5          CIVIL ACTION NUMBER

 6   VS.      2:05 CV 922 M

 7   SOUTHEAST UNLOADING, L.L.C.; IVEY CRUMP,
     JR.,
 8
 9      Defendants.

10

11   VIDEO DEPOSITION OF ANTHONY MILES

12

13      S T I P U L A T I O N S

14      IT IS STIPULATED AND AGREED by

15   and between the parties through their

16   respective counsel that the video

17   deposition of:

18      ANTHONY MILES,

19   May be taken before Carol J. Reyer, Court

20   Reporter of Birmingham, Alabama, acting as

21   Commissioner, at the Law Offices of

22   Maynard, Cooper & Gale, 2400

23   AmSouth/Harbert Plaza, 1901 Sixth Avenue
```

Page 2

```
 1   North, Birmingham, Alabama, on the 25th
 2   day of July, 2006, commencing at
 3   approximately 9:20 a.m.
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

Page 3

```
 1      A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFFS:
 4      LEE D. WINSTON
        Attorney-at-Law
 5      WIGGINS, CHILDS, QUINN & PANTAZIS
        301 19th Street North
 6      Birmingham, Alabama 35203
        205-328-0640
 7
 8
     FOR THE DEFENDANTS:
 9
        KELLY L. DeGANCE
10      Attorney-at-Law
        HOLLAND & KNIGHT
11      50 North Laura Street, Suite 3900
        Jacksonville, Florida 32202
12      904-798-5412
13
14   ALSO PRESENT: MIKE NICHOLS, Videographer
15
16
17
18
19
20
21
22
23
```

Page 4

```
 1        I N D E X
 2   ANTHONY MILES       PAGE
 3     Examination by Ms. DeGance    7
 4   - - - - - - - - - - - - - -
 5        E X H I B I T S
 6
 7   DEFENDANT'S         PAGE

 8     NO. 1 -           32

 9     NO. 2 -           89

10     NO. 3 -          108

11     NO. 4 -          116

12     NO. 5 -          122

13     NO. 6 -          136

14     NO. 7 -          144

15     NO. 8 -          162

16     NO. 9 -          168

17     NO. 10 -         184

18     NO. 11 -         208

19     NO. 12 -         212

20     NO. 13 -         213

21     NO. 14 -         214

22     NO. 15 -         215

23     NO. 16 -         216
       NO. 17 -         217
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 5

```
 1    NO. 18 -        218
 2    NO. 19 -        219
 3    NO. 20 -        221
 4    NO. 21 -        222
 5    NO. 22 -        229
 6    NO. 23 -        239
 7    NO. 24 -        240
 8    NO. 25 -        241
 9    NO. 26 -        242
10    NO. 27 -        244
11    NO. 28 -        256
12    NO. 29 -        257
13    NO. 30 -        257
14
15
16
17
18
19
20
21
22
23
```

Page 6

```
 1         I, CAROL J. REYER, a Court
 2    Reporter of Birmingham, Alabama, acting as
 3    Commissioner, certify that on this date,
 4    as provided by the Alabama Rules of Civil
 5    Procedure and the foregoing stipulation of
 6    counsel, there came before me at the Law
 7    Offices of Maynard, Cooper & Gale, 2400
 8    AmSouth/Harbert Plaza, 1901 Sixth Avenue
 9    North, Birmingham, Alabama, on the 25th
10    day of July, 2006, commencing at
11    approximately 9:20 a.m., ANTHONY MILES,
12    witness in the above cause, for oral
13    examination, whereupon the following
14    proceedings were had:
15         THE VIDEOGRAPHER: On the record
16    9:20 a.m. It's Tuesday, July 25th, 2006.
17    We're taking the videotape deposition of
18    Anthony Miles in the matter of Anthony
19    Miles versus Southeast Unloading, L.L.C.,
20    Ivey Crump, Jr., for the United States
21    District Court for the Middle District of
22    Alabama, Southern Division.
23         Would the attorneys present
```

Page 7

```
 1    please identify themselves?
 2         MR. WINSTON: Lee Winston
 3    representing Anthony Miles.
 4         MS. DeGANCE: I'm Kelly DeGance
 5    on behalf of Southeast Loading and Ivey
 6    Crump, Jr.
 7         THE VIDEOGRAPHER: Would you
 8    please swear in the witness?
 9              ANTHONY MILES,
10    Having been duly sworn, testified as
11    follows:
12         THE COURT REPORTER: Usual
13    stipulations?
14         (No response.)
15    EXAMINATION BY MS. DeGANCE:
16    Q. Mr. Miles, my name is Kelly
17    DeGance. I'm going to be asking you some
18    questions today.
19         Have you had your deposition
20    taken before?
21    A. No.
22    Q. Okay. Basically I'm going to be
23    asking you questions. I'm going to ask
```

Page 8

```
 1    that you provide honest answers to them.
 2    You need to answer with a yes or no
 3    because it's important for the court
 4    reporter to be able to transcribe what
 5    you're saying, and if you nod your head or
 6    say uh-huh or huh-uh, she's not going to
 7    know -- she's not going to be able to
 8    transcribe it properly.
 9         If you don't know an answer to a
10    question I ask you, it's okay for you to
11    say you don't know. Don't guess or
12    speculate in any way.
13         If you need to take a break at
14    any time, we can do that. I just ask
15    that, if there's a question pending, that
16    you answer the question before we take a
17    break.
18         From time to time, you might hear
19    your attorney make objections to some of
20    my questions. You still need to answer
21    the question unless he specifically
22    instructs you not to do so, okay.
23         Are you taking any medications
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 9

1  today that would prohibit your ability to
2  understand a question or provide a
3  truthful answer?
4      A. No.
5      Q. No.
6          Okay. Could you state your full
7  name, please?
8      A. Anthony Randolph Miles.
9      Q. And what's your home address,
10 Mr. Miles?
11     A. 413 Planters Road, Montgomery,
12 Alabama 36109.
13     Q. Who do you live with?
14     A. I live with my wife, Nora Powell,
15 Brittany Powell and Christopher Powell.
16     Q. Are those your children?
17     A. Those are my stepchildren.
18     Q. How old are they?
19     A. 18 and 14.
20     Q. Okay. Have you used any other
21 names other than the one you just gave?
22     A. No.
23     Q. What's your Social Security

Page 10

1  number?
2      A.
3      Q. What's your date of birth?
4      A.
5      Q. What did you do to prepare for
6  your deposition today?
7      A. Prepare for it?
8      Q. Uh-huh (affirmative), yes.
9      A. I spoke to my lawyer. That's
10 about it.
11     Q. Okay. Other than speaking with
12 your lawyer, have you spoken with anyone
13 else about your deposition today?
14     A. My deposition today, not really,
15 no.
16     Q. Did you review any documents in
17 preparation for your deposition today?
18     A. To who?
19     Q. Did you review any documents or
20 pieces of paper in preparing for today?
21     A. Yeah, those.
22     Q. And when you say, "those," are
23 you referring to the documents that you're

Page 11

1  producing in response to my request for
2  documents that I served?
3      A. I'm not sure about all the
4  documents that you're talking about.
5      Q. But just for the record, I want
6  to be sure we're talking -- you know, I
7  clarify what documents you're talking
8  about. You're pointing to documents that
9  are going to be produced over to Southeast
10 Unloading; is that correct, from your
11 attorney?
12     A. Yeah, I basically viewed the
13 documents, all of those.
14     Q. Okay. Any other documents?
15     A. Not that I know of.
16     Q. Okay. Have you ever been
17 arrested?
18     A. Yes.
19     Q. For what?
20     A. I have --
21     Q. Start with the first one.
22     A. I'm not sure about the first
23 one. I've been arrested for -- I don't

Page 12

1  even know what I was arrested for.
2  Basically, the case was somebody -- they
3  sprayed me with pepper spray and
4  everything else, and then told me they
5  were sorry.
6      Q. How many times have you been
7  arrested in your life?
8      A. I'm not sure.
9      Q. More than five?
10     A. Huh-uh (negative), I don't think
11 so.
12     Q. Okay. Less than five?
13     A. I believe so.
14     Q. Okay. When you talk about being
15 sprayed with pepper spray, how long ago
16 was that?
17     A. That was in Florida, years ago.
18 I can't give you a specific time. I got
19 here in '97, so it had to be before '97.
20     Q. Did you go to jail?
21     A. Uh-huh (affirmative).
22     Q. Is that yes?
23     A. Yes.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 13

1    Q. Okay. Were there criminal
2  charges against you?
3    A. No.
4    Q. No.
5      How long were you in jail?
6    A. Six or seven hours.
7    Q. And then you were released?
8    A. Uh-huh (affirmative).
9    Q. And there were no criminal
10  charges?
11    A. Huh-uh (negative.)
12    Q. No?
13    A. No.
14    Q. Since 1997, since you moved here
15  to Alabama, have you been arrested since
16  then?
17    A. No.
18    Q. No? Is that a no?
19    A. Uh-huh (affirmative), yes. No, I
20  have not.
21    Q. Okay. Have you ever been
22  convicted of a crime?
23    A. What type of crime?

Page 14

1    Q. Any type of crime.
2      MR. WINSTON: Like a traffic
3  ticket or --
4    Q. Anything but a traffic ticket.
5  Have you ever been convicted of a crime
6  other than a speeding violation?
7    A. No felonies.
8    Q. Have you ever been convicted of a
9  misdemeanor?
10    A. Yeah.
11    Q. What have you been convicted of?
12    A. Speeding.
13    Q. Speeding.
14      Other than traffic violations,
15  have you ever been convicted of a crime?
16    A. No.
17    Q. Any DUIs?
18    A. No.
19    Q. Okay. Since high school -- well,
20  actually, in the last ten years, tell me
21  what cities you've lived in.
22    A. The last ten years?
23    Q. Yeah.

Page 15

1    A. That's going back to '96?
2    Q. Yes, sir.
3    A. Cities or states?
4    Q. Cities.
5    A. I don't know what they would call
6  a city, but I lived in Florida, and I
7  lived here in Alabama.
8    Q. When did you move to Alabama? In
9  1997?
10    A. April 3rd, 1997.
11    Q. Have you lived in Alabama since
12  that time?
13    A. We moved back to Florida in 2000.
14    Q. You did?
15    A. Uh-huh (affirmative).
16    Q. Then when did you move back to
17  Alabama?
18    A. 2000.
19    Q. How long were you in Florida?
20    A. February till about July.
21    Q. Why did you move to Florida?
22    A. Job transfer.
23    Q. With what company?

Page 16

1    A. Henry Dock Works.
2    Q. Why did you move back to Alabama?
3    A. My fiancee decided she didn't
4  want to move.
5    Q. Okay. Do you have a high school
6  degree?
7    A. Yes.
8    Q. What year did you graduate from
9  high school?
10    A. '79.
11    Q. Where did you go to high school?
12    A. New York.
13    Q. What's the name of the high
14  school?
15    A. John Bound.
16    Q. Excuse me?
17    A. John Bound.
18    Q. Okay. What city is that in?
19    A. That's in Queens, New York.
20    Q. Have you ever been in college?
21    A. Yes.
22    Q. What college did you attend?
23    A. West Virginia State University.

4 (Pages 13 to 16)

## FREEDOM COURT REPORTING

Page 17

1    Q. Did you obtain a degree from West
2  Virginia State University?
3    A. No, I did not.
4    Q. How many years did you attend
5  West Virginia State University?
6    A. Approximately two years.
7    Q. What was your major?
8    A. Accounting.
9    Q. Why did you leave?
10    A. I ran out of money.
11    Q. Okay. Have you had any other
12  type of vocational training or college
13  education other than what you just
14  described?
15    A. Yes, Commercial Programming,
16  Unlimited.
17    Q. Excuse me?
18    A. Commercial Programming,
19  Unlimited.
20    Q. What's that?
21    A. That is a two-year computer
22  college.
23    Q. Where is that college located?

Page 18

1    A. Now it's in Florida. It used to
2  be at 853 Broadway in New York.
3    Q. When did you attend that school?
4    A. '92 to '90 -- '92 to -- I've got
5  to get the dates right. What do they call
6  it? '84 to '82.
7    Q. '82 to '84?
8    A. Uh-huh (affirmative).
9    Q. Yes?
10    A. Yes.
11    Q. Did you earn any type of degree
12  from that college?
13    A. A two-year programming degree
14  with word processing.
15    Q. Is this like a computer
16  programming degree?
17    A. Yes.
18    Q. Okay. Where do you currently
19  work?
20    A. I currently work with Impact
21  Resource Group out of Dayton, Ohio.
22    Q. And what is Impact Resource
23  Group?

Page 19

1    A. They're a subcontractor.
2  Currently, the division I work for is with
3  Home Depot.
4    Q. And what do you do for them?
5    A. I'm an assembly technician.
6    Q. And you say they're out of
7  Dayton, Ohio?
8    A. Uh-huh (affirmative).
9    Q. Do you work here locally for
10  them?
11    A. Yes, in Montgomery.
12    Q. Is it a full-time or part-time
13  job?
14    A. Full-time.
15    Q. How long have you been working
16  there?
17    A. Since around February.
18    Q. Of this year?
19    A. Yes.
20    Q. What are your job duties as an
21  assembly technician?
22    A. Customer service. I have to go
23  around the store and count all of their

Page 20

1  ready-to-sell items, assemble what they
2  ask us to assemble, and anything extra, I
3  just get -- I call up and get a work order
4  and assemble anything extra that they
5  need.
6    Q. When you say, "the store," you're
7  talking about Home Depot?
8    A. Yes.
9    Q. So, is this sort of a contract
10  position within Home Depot?
11    A. Yes, it is.
12    Q. Okay. And what types of things
13  do you assemble?
14    A. Everything in the store.
15    Q. So, like a gas grill?
16    A. Yes.
17    Q. Okay. Any kind of item that
18  needs assembly, you would assemble it --
19    A. Yes.
20    Q. -- for customers?
21    A. I assemble it for the store, and
22  the store will, in turn, either put it on
23  display or give it to a customer.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 21

1    Q. So, you don't work directly for
2  Home Depot, you work for this Impact
3  Resource Group?
4    A. Yes.
5    Q. Okay. Do you receive any
6  benefits as part of your employment?
7    A. I get paid.
8    Q. Do you have health insurance
9  through your employer?
10   A. No.
11   Q. Did they give -- did Impact
12 Resource Group give you the opportunity to
13 purchase or receive health insurance
14 through them?
15   A. I believe so.
16   Q. Did you decline that?
17   A. Yes, I did.
18   Q. Do you have health insurance?
19   A. With, what is it called, DHR, the
20 State.
21   Q. So, you have health insurance
22 through the State?
23   A. I just go to the State. I signed

Page 22

1  up with the State.
2    Q. Okay. Do you pay a price for
3  that?
4    A. Yes.
5    Q. Or is it free?
6    A. I pay a price.
7    Q. Do you know how much you pay
8  approximately?
9    A. Yeah, 10 to $20.
10   Q. Per visit or per month?
11   A. Per visit.
12   Q. So, you just pay 10 to $20 per
13 visit to the doctor?
14   A. Uh-huh (affirmative).
15   Q. Okay. How long have you been
16 receiving insurance through the State?
17   A. I'm not sure. A couple of
18 months.
19   Q. Only a couple of months?
20   A. Uh-huh (affirmative).
21   Q. Did you have health insurance
22 before that?
23   A. I had health insurance with

Page 23

1  Southeast Unloading.
2    Q. I'm talking about after Southeast
3  Unloading.
4    A. I believe I did, yes.
5    Q. Through who?
6    A. ProLogistics.
7    Q. Say that again.
8    A. ProLogistics.
9    Q. Is that an employer?
10   A. That's a temporary agency.
11   Q. Okay. But currently you have
12 health insurance through the State and
13 you've had it through the State for a
14 couple of months; is that correct?
15   A. Yes.
16   Q. And Impact Resource Group offered
17 you the ability to obtain insurance
18 through them, and you declined so?
19   A. I believe so.
20   Q. Okay. Did Impact Resource Group
21 offer you the ability to purchase life
22 insurance?
23   A. I am not sure.

Page 24

1    Q. Okay. Did Impact Resource Group
2  offer you the opportunity to purchase any
3  kind of disability insurance?
4    A. I believe so.
5    Q. They did.
6      Did you decline that as well?
7    A. I don't think so.
8    Q. Did you -- are you receiving
9  disability insurance?
10   A. I'm not disabled, so I don't --
11   Q. Well, it's insurance in case you
12 do become disabled, and you can purchase
13 it, and employers sometimes offer it, and
14 I'm asking you did Impact Resource Group
15 offer you the opportunity to purchase
16 disability insurance?
17   A. Well, they may have given me all
18 their forms. I'm sure they did. I'm not
19 sure. I don't remember everything I
20 signed. I -- I just know what's coming
21 out of my check, so I'd have to look at my
22 pay stub to give you an accurate answer.
23   Q. Okay, and that's fine.

**367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 25

1    So, you're not sure whether you
2  have disability insurance or not?
3    A. No, I'm not.
4    Q. Okay, that's fine. I mean, if
5  you don't know, just say you don't know,
6  and that's fine.
7    Do you know whether you have
8  dental insurance through Impact Resource
9  Group?
10    A. No.
11    Q. No, you don't know?
12    A. I don't believe so.
13    Q. No, you don't have it.
14    Do you have dental insurance
15  through anyone else?
16    A. No.
17    Q. No?
18    A. Huh-uh (negative).
19    Q. Okay. Are there any other
20  benefits that you know of that you receive
21  from Impact Resource Group besides your
22  pay?
23    A. No.

Page 26

1    Q. Okay. Are you paid on an hourly
2  basis?
3    A. I'm paid on a piece rate.
4    Q. Okay. And tell me how -- explain
5  how that works at Impact Resource Group.
6    A. The same way -- that and
7  Southeast are the same. You get paid for
8  what you do.
9    Q. Okay. So, for example, are you
10  getting paid per --
11    A. Per item.
12    Q. That you assemble?
13    A. Uh-huh (affirmative).
14    Q. Yes?
15    A. Yes, ma'am.
16    Q. Okay. And how much are you paid
17  per item that you assemble?
18    A. I couldn't give you all those
19  answers. Every item is different.
20    Q. Okay. Do you know -- do you
21  happen to know, and maybe you don't, how
22  much you would get paid to assemble a gas
23  grill?

Page 27

1    A. All gas grills are different
2  prices.
3    Q. Well, pick one.
4    A. CharBroil is about $4.70 per
5  grill.
6    Q. Okay. What's the most expensive
7  item that you get paid or what's the most
8  you get paid to assemble an item?
9    A. I wouldn't know the most.
10    Q. Are there, like, high-ticket
11  items that you-all as assembly technicians
12  know if you assemble one of those you're
13  going to get more money than if you
14  assemble a gas grill?
15    A. You could say that, but it's per
16  order, so you can't pick and choose what
17  you're going to build. And you don't get
18  paid just because it's a high-priced
19  item. You get paid on how much it takes
20  to put it together.
21    Q. Right.
22    A. Mixed in with the price, so it's
23  kind of --

Page 28

1    Q. So, tell me -- what is one of the
2  more complicated items to assemble?
3    A. They're all about the same to me,
4  I mean. A Fiesta grill is complicated.
5    Q. And how much would you receive
6  for assembling or putting together one of
7  those?
8    A. About 5.63.
9    Q. Okay. So, you're making anywhere
10  -- so, I don't want to put words in your
11  mouth. What's the most that you've made
12  assembling an item?
13    A. One item?
14    Q. Yes.
15    A. One item runs about $11.34 cents.
16    Q. Okay. And, so, you get paid per
17  item that you assemble?
18    A. Yes.
19    Q. Okay. What if you go to work and
20  don't assemble any items that day?
21    A. Well, I wouldn't go to work.
22    Q. What if -- how is Impact Resource
23  Group insuring that you're making minimum

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 29

```
 1  wage?  Do you know that?
 2      A.  You'd have to ask them that.
 3      Q.  Okay.  If you work over 40 hours
 4  per week, are they paying you overtime?
 5      A.  Yes.
 6      Q.  Okay.  How is that factored in?
 7      A.  They take what you normally make
 8  through a week, and that's broken down the
 9  same way they did at Southeast, it's
10  broken down to an hourly figure, and you
11  get half of that.  After an 80 hour --
12  it's a biweekly check, so after 80 hours.
13      Q.  So, they're paying you overtime
14  after 80 hours?
15      A.  It's 40 hours a week, so . . .
16      Q.  Are you ever working more than 40
17  hours in one week?
18      A.  Yes.
19      Q.  What if you work 50 hours the
20  first week and 30 hours the second week,
21  do you still get overtime?
22      A.  No, it's still 80 hours.
23      Q.  So, they're paying you on a
```

Page 30

```
 1  80-hour workweek?
 2      MR. WINSTON:  Is that the case?
 3      Q.  They're paying you on an 80-hour
 4  biweekly basis?
 5      A.  I don't know exact.  They break
 6  it down week-by-week.  You get a biweekly
 7  check.  So, if it supersedes 80 hours, you
 8  would get overtime.
 9      Q.  And then how much are they paying
10  you in overtime?  Are they paying you time
11  and a half?
12      A.  It's going to be half of that,
13  because overtime is calculated on half of
14  it.  Say if it's $10 an hour, your
15  overtime would be $5 an hour.
16      Q.  Have you had any other employment
17  since leaving Southeastern Unloading?  I
18  think you mentioned ProLogistics.  I want
19  to talk about all of your employers since
20  leaving Southeast Unloading.
21      A.  I've had, I've had some
22  employers.
23      Q.  Can you take me through beginning
```

Page 31

```
 1  with the first job you had when you left
 2  Southeast Unloading?
 3      A.  That took a while, that took a
 4  while.  Southeast Unloading refused to pay
 5  my worker's comp -- I mean, not my
 6  worker's comp, my unemployment.
 7      Q.  Okay.
 8      A.  And --
 9      MR. WINSTON:  Do you remember
10  what the question was?
11      Q.  Yeah, let's answer the question.
12      The question is:  What jobs have
13  you had since leaving Southeast Unloading?
14      A.  I believe it was Satellites
15  Unlimited.
16      Q.  Was that the first one?
17      A.  Yes.
18      Q.  Okay.  And how long were you
19  there?
20      A.  You have it on my resume.  I'm
21  not sure.
22      Q.  It's on your resume?
23      A.  Uh-huh (affirmative).
```

Page 32

```
 1      Q.  Did you receive benefits or any
 2  health insurance while you were there?
 3      A.  I believe so.
 4      Q.  You did.
 5      Was that a full-time or part-time
 6  job?
 7      A.  Full-time.
 8      Q.  Okay.  And you're not sure how
 9  long you were there, how long you were
10  there?
11      A.  Huh-uh (negative).
12      (Defendant's Exhibit No. 1
13      marked for identification.)
14      Q.  I'm going to show you your
15  resume.  Actually, why don't I do that
16  right now because maybe it will refresh
17  your recollection as to some of this.  I'm
18  going to hand you a document and ask if
19  you recognize it, please?  Is that your
20  resume?
21      A.  It looks like it, yes.
22      Q.  Okay.  And I'm giving you this
23  document that's been marked as Exhibit 1
```

8 (Pages 29 to 32)

# FREEDOM COURT REPORTING

Page 33

1  which you just identified as your resume
2  to help refresh your recollection of all
3  the jobs you've had since leaving
4  Southeast Unloading. So, can you -- does
5  that help you remember how long you were
6  at Satellites Unlimited?
7      A. Yeah, about February to April.
8      Q. Of '05?
9      A. Yes, ma'am.
10     Q. Why were you only there for two
11 months?
12     A. They had a problem with paying
13 us.
14     Q. Explain what that means.
15     A. The agreement was for gas to
16 drive around and put in satellites, and
17 then they stopped paying for gas, and I
18 couldn't afford to pay for my own gas and
19 put in satellites using their equipment.
20     Q. Did they pay you an hourly wage
21 or a salary?
22     A. It was piecework.
23     Q. So, it was piecework?

Page 34

1      A. Uh-huh (affirmative).
2      Q. So, you were paid per satellite
3  that you installed?
4      A. Yes.
5      Q. Okay. And you said that the
6  original agreement with them was that you
7  would be paid for your gas as well?
8      A. I had a gas card, yes.
9      Q. Oh, okay. And then did they take
10 the gas card away?
11     A. They changed the dates of the gas
12 card, so it didn't coincide with the dates
13 that we thought was paid. So, after $70,
14 I had no gas.
15     Q. Oh, okay. You could only use the
16 gas card certain days of the week or
17 certain --
18     A. Yeah, it didn't coincide with the
19 pay dates, so the gas card would run out
20 of money, so you couldn't use the gas
21 card.
22     Q. Okay. Oh, okay. So, did you
23 resign?

Page 35

1      A. Yes.
2      Q. You resigned.
3          And then what was the next job
4  that you had since leaving Southeast
5  Unloading?
6      A. The one that's on here, off and
7  on with Labor Finders.
8      Q. What's Labor Finders?
9      A. Daily work for daily pay.
10     Q. It's day labor work?
11     A. Uh-huh (affirmative).
12     Q. Okay. And --
13     A. Skilled and unskilled.
14     Q. What type of work have you been
15 doing for them or did you do for them?
16     A. Grinder, pallets, clean up
17 construction sites.
18     Q. And how were you paid by them?
19 Were you paid by the hour, or were you
20 paid by the job, or were you paid by the
21 day?
22     A. Paid by the day.
23     Q. Paid by the day.

Page 36

1          And Labor Finders would be the
2  one that paid you?
3      A. Yes.
4      Q. Okay. And did you receive any
5  kind of insurance or benefits through
6  them?
7      A. No.
8      Q. Okay. This was just day labor
9  work?
10     A. Yes.
11     Q. How many days per week were you
12 working for them approximately?
13     A. Whenever they had work. I went
14 there every day, but I wasn't guaranteed
15 to work every day.
16     Q. Okay. Do you have any idea how
17 many days per week on average you were
18 working for them?
19     A. About four.
20     Q. About four.
21         So, there would probably be one
22 day a week that they wouldn't have
23 anything for you?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 37

1    A. Yes.
2    Q. And you wouldn't know until you
3  got there whether there was a job for you
4  for that day?
5    A. Yes.
6    Q. Okay. And how long did you work
7  there? It states on your resume to
8  present, but I know that you testified
9  you're now working for Impact Resource
10 Group.
11   A. Whenever I'm not working, I can
12 go there.
13   Q. So, it's just sort of a side
14 thing that you do when you're not working?
15   A. Yeah, if I'm off on the weekend,
16 I can go there on Saturday and make some
17 money if they have something available.
18   Q. So, they take workers on
19 Saturdays, on the weekends, too?
20   A. Yes.
21   Q. Oh, okay. So, are you still
22 affiliated with them?
23   A. I'm affiliated, but I haven't

Page 38

1  been there in a while.
2    Q. Okay. How many days -- what days
3  per week are you working at Impact
4  Resource Group, are you working for them?
5    A. Monday through Friday.
6    Q. And that's pretty much 40
7  hours a week, you said, or more?
8    A. Yeah, it's --
9    Q. Okay. I understand that.
10     Are there any other jobs that
11 you've had since leaving Southeast
12 Unloading besides what we've talked about?
13   A. ProLogistics is not on here.
14   Q. ProLogistics.
15     Okay. When did you work for
16 them, if you recall?
17   A. In between these two jobs.
18   Q. In between which two?
19   A. Labor Finders and the satellite
20 company.
21   Q. So, in the April, May 2005 time
22 frame; would that be correct?
23   A. Yes.

Page 39

1    Q. Okay. And what did you do for
2  ProLogistics?
3    A. Forklift operator.
4    Q. Excuse me?
5    A. Forklift operator.
6    Q. Okay. Was that a full or
7  part-time position?
8    A. Full-time.
9    Q. Did they offer you any type of
10 benefits or insurance?
11   A. Yes.
12   Q. They did offer you health
13 insurance?
14   A. Yes.
15   Q. Did you accept it?
16   A. Yes.
17   Q. You accepted health insurance
18 from them?
19   A. Yes.
20   Q. Okay. How long did you work
21 there?
22   A. A couple of months.
23   Q. Why did you leave?

Page 40

1    A. We had a misunderstanding, and
2  the gentleman in charge was -- they took
3  him away. The police came and got him,
4  whatever he did, so everybody was out of
5  work.
6    Q. Who had a misunderstanding? You
7  and he?
8    A. I don't know what he did. I
9  heard, but I don't know.
10   Q. But did you have a
11 misunderstanding with anyone, or was this
12 something that, you know, involved him
13 only?
14   A. It involved everybody in the
15 whole company.
16   Q. Okay. You're going to have to
17 explain this more to me. I don't
18 understand what you're saying.
19   A. He got arrested supposedly for
20 embezzlement, which put all of us out of
21 business.
22   Q. Was he the owner?
23   A. No.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 41

1    Q. Why did it put everybody out of
2    business?
3    A. He worked -- he was Palapina, and
4    we worked for Palapina, so when Palapina
5    closed down.
6    Q. Is Palapina a company?
7    A. Yeah.
8    Q. Okay. Then what's Palapina have
9    to do with ProLogistics?
10    A. ProLogistics is a subcontractor
11    for the company.
12    Q. Oh, okay. So, he worked for
13    Palapina, and ProLogistics was a
14    subcontractor. So, when he went to jail,
15    the project was just sort of off?
16    A. They just revamped the whole
17    system.
18    Q. Okay.
19    A. So, they're still there, but
20    everybody is new.
21    Q. So, did -- was everybody
22    terminated?
23    A. I think I -- I would call it

Page 42

1    transferred.
2    Q. Okay. Where was everybody
3    transferred?
4    A. I went to Mobisis (sp).
5    Q. What's Mobisis?
6    A. It's another one of the companies
7    for Hyundai.
8    Q. It's another one of the companies
9    for?
10    A. Hyundai.
11    Q. Okay. And what did you do --
12    now, was Mobisis another employer after
13    ProLogistics?
14    A. No, that's all -- ProLogistics
15    supplies for everybody.
16    Q. Okay. So, Mobisis is just
17    another company that ProLogistics was a
18    subcontractor for?
19    A. Uh-huh (affirmative).
20    Q. Is that correct?
21    A. Yes.
22    Q. And, so, then, you did the same
23    type of work for Mobisis?

Page 43

1    A. No, I did inspector work.
2    Q. You did inspector work.
3    During this time you worked for
4    ProLogistics, how were you paid?
5    A. Weekly.
6    Q. You were paid weekly?
7    A. Uh-huh (affirmative).
8    Q. Were you paid an hourly wage?
9    A. Yes.
10    Q. How much were you paid per hour?
11    A. It went from nine to ten
12    something.
13    Q. Per hour?
14    A. Uh-huh (affirmative).
15    Q. Were you paid for your overtime?
16    A. Yes.
17    Q. You were?
18    A. (Witness nods head.)
19    Q. Okay. How long did you work
20    for -- on the Mobisis project or for
21    Mobisis?
22    A. I worked for all different parts
23    of Hyundai.

Page 44

1    Q. Okay. Well, how long did you
2    work for ProLogistics in total?
3    A. About three or four months.
4    Q. Why did you eventually leave?
5    A. I eventually left because they
6    had a situation.
7    Q. Well, tell me about the
8    situation.
9    A. Like I said, it was -- Mike Mayer
10    was arrested for embezzlement.
11    Q. But you said that after he was
12    arrested you transferred to Mobisis?
13    A. No, no, ProLogistics moved us
14    around.
15    Q. Right.
16    Okay. So, you got moved around,
17    but you kept working for ProLogistics
18    after the arrest; is that correct?
19    A. Yes.
20    Q. Okay. Well, when did you
21    eventually leave ProLogistics for good, or
22    are you still working there?
23    A. No, I went from ProLogistics over

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 45

1  to Omni Source, which is another temporary
2  agency, paying more money.
3      Q. So, did you resign or were you
4  terminated from ProLogistics? Did they
5  fire you, or did you quit?
6      A. I think I'm still listed.
7      Q. At ProLogistics?
8      A. Yeah. As a temporary, yes.
9      Q. Okay. And why did you switch to
10 Omni Source? Because they paid more
11 money?
12     A. Uh-huh (affirmative).
13     Q. So, then you went to Omni Source
14 after ProLogistics?
15     A. Omni Source, Labor Finders, yeah.
16     Q. Is Omni Source a day labor?
17     A. It's the same, a temporary
18 agency. It's the same thing, just a
19 different one.
20     Q. As Labor Finders?
21     A. Uh-huh (affirmative).
22     Q. Did you receive any jobs from
23 Omni Source?

Page 46

1      A. Yes.
2      Q. Okay. Was it day labor type of
3  jobs?
4      A. No, weekly.
5      Q. Weekly?
6      A. Uh-huh (affirmative).
7      Q. Temporary jobs that were weekly?
8      A. Yes.
9      Q. How long did you do -- how long
10 did you accept jobs from them?
11     A. I accepted jobs from them all the
12 way up until I started working for, I
13 believe, Home Depot, or Impact Resources.
14     Q. Okay. So, you accepted jobs from
15 Omni Source up until you started working
16 for Impact Resource Group?
17     A. Uh-huh (affirmative).
18     Q. How many days per week were you
19 working for Omni Source?
20     A. Five.
21     Q. Five days a week.
22        So, was it pretty full-time work?
23     A. Yes, ma'am.

Page 47

1      Q. Were they placing you every week?
2      A. Uh-huh (affirmative), yes.
3      Q. How were you paid?
4      A. $11 an hour.
5      Q. So, you were paid $11.
6         Were you paid for overtime?
7      A. Yes.
8      Q. Did you receive any benefits or
9  insurance when you were working for them?
10     A. Omni Source, I don't think so.
11     Q. No.
12        Approximately how much is your
13 check? I realize you get paid every two
14 weeks. Approximately how much is your
15 check from Impact Resource Group every two
16 weeks?
17     A. I'll find that out on Thursday.
18 It's somewhere in the neighborhood of 7,
19 $800.
20     Q. 7 or $800 every two weeks?
21     A. Yes.
22     Q. Okay. When you were working for
23 Satellites -- now, you only worked for

Page 48

1  Satellites Unlimited for a couple of
2  months, correct?
3      A. Yes, ma'am.
4      Q. Do you remember how much you were
5  earning with them approximately per pay
6  period?
7      A. No. I'd have to look at the
8  stubs, to be honest with you.
9      Q. Do you still have the stubs?
10     A. Yeah.
11     Q. Okay. And with ProLogistics, you
12 were making 9 to $10 an hour
13 approximately?
14     A. Yes.
15     Q. Okay. And then Omni Source, you
16 were paid by the week, and you were making
17 about $11 an hour; is that correct?
18     A. Yes.
19     Q. Okay. And that was full-time,
20 both of those jobs?
21     A. Yes.
22     Q. Okay. And with Impact Resource
23 Group, now you're making 7 to $800 every

12  (Pages 45 to 48)

# FREEDOM COURT REPORTING

Page 49

1 two weeks?
2     A. Yes.
3     Q. Approximately, approximately?
4     A. Yes.
5     Q. Okay. Are there any other jobs
6 that you can think of that you've had
7 since leaving Southeast Unloading?
8     A. No, I don't think so.
9     Q. That's all?
10     A. I'm not sure, but I would say no.
11     Q. Okay. When did you first begin
12 working at Southeast Unloading?
13     A. I believe it was November of
14 2001.
15     Q. What was your position?
16     A. My starting position?
17     Q. Yes, sir.
18     A. Freight handler.
19     Q. Freight handler.
20         Did your position change while
21 you were there, or were you a freight
22 handler the whole time?
23     A. It changed.

Page 50

1     Q. What did it change to?
2     A. I started doing dock supervisory
3 work.
4     Q. Did you have an official title
5 change?
6     A. According to Mr. Snipe, yes.
7     Q. According to who?
8     A. Jermaine Snipe.
9     Q. Who's Jermaine Snipe?
10     A. He was the site supervisor.
11     Q. Did you receive a raise?
12     A. I believe so.
13     Q. You received a raise?
14     A. I believe so.
15     Q. What was your -- what was your
16 title again?
17     A. Dock supervisor.
18     Q. You were a dock supervisor, and
19 Jermaine Snipe is the one that gave you
20 this promotion?
21     A. Yes.
22     Q. And he was authorized to give you
23 a promotion?

Page 51

1     A. Yes.
2     Q. What's his title?
3     A. Site supervisor.
4     Q. Is he still there?
5     A. Not that I know of.
6     Q. So, he's a site supervisor, and
7 he promoted you to be dock supervisor, and
8 you received a raise?
9     A. Yes, I believe so.
10     Q. What was the raise that you
11 received?
12     A. It was on a percentage basis.
13     Q. Okay. Well, do you know what
14 percentage it was?
15     A. When he and I talked, it was
16 $1,000 a week, is what I told him I needed
17 in order to do the books.
18     Q. What do you mean in order to do
19 the books?
20     A. Dock supervisor, that's what it
21 would entail.
22     Q. What do you mean doing the books?
23     A. Writing up the accounts,

Page 52

1 collecting checks, pricing trucks and
2 giving out work to the employees.
3     Q. As the dock supervisor, would you
4 have been the only supervisor on the
5 loading dock where the trucks are
6 unloaded?
7     A. On that particular dock, yes.
8     Q. Okay. You would have been the
9 only one?
10     A. On that particular dock, yes.
11     Q. Okay.
12     A. Just --
13     Q. And you say that -- did Jermaine
14 Snipe give you a thousand-dollar-a-week
15 raise?
16     A. I made about that much.
17     Q. Okay. Was this a $1,000 a week
18 raise, or was it $1,000 a week total?
19     A. It was just what we agreed upon.
20     Q. And what did you agree upon?
21 That you needed --
22     A. I needed at least $1,000 a week
23 because I wouldn't be able to . . .

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 53

1    Q. What were you making before your
2  promotion?
3    A. About eight.
4    Q. About 800?
5    A. Yes.
6    Q. You were making 800 a week.
7      When did you receive this
8  promotion?
9    A. 2002.
10   Q. You received the promotion in
11 2002?
12   A. Yeah.
13   Q. So, your title changed and you
14 became a dock supervisor in 2002?
15   A. Yes.
16   Q. So, you were no longer a freight
17 handler?
18   A. The way they phrase it, you do
19 both jobs.
20   Q. I know management has different
21 paperwork than other employees. Did you
22 have to fill out any type of management
23 paperwork in conjunction with becoming a

Page 54

1  supervisor?
2    A. No.
3    Q. You didn't have to sign any of
4  the management or supervisory paperwork?
5    A. No.
6    Q. Okay. So, you didn't sign
7  anything at all?
8    A. Not that I know of.
9    Q. Okay. But you noticed -- I mean,
10 if you looked at your pay stubs, your pay
11 stubs clearly went from $800 per week to
12 $1,000 per week beginning in 2002 when you
13 received this promotion?
14   A. It was in 2002. I don't remember
15 exactly when it was in 2002.
16   Q. Right, right. I mean, I have all
17 of your pay stubs, so if I go back and
18 look at your pay in 2002, I'll be able to
19 see, okay, here's when he got his
20 promotion because he went from $800 a week
21 to $1,000 a week, and then you would be at
22 $1,000 a week from then on, correct?
23   A. I'm not sure.

Page 55

1    Q. Why not?
2    A. Because I don't know how much --
3  I mean, how it worked out because you
4  unload trucks and you give out work.
5    Q. Right.
6    A. So, it's going to -- the pay is
7  going to be different.
8    Q. But it was markedly more after
9  the promotion, correct?
10   A. It should have been more, yes.
11   Q. And it should have been at least
12 $1,000, correct?
13   A. Yes.
14   Q. Okay. So, I'll be able to tell
15 when the promotion was given to you?
16   A. I believe you could. I'm not
17 sure.
18   Q. Okay. So, tell me specifically,
19 what were all of your job duties as the
20 dock supervisor? You sort of started
21 talking about them. Tell me everything
22 you did as a dock supervisor.
23   A. Assign the trucks to the

Page 56

1  different employees, price the trucks,
2  call in comchecks.
3    Q. Okay. Why don't you take a
4  minute and explain Southeast Unloading's
5  business for me?
6    A. Southeast Unloading was a
7  subcontractor for unloading specific
8  trucks, cash and account trucks for Winn
9  Dixie warehouse.
10   Q. Okay.
11   A. As well as train cars.
12   Q. Okay. Tell me if this is
13 correct. It's my understanding that
14 Southeast Unloading would provide labor to
15 unload Winn Dixie trucks at sort of a
16 loading dock, and the trucks would be full
17 of perishable and non-perishable goods; is
18 that correct?
19   A. Yeah.
20   Q. Meaning there was grocery and --
21   A. Yeah, there was two different
22 warehouses.
23   Q. Right.

14 (Pages 53 to 56)

# FREEDOM COURT REPORTING

Page 57

1    A. Right.
2    Q. And it's my understanding that
3    the driver, tell me if I'm wrong, would
4    have the option to unload the truck
5    himself, or he could have -- or he could
6    essentially have someone from Southeast
7    Unloading do it and then pay them to do
8    it; is that correct?
9    A. Partial.
10   Q. Okay. Tell me how I'm wrong.
11   A. Southeast Unloading had contracts
12   with certain truck lines, so you didn't
13   have an option.
14   Q. Okay. So, if they had a contract
15   with a truck line, then that driver
16   automatically would have Southeast
17   Unloading unload the truck?
18   A. Yes.
19   Q. Correct. But if they didn't --
20   if Southeast Unloading did not have a
21   contract with a particular truck line,
22   then was it at the driver's discretion
23   whether he wanted to unload the truck

Page 58

1    himself or whether he wanted to have
2    Southeast Unloading do it?
3    A. Yes.
4    Q. Okay, because that was my
5    understanding.
6    A. You could do that, but you can't
7    do it with any automated equipment.
8    Q. You'd have to do it manually?
9    A. (Witness nods head.)
10   Q. So, did most drivers have
11   Southeast Unloading do the work for them?
12   A. Yes.
13   Q. Okay. And then the driver would
14   then pay the unloader or, I guess, pay
15   Southeast Unloading to unload the truck;
16   is that correct?
17   A. Yes.
18   Q. And you said as a dock supervisor
19   you would determine price for unloading
20   the truck?
21   A. Right.
22   Q. Okay. And how did you come up
23   with a price? Did you have a price sheet,

Page 59

1    or did you --
2    A. Yes.
3    Q. You had a price sheet, and you
4    would look at that price sheet and come up
5    with a price?
6    A. Yes.
7    Q. Okay. And then you were
8    responsible for quoting it to the driver?
9    A. Yes.
10   Q. Okay. And then you also said you
11   were responsible for assigning trucks to
12   certain employees?
13   A. Yes.
14   Q. Okay. Who would collect the
15   money, then, from the drivers?
16   A. I would.
17   Q. You would.
18       And then did you, in turn, give
19   them a receipt?
20   A. Yes.
21   Q. Okay. As a dock supervisor, was
22   there a receipt book that you used?
23   A. They had different receipt books,

Page 60

1    but yes.
2    Q. Okay. And we're going to get
3    into that in a minute.
4        Did you work as a dock supervisor
5    up until -- from 2002 until you were
6    terminated?
7    A. No.
8    Q. All right. What other positions
9    did you hold?
10   A. It got to the point where the
11   prices had been changed, so I told them I
12   could no longer do that.
13   Q. Could no longer do what?
14   A. Supervisory work.
15   Q. Okay. What do you mean the
16   prices had been changed?
17   A. Ivey Crump would come around, and
18   for certain people, he would change the
19   price without telling you.
20   Q. Change the price for unloading
21   the truck?
22   A. Yes.
23   Q. Okay. Go ahead. What do you

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 61

1  mean he would change the price without
2  telling you?
3      A. Well, for me personally, if I had
4  to do a truck because everybody was busy,
5  I would price it according to that sheet,
6  and while I was doing the truck, he would
7  go outside and tell the driver he would do
8  it for cheaper.
9      Q. Okay.
10     A. And then when the other employees
11 that were Caucasian came in, he would let
12 them price their own truck.
13     Q. What Caucasian employees did he
14 let price their own trucks?
15     A. David Barnett.
16     Q. David Barnett?
17     A. That came from the other
18 warehouse.
19     Q. Any other Caucasian employees
20 that were allowed to price their own
21 trucks?
22     A. Dave Gilbert.
23     Q. Dave Gilbert?

Page 62

1      A. Yes.
2      Q. Any others?
3      A. Blair.
4      Q. Excuse me?
5      A. Blair.
6      Q. Blair.
7      A. And Chris.
8      Q. Chris who?
9      A. I don't remember his last name,
10 but it's in the file.
11     Q. Any other employees, white
12 employees that were permitted to --
13     A. (Witness shakes head.)
14     Q. Okay. What other Caucasian
15 employees did you work with other than
16 those four?
17     A. Arlene.
18     Q. Arlene?
19     A. Barker.
20     Q. Any other Caucasian employees
21 that you worked with?
22     A. Ken.
23     Q. Ken who?

Page 63

1      A. I can't pronounce his last name.
2      Q. Any others?
3      A. Not that I can recall.
4      Q. How many employees would you say
5  total were there at the dock?
6      A. Oh, Lord. At one warehouse,
7  about 30.
8      Q. Okay. What about the other
9  warehouse?
10     A. About 15 to 17.
11     Q. So, about 45 to 50 employees
12 total?
13     A. Well, there was different -- no,
14 it was more than that. They had --
15     Q. There was more than that?
16     A. Uh-huh (affirmative).
17     Q. More than 50 employees?
18     A. Those were unloaders.
19     Q. Right.
20     A. Okay.
21     Q. There were about 50 unloaders?
22     A. Yes.
23     Q. Any other Caucasian unloaders

Page 64

1  besides the six that you just named?
2      A. I don't remember the other
3  gentleman's name.
4      Q. Was Arlene Barker an unloader?
5      A. An unloader and a supervisor
6      Q. Okay. Were the remaining, other
7  than the ones you named and you said there
8  was one other one you can't remember, were
9  the other remaining ones
10 African-American?
11     A. Yes.
12     Q. Okay. So, the majority of them
13 were African-American, correct?
14     A. Yes.
15     Q. Who was your supervisor while you
16 worked at Southeast Unloading? Tell me
17 first, who was your supervisor while you
18 were a dock supervisor?
19     A. Jermaine and Ivey.
20     Q. Jermaine?
21     A. Snipe.
22     Q. Was he above you?
23     A. Yes.

16 (Pages 61 to 64)

# FREEDOM COURT REPORTING

Page 65

1    Q. And then Ivey Crump, Jr.?
2    A. Yes.
3    Q. What about Wayne? And I'm sorry,
4  I'm not going to -- I don't know how to
5  pronounce his last name, so why don't we
6  just call him Wayne. You know who I'm
7  talking about, don't you, Wayne G.?
8    A. Uh-huh (affirmative).
9    Q. Okay. Was he above you?
10   A. Not at that time.
11   Q. Well, did he work there?
12   A. Not at that time.
13   Q. He didn't work at Southeast
14 Unloading in 2002?
15   A. I don't know. I didn't work at
16 that warehouse.
17   Q. You worked at -- where did you
18 work? Hope Hall?
19   A. No.
20   Q. Where did you work?
21   A. I worked on Sixth Street.
22   Q. You worked on Sixth Street?
23   A. Yes, the grocery warehouse.

Page 66

1    Q. Okay, right. And Wayne did not
2  work at the Sixth Street warehouse in
3  2002?
4    A. No.
5    Q. Okay. You were telling me that
6  Mr. Crump was changing the prices and you
7  decided you didn't want to be a supervisor
8  anymore?
9    A. Uh-huh (affirmative).
10   Q. So, what position did you move
11 into after that?
12   A. I went back to a regular
13 unloader.
14   Q. So, you went back to being a
15 freight handler?
16   A. Yes.
17   Q. Approximately what year was that?
18   A. Around the same year, 2002.
19   Q. So, within the same year, you
20 went from being a supervisor to being a
21 freight handler again?
22   A. Yes, I did.
23   Q. So, as a freight handler, what

Page 67

1  were your job duties?
2    A. Customer service, load and
3  unload.
4    Q. But you didn't have the same
5  duties anymore as far as assigning trucks
6  and pricing trucks, did you?
7    A. No, I trained Andre Brown to do
8  that.
9    Q. You trained who?
10   A. Andre Brown.
11   Q. Did Andre Brown become a
12 supervisor?
13   A. Yes.
14   Q. Andre Brown became a supervisor.
15 So, once you moved -- in 2002
16 when you moved back into the position of
17 being a freight handler, you were no
18 longer responsible for pricing trucks and
19 collecting money then, were you?
20   A. I helped out.
21   Q. What do you mean?
22   A. I trained Andre Brown. So, if he
23 didn't know anything and he had a

Page 68

1  question, I would answer it.
2    Q. Okay. But was it part of your
3  job as a freight handler to price trucks
4  and collect money?
5    A. According to Mr. Crump, it was
6  part of everyone's job if they had
7  supervisory experience to help out when
8  needed.
9    Q. So, Mr. Crump said it was okay
10 for every single freight handler that had
11 any supervisory experience to just go out
12 and price trucks and collect money?
13   A. No, to assist.
14   Q. What do you mean to assist?
15   A. In other words, if Mr. Brown had
16 three docks and wanted to know about
17 trucks on the back dock that were Winn
18 Dixie trucks, if you had experience, he
19 would ask you to go back there and tell
20 them what was there, and you could tell
21 them what was there. And he had those
22 printouts, and he would know what price to
23 give.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 69

1     Q. Were you responsible as a freight
2   handler during that time for collecting
3   money from trucks, truck drivers?
4     A. Not at the grocery warehouse.
5     Q. At any warehouse, were you
6   responsible for collecting money as a
7   freight handler?
8     A. Yes.
9     Q. What warehouse?
10    A. The one with Wayne, perishable.
11    Q. Okay. So, you worked under Wayne
12  in perishable?
13    A. Yes.
14    Q. Why were you authorized, if you
15  weren't a supervisor anymore, to collect
16  money?
17    A. Wayne told me that he needed me
18  to price the trucks because he couldn't
19  make it back and forth and watch the
20  trucks at the same time.
21    Q. So, Wayne told you he needed you
22  to price the trucks?
23    A. Uh-huh (affirmative).

Page 70

1     Q. And Wayne told you to collect the
2   money?
3     A. Yes.
4     Q. Did Wayne have a receipt book?
5     A. Yes.
6     Q. Did Wayne give you the receipt
7   book to go do this task that he asked you
8   to do?
9     A. No, we used to send whoever was
10  going up front, we'd send them the checks,
11  the cash, all that, the truck numbers, and
12  Wayne would send back somebody with all
13  the receipts for the appropriate doors.
14    Q. After they already signed?
15    A. Excuse me?
16    Q. Were they already signed when
17  he'd send them back?
18    A. Yes, yes.
19    Q. So, I'm going to go through this
20  process in a minute, but first let me ask
21  you, do you know Ivey Crump, Sr.?
22    A. Yes, I do.
23    Q. Have you ever met him?

Page 71

1     A. Yes, I have.
2     Q. How many times?
3     A. I've spoken to him four or five
4   times.
5     Q. By phone or in person?
6     A. In person.
7     Q. Where?
8     A. At the grocery warehouse.
9     Q. Ivey Crump, Sr., would come to
10  the grocery warehouse on Sixth Street?
11    A. Yes.
12    Q. How often?
13    A. I spoke to him three or four
14  times there.
15    Q. When's the last time you spoke to
16  Ivey Crump, Sr.?
17    A. Oh, God. Oh. When I was at the
18  perishable warehouse.
19    Q. When was that, approximately what
20  year?
21    A. I'm not sure of the year. It was
22  before I was terminated.
23    Q. Okay. Did you ever speak to Ivey

Page 72

1   Crump, Sr., at any time after the previous
2   lawsuit that you filed against this
3   company was filed?
4       MR. WINSTON: Object to the form.
5     Q. Okay. Do you recall, do you
6   recall filing a lawsuit against Southeast
7   Unloading?
8       MR. WINSTON: What's the time?
9       MS. DeGANCE: Excuse me?
10      MR. WINSTON: The time.
11    Q. (BY MS. DeGANCE:) Okay. Do you
12  recall -- I don't know how many lawsuits
13  you've filed against Southeast Unloading.
14  I'm assuming you've only filed one other
15  lawsuit because that's the only one I know
16  of. Do you recall filing a lawsuit
17  against Southeast Unloading before the one
18  that we're currently here for?
19    A. I didn't file a lawsuit.
20    Q. Do you recall being a party in a
21  lawsuit --
22    A. Yes.
23    Q. -- against Southeast Unloading?

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 73

1    A. Yes.
2    Q. Okay. And do you recall that
3  that lawsuit settled in September of 2004?
4    A. I'm not sure when it was actually
5  settled. I can --
6    Q. Okay. Well, let me ask you
7  this: At any time from the time you
8  became a party in that lawsuit, did you
9  speak to Ivey Crump, Sr., at any time
10 following that?
11   A. You mean from the time of
12 September or before?
13   Q. No, from any time --
14   A. From the time I signed on?
15   Q. From the time you signed on
16 forward, okay, from the time you signed on
17 to that lawsuit until now, have you spoken
18 to Ivey Crump, Sr.?
19   MR. WINSTON: I just want to
20 object to the form. If you know the
21 time. I mean, do you know whether he
22 joined that case, which I know was in 90
23 -- I mean, I don't know.

Page 74

1    THE WITNESS: I don't know what
2  day I actually signed on to that case.
3    Q. (BY MS. DeGANCE:) Right.
4    A. But I believe I had spoken to --
5  I was in the office with Kevin, Ivey
6  Crump, Sr., Ivey Crump, Jr., and either
7  Chris Spence or Rester.
8    Q. Okay. At Sixth Street?
9    A. No, at the perishable warehouse.
10   Q. And where is that?
11   A. Hope Hall.
12   Q. In Hope Hall?
13   A. Uh-huh (affirmative).
14   Q. So, Ivey Crump, Sr., Ivey Crump,
15 Jr., Kevin Crump, and you think maybe
16 Chris Spence or Rester Bryan?
17   A. Yeah, there was another person
18 there, but I remember talking to them.
19   Q. Came to the Hope Hall warehouse,
20 and you had a conversation with them?
21   A. Yes.
22   Q. And this was after you became
23 involved with the previous lawsuit?

Page 75

1    A. See, I don't know when I signed
2  on.
3    Q. What was the conversation about?
4    A. The conversation was about my
5  transfer.
6    Q. Transfer where?
7    A. From grocery to perishable.
8    Q. Okay. Were you a freight handler
9  at that time?
10   A. Yes.
11   Q. Okay. So, this was your transfer
12 from grocery to perishable?
13   A. Yes.
14   Q. When you went to work for
15 perishable, that's when you went to work
16 for Wayne; is that correct?
17   A. No.
18   Q. Oh, it's not. I thought Wayne
19 was the supervisor of perishable?
20   A. Raymond Butts was the supervisor.
21   Q. Okay. What did Wayne supervise?
22   A. Wayne wasn't there at that time.
23   Q. Oh, he wasn't there. So, if

Page 76

1  Wayne wasn't there, then this would have
2  had to be prior to 2004; is that correct?
3    A. Yeah.
4    Q. Okay. So, this conversation
5  you're describing had to be prior to your
6  involvement with that lawsuit?
7    A. I'm not sure.
8    Q. Okay. But in any event, you are
9  certain that this conversation took place
10 prior to Wayne working as a supervisor in
11 perishable?
12   A. I don't know what Wayne was doing
13 at that time. He wasn't the person I
14 dealt with on the dock. I dealt with
15 Raymond Butts.
16   Q. Okay, okay. I understand that,
17 but you've previously testified that Wayne
18 gave you permission to collect money?
19   A. Yeah, that's after Raymond Butts
20 was no longer there. He resigned.
21   Q. So, that was after Raymond Butts
22 was no longer there?
23   A. Right.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 77

1    Q. Okay. And this conversation you
2  had that you just described, you say it
3  was about your transfer?
4    A. Yes.
5    Q. Did you-all discuss anything
6  else?
7    A. Well, we discussed Ivey's
8  attitude.
9    Q. Ivey?
10   A. Jr.
11   Q. In front of Ivey, Jr.?
12   A. Yeah.
13   Q. Okay. And what was said about
14 Ivey, Jr.'s, attitude?
15   A. Oh, I had spoken to Mr. Crump on
16 several occasions about his attitude; it
17 just had never changed.
18   Q. When you say Mr. Crump, do you
19 mean --
20   A. Sr.
21   Q. You've spoken to Ivey, Sr.,
22 several times about Ivey, Jr.'s, attitude?
23   A. Yes.

Page 78

1    Q. Tell me about these
2  conversations. Let's go through them.
3  This conversation you're talking about
4  right now, what did you say in this room
5  full of people about Ivey, Jr.'s,
6  attitude?
7    A. I didn't understand why he had
8  such a nasty attitude toward me as an
9  individual. And we were talking about a
10 transfer, and for some reason he had an
11 attitude towards me in reference to a
12 transfer.
13   Q. Ivey, Jr., did?
14   A. Yes.
15   Q. So, what did you say about his
16 attitude?
17   A. I asked him what was his problem;
18 I didn't understand what his problem was.
19   Q. And what was the response?
20   A. Kevin said, "Miles, how long have
21 you been working here?" And I told him,
22 and he told Ivey. He opened up a
23 calendar, turned the page and said,

Page 79

1  "Miles, come back on this date and you can
2  start work." And Ivey turned red and
3  folded his arms and said, "Come on, Dad,"
4  and they left.
5    Q. Ivey, Jr.?
6    A. Yes.
7    Q. Did Ivey, Sr., say anything?
8    A. He said something, but I don't
9  remember exactly what he said.
10   Q. He said something to who? To
11 you?
12   A. He was talking to his two sons.
13   Q. You don't remember what he said?
14   A. I don't remember word-for-word.
15   Q. What do you think he said? Do
16 you have any recollection about what it
17 even --
18   A. What he said to me was that he
19 had told Ivey, Jr., that when he talked to
20 people, he needed to talk to them the same
21 way he would like them to talk to him, and
22 he couldn't just -- he couldn't put
23 hisself in somebody else's shoes.

Page 80

1    Q. Did Ivey, Sr., make this
2  statement to you in front of Ivey, Jr.,
3  Kevin Crump and the other person?
4    A. He made it -- yes.
5    Q. He made it in front of all those
6  people?
7    A. Uh-huh (affirmative).
8    Q. Do you recall any other
9  conversations that you've ever had with
10 Ivey, Sr.?
11   A. Yeah, in the grocery warehouse.
12   Q. At Sixth Street?
13   A. Yes.
14   Q. When, when? After this
15 conversation you just described or before?
16   A. Oh, it was way before.
17   Q. Way before.
18     Is the conversation you just
19 described the last conversation you ever
20 had with Ivey, Sr.?
21   A. From my recollection, yes.
22   Q. Okay. Have you ever been to the
23 company office at Yulee?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 81

1    A. No.
2    Q. Okay. How many managers were on
3 site when you worked as a freight
4 handler? And I'm talking about 2004, so
5 are we on the perishable side in 2004?
6    A. Uh-huh (affirmative).
7    Q. How many managers or supervisors
8 would be on site at one time?
9    A. It fluctuates.
10    Q. Can you give me an approximation?
11 I mean, there was one station on the
12 perishable side and one on the
13 non-perishable side.
14    A. I don't know if they were called
15 managers. The person that priced the
16 trucks --
17    Q. Yes.
18    A. -- and wrote it down and got the
19 receipts to the drivers?
20    Q. Yes.
21    A. We had one in the freezer.
22    Q. Okay. And who was that?
23    A. Different ones. You had me, when

Page 82

1 I did it. You had Arlene, when she did
2 it. You had --
3    Q. I'm talking about -- I'm sorry to
4 interrupt you. I'm talking about only in
5 2004.
6    A. I'm telling you.
7    Q. You were authorized to do this in
8 2004?
9    A. Yes.
10    Q. So, you, Arlene. Go ahead.
11    A. Robert Dobbins, David Barnett and
12 Wayne, of course.
13    Q. Because Wayne was the manager?
14    A. Wayne was the dock supervisor.
15    Q. Okay. Anybody else?
16    A. I can't remember his name.
17    Q. But there was another person?
18    A. Yeah, there was another person
19 that priced trucks down there.
20    Q. Okay. And, so, all of you were
21 authorized to price trucks and collect
22 money?
23    A. Oh, Ken.

Page 83

1    Q. Okay.
2    A. Ken did. I showed Ken how to do
3 it.
4    Q. So, all of you were authorized to
5 price trucks and collect money on the
6 freezer side?
7    A. Yes.
8    Q. And who gave you that
9 authorization?
10    A. Wayne.
11    Q. Wayne did. And Wayne gave
12 authorization to all of those people to
13 price trucks and collect money?
14    A. Yes.
15    Q. Okay. What about on the
16 non-perishable side?
17    A. Grocery side, you mean?
18    Q. Yeah, I'm sorry, grocery side.
19    A. I can't really speak on that
20 side, because once I transferred, I didn't
21 know. Like I said, if David went over
22 there when I was there, David priced his
23 own truck, and I had a problem with that.

Page 84

1    Q. Okay. Because you were
2 collecting money, but you weren't pricing
3 your own truck; is that correct?
4    A. No, that's not why I had a
5 problem.
6    Q. Explain this to me because I
7 don't understand.
8    A. Okay. All of the ethnic people,
9 we went by that price sheet. When David
10 came over there, he looked at the truck
11 and he would just give any price he wanted
12 not according to that price sheet. So --
13    Q. How did that have any effect on
14 you at all?
15    A. I just wanted to know how was it
16 possible for one person to have to follow
17 the rules and another person not to follow
18 rules, and I wanted to know what the
19 difference was.
20    Q. Okay. Did you complain about
21 that?
22    A. Yeah, I talked to Ivey about it.
23    Q. Ivey who?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 85

1    A.  Ivey Crump, Jr.
2    Q.  And what did he say?
3    A.  I'm Ivey Crump, Jr., I do what I
4  like, and I don't have to explain nothing
5  to you.
6    Q.  So, was David the only one that
7  was pricing his own truck on the freezer
8  side at that point?
9    A.  No, no, no, we're talking about
10  the dry side, grocery side.
11    Q.  I'm sorry, you named David
12  Barnett as a freezer side person.
13    A.  Yeah.  He would come over to the
14  dry side and do a truck or two and then
15  leave.
16    Q.  Okay.  So, you said in the
17  freezer all of those people that you just
18  named were authorized to collect money,
19  right?
20    A.  Yeah.
21    Q.  Okay.  How many receipt books
22  were there on the freezer side?
23    A.  I have no idea.

Page 86

1    Q.  Was there more than one?
2    A.  From the time I was there?
3    Q.  In 2004.
4    A.  In 2004, that one year, I don't
5  know who had the receipt books, but the
6  one that Wayne had, you know, when it runs
7  out, he would just go get another book.
8    Q.  Okay.  Did Wayne hold the receipt
9  book?
10    A.  Yes.
11    Q.  Explain to me how it would work
12  when you would collect money and a receipt
13  would have to be given to the driver.
14  Just explain how that would work, because
15  it's my understanding that Wayne had the
16  receipt book.
17    A.  Right.
18    Q.  Tell me how that transpired.
19    A.  Well, I'd price the truck, and
20  whoever was there first -- in other words,
21  first come first serve.  So, if someone
22  beat me to the freezer, they would get the
23  first truck.  Once we price the trucks the

Page 87

1  drivers wanted us to do or ones that we
2  had to do, they would get first pick, and
3  it would go on like that.  There was only
4  three of us in there, so, you know, that
5  was it.  Once a truck was done and we
6  added up the restacks and how much it
7  would cost, I would go tell the driver.
8  He would either give cash or write out a
9  check.  And once we collected all of those
10  trucks that were done at that one time,
11  whoever was going up front to thaw out --
12  it's 20 degrees below zero and 30 degrees
13  below zero.
14    Q.  I know.
15    A.  So, when you -- whoever went up
16  front first to get a soda or whatever
17  would take all the cash, all the receipts
18  -- I mean, all the cash, all the checks,
19  drive up front and give them to Wayne, and
20  when they came back, they would collect
21  the receipts and bring them back to the
22  freezer.
23    Q.  So, that person that would go up

Page 88

1  to the front would give Wayne the money?
2    A.  Uh-huh (affirmative).
3    Q.  Okay.  So, for example, and I'm
4  just using round numbers, if you collected
5  $100 from a truck yourself in cash, that
6  person would go up to Wayne, give him the
7  $100, Wayne would write out a receipt --
8    A.  Uh-huh (affirmative).
9    Q.  -- for that driver, give it to
10  that person who had come up there, that
11  person would come back, and would that
12  person give you the receipt to give the
13  driver or would he give the driver the
14  receipt directly?
15    A.  It depends who was going
16  outside.  In other words, if I went
17  outside to thaw out, they would give me
18  the receipts for all the trucks that was
19  out there.
20    Q.  And then you would go distribute
21  them to the drivers?
22    A.  Yes.
23    Q.  Okay.  So, there was no real set

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660