# FREEDOM COURT REPORTING

Page 89

1   policy, it was just whoever happened to be
2   around would take the receipts and
3   distribute them?
4       A. Yes.
5       Q. And that was the process that was
6   followed each time?
7       A. Yes.
8       Q. So, when you say you collected
9   money from the drivers, you would collect
10  money, but Wayne was still signing these
11  receipts and then handing them back?
12      A. Yeah, I would say that.
13      Q. Okay.
14          (Defendant's Exhibit No. 2
15          marked for identification.)
16      Q. And I'm going to show you what I
17  would like to have marked as Defendant's
18  Exhibit No. 2. Wait, hold on. Hang on
19  one second. Oh, I see what she did.
20  Sorry. These should all be together as
21  one exhibit.
22      MR. WINSTON: That always happens
23  to me.

Page 90

1       MS. DeGANCE: See, you hand
2   copies to them, and then you get them back
3   in whatever order you get them back. And
4   this is going to be Exhibit No. 2. And
5   I'll give you a copy in just one second.
6       Q. (BY MS. DeGANCE) Mr. Miles, I'm
7   handing you what's been marked as
8   Defendant's Exhibit No. 2, and I just want
9   you to take a look at them, if you would.
10      A. Uh-huh (affirmative).
11      Q. And basically, tell me what they
12  are, if you recognize them.
13      A. They look like receipts.
14      Q. Okay. And these are just -- I
15  just pulled random receipts from a bunch
16  of different receipt books, and do these
17  look like the receipts that you were just
18  describing?
19      A. That's some of them.
20      Q. Okay. I notice on the left-hand
21  side of the first page, all down the
22  receipts on the left-hand side of the
23  first page it says Southeast Unloading,

Page 91

1   L.L.C. Do you see that?
2       A. Yes.
3       Q. Now, flip to the second page, and
4   notice that those receipts are a little
5   bit different?
6       A. Exactly.
7       Q. They say Southeast Unloading, but
8   they don't have Southeast Unloading
9   printed down the side. Do you see that?
10      A. Yeah.
11      Q. And then if you flip to the
12  third, fourth and fifth pages, you'll
13  notice that they're like the first page
14  and that Southeast Unloading is printed
15  down the side. Do you see that?
16      A. Yes.
17      Q. So in any event, do you see the
18  signature on every single one of these
19  receipts?
20      A. The initials?
21      Q. Yeah, the initials.
22      A. Yeah.
23      Q. Do you know whose initials those

Page 92

1   are?
2       A. I have no idea.
3       Q. Okay. It appears to be Wayne
4   G. -- I mean, it appears to be W. G.
5       A. It doesn't look like a W. G. to
6   me, but okay.
7       Q. Do you know if this could be
8   Wayne's initials?
9       A. No, I do not.
10      Q. Do you know what Wayne's initials
11  -- how Wayne would sign receipts?
12      A. He would draw a G. and a long --
13  because his name is long.
14      Q. Right.
15      A. Yeah.
16      Q. So, you don't know if he would
17  ever sign his receipts W. G.?
18      A. Well, it depends on who actually
19  signed the receipts that day.
20      Q. Well, you testified that Wayne
21  held the receipt book and would sign the
22  receipts and give them out?
23      A. Yes, on certain occasions, but

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 93

1  like I said, when we ran out of receipts,
2  he would get a different book.
3      Q. Right, and then he would start
4  over?
5      A. Right.
6      Q. When a receipt was signed, did it
7  create a carbon copy that would stay in
8  the book?
9      A. Sometimes he did, sometimes he
10 didn't.
11     Q. What do you mean?
12     A. If a truck driver drove off, then
13 he wouldn't -- he would X that receipt
14 out.
15     Q. But how would that affect the
16 carbon copy that was in the book?
17     A. It means that he would put the
18 carbon -- he wouldn't use the carbon.
19     Q. But it's my understanding that
20 these receipt books automatically -- I
21 mean, you don't put a carbon in, you just
22 sign it and it automatically creates a
23 second copy that stays in the book and I

Page 94

1  believe the color is yellow?
2      A. No, you had to put the carbon in
3  them.
4      Q. You had to put the carbon in?
5      A. Yeah.
6      Q. And it would create a copy that
7  stayed in the book?
8      A. If you put the carbon in.
9      Q. Do you know, is that how
10 Southeast Unloading would track how many
11 loads were unloaded on a certain day?
12     A. No.
13     Q. What was the purpose in having
14 the carbon copy of all the receipts?
15     A. That came near the end.
16     Q. What do you mean?
17     A. After the settlement.
18     Q. Okay. Well, then, what was the
19 purpose in having the -- so, you're saying
20 that before settlement -- when you say
21 settlement, you mean settlement of the
22 previous lawsuit?
23     A. Uh-huh (affirmative).

Page 95

1      Q. So, are you testifying that
2  before that lawsuit was settled Southeast
3  Unloading didn't use any yellow copies --
4      MR. WINSTON: Object to the form.
5      Q. -- in their receipt books?
6      A. No, I didn't say that. What I'm
7  saying is different people would sign a
8  receipt.
9      Q. When?
10     A. During -- in the book.
11     Q. How would -- how would different
12 people sign the receipts?
13     MR. WINSTON: I'm sorry.
14     Q. When you explained the process to
15 me, you explained that Wayne held the
16 receipt book and would sign the receipts.
17 If other people were signing these
18 receipts in this receipt book, explain to
19 me how that worked in the process that you
20 described.
21     A. If Wayne was busy, he would give
22 somebody a receipt and I guess they would
23 sign it.

Page 96

1      Q. Would he give them the receipt
2  book or an individual receipt?
3      A. Receipts, bring forward receipts,
4  whatever it was, yeah.
5      Q. He would just rip out blank
6  receipts and give it to them?
7      A. Uh-huh (affirmative).
8      Q. So, if that's the case, then
9  these receipt books that have carbon
10 copies in them, is it fair to say that
11 there should be some blank ones, then,
12 periodically throughout the books?
13     A. I guess so, yeah.
14     Q. Because if he's ripping out
15 receipts, then a carbon copy wouldn't be
16 made, correct?
17     A. Exactly.
18     Q. So, then there would be blank
19 ones, then, throughout the receipt book,
20 wouldn't there?
21     A. Some of them he X'd off; he'd
22 cross off.
23     Q. But they'd be marked in some way

24  (Pages 93 to 96)

# FREEDOM COURT REPORTING

Page 97

1  or be blank?
2     A. Yeah.
3     Q. Or they'd be blank?
4     A. Yeah.
5     Q. Correct?
6     A. Yeah.
7     Q. If he was busy and he would just
8  rip out receipts, who was he handing his
9  blank receipts to?
10    A. Robert Dobbins.
11    Q. Anyone else?
12    A. I don't know all the initials. I
13 just know Robert Dobbins because Robert
14 would write them out.
15    Q. So Robert Dobbins would sign the
16 receipts?
17    A. Yes.
18    Q. Would there ever be a receipt
19 signed by Robert Dobbins still in the
20 receipt book?
21    A. Yes.
22    Q. So, there would be carbon copies
23 created with some of Robert Dobbins'

Page 98

1  signature?
2     A. I don't know. It's on one of
3  these. It's in that book.
4     Q. Okay. Is there a particular
5  person that's responsible for the receipt
6  book?
7     A. I wouldn't know what their
8  procedure is on that.
9     Q. Who was authorized to sign
10 receipts in 2004?
11    A. Whoever he gave a receipt to.
12    Q. Whoever who gave a receipt to?
13    A. Wayne.
14    Q. Okay. So, Wayne would just give
15 receipts to various people, and those
16 people would be authorized to sign them?
17    A. If Wayne gave you a receipt and
18 told you to go fill it out, I would assume
19 that would mean you were authorized.
20    Q. Southeast Unloading did not have
21 a policy in place that stated that only
22 supervisors were allowed to solicit
23 drivers and sign receipts?

Page 99

1     A. Southeast Unloading had a bunch
2  of policies in place, but they never
3  followed them.
4     Q. I'm asking you about that one.
5  What is their policy?
6     A. What do you mean?
7     Q. Did Southeast Unloading have a
8  policy that only supervisors were
9  permitted to solicit drivers and sign
10 receipts?
11    MR. WINSTON: Object to the
12 form. You can answer.
13    A. Uh-huh (affirmative).
14    Q. Yes?
15    A. Yes.
16    Q. Okay.
17    A. And that he had non --
18    Q. That was the answer to the
19 question.
20    MR. WINSTON: Wait till a
21 question.
22    Q. Well, let me ask you this: The
23 way you've described it, there were

Page 100

1  numerous people signing receipts and
2  collecting money, and it doesn't sound
3  like there were any policies strictly
4  followed. So, my question to you is: How
5  did Southeast Unloading ensure that its
6  employees were not stealing from it?
7     A. I don't have any idea. I mean,
8  from what I was told by -- I don't
9  remember the guy's name, a heavyset guy
10 that they brought in from somewhere that
11 accused people of stealing.
12    Q. That who brought in from
13 somewhere?
14    A. Southeast Unloading.
15    Q. Was it a Southeast Unloading
16 employee?
17    A. Yes.
18    Q. Okay.
19    A. They accused everybody of
20 stealing.
21    Q. Who did?
22    A. Ivey would tell them, would say
23 somebody was stealing.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 101

1    Q. Who else did Ivey accuse of
2  stealing?
3    A. Arlene Barker.
4    Q. He accused Arlene Barker of
5  stealing?
6    A. The person underneath him. The
7  guy, I don't remember his name.
8    Q. What do you mean the person
9  underneath him? Did Ivey Crump, Jr.,
10  accuse Arlene Barker of stealing?
11    A. I don't know exactly what -- who
12  did what. When she was a supervisor and
13  Andre Brown was a supervisor, their
14  initials are the same, and they accused
15  her of stealing.
16    Q. Who did?
17    A. The gentleman that was in that
18  office. I can't remember his name.
19    Q. It wasn't Ivey Crump, Jr.?
20    A. Ivey was in the other warehouse.
21    Q. But he was still the highest
22  level person on site, wasn't he?
23    A. Exactly, right, right.

Page 102

1    Q. Well, did he accuse her of
2  stealing?
3    A. I would guess, subsequently.
4    Q. Were you present when she was
5  accused of stealing?
6    A. When the other gentleman said
7  that she was stealing, yes.
8    Q. Who was this other gentleman?
9    A. I can't remember his name.
10    Q. Was he a supervisor?
11    A. Yes.
12    Q. And he accused Arlene Barker of
13  stealing?
14    A. Yes.
15    Q. And he told you this?
16    A. Yes, it was said in front of all
17  of us.
18    Q. What did he say?
19    A. He said there was some money
20  missing and she had stolen it and they
21  wanted her to sit outside until they
22  figured out what they were going to do.
23    Q. Okay. And what was the outcome

Page 103

1  to that?
2    A. They transferred her to the
3  frozen warehouse and didn't allow her to
4  do the books.
5    Q. Do you know whether they had
6  proof that she was stealing?
7    A. I don't believe so.
8    Q. They didn't?
9    A. I don't think she stole.
10    Q. You don't?
11    A. Huh-uh (negative).
12    Q. Okay. Was there any way for
13  Southeast Unloading to keep track of which
14  trucks were coming in and how much money
15  should be collected other than just
16  relying on the employees to be honest?
17    A. Yeah, that printout.
18    Q. I don't understand. What
19  printout?
20    A. The ones in our packets, the
21  printouts of the tie high sheets.
22    Q. The what sheets?
23    A. The tie high sheets.

Page 104

1    Q. Okay.
2    A. Every truck would have a tie high
3  sheet so you would know how many trucks
4  came in. You wouldn't know how many we
5  did, but you would know how many came in.
6    Q. You wouldn't know how many you
7  did?
8    A. You couldn't be accurate.
9    Q. Because some of the drivers do
10  them themselves?
11    A. Yes.
12    Q. Okay. We've been going for an
13  hour. Do you want to stop for a break for
14  a minute because I want to look at these?
15    THE VIDEOGRAPHER: This marks the
16  end of Videotape No. 1. We are off the
17  record at 10:28.
18    (Recess.)
19    THE VIDEOGRAPHER: Back on the
20  record 10:38. Begin Tape 2.
21    Q. (BY MS. DeGANCE:) Mr. Miles,
22  before the break, you were talking about
23  some ways in which Southeast Unloading

26 (Pages 101 to 104)

# FREEDOM COURT REPORTING

Page 105

1 could kind of keep track of what trucks
2 came in and left. And we're going to go
3 over those documents a little bit later
4 that your attorney has just produced to me
5 today, but I wanted to first talk to you a
6 little bit about the incident that led to
7 your, the end of your employment from
8 Southeast Unloading. Were you terminated?
9 A. Yes.
10 Q. Okay. When were you terminated?
11 Do you recall?
12 A. Either that Thursday or that
13 Friday before the first of November.
14 Q. Okay. So, the very end of
15 October, then?
16 A. Yes.
17 Q. Of 2004?
18 A. Yes.
19 Q. Okay. Who informed you that you
20 were terminated?
21 A. Ivey Crump, Jr.
22 Q. And explain to me how that --
23 what happened? What did he say to you?

Page 106

1 A. He said, "I want you off the
2 premises. I've got the supervisors here.
3 I don't want to hear nothing, get out.
4 Don't come back. I'll talk to you after
5 we do an investigation."
6 Q. Did he tell you why you were
7 being terminated?
8 A. Yeah, he said I stole from him.
9 Q. Okay. Did he say anything else
10 about why you were being terminated?
11 A. He just said I stole from him.
12 Q. He didn't go into anymore detail
13 than that?
14 A. No.
15 Q. He just said you stole from him?
16 A. Yeah.
17 Q. Were there any witnesses present
18 during this conversation that you had with
19 Ivey Crump, Jr.?
20 A. Yes.
21 Q. Who?
22 A. Two supervisors from Winn Dixie,
23 Robert Dobbins and the truck driver and

Page 107

1 myself.
2 Q. Two supervisors from Winn Dixie,
3 do you remember who they were?
4 A. I can see them.
5 Q. Not helping me.
6 A. I believe it was Mr. Snow and
7 Tony, and I don't know Tony's last name.
8 Q. And Robert Dobbins was present?
9 A. Yes.
10 Q. Why was he present? Was he a
11 supervisor?
12 A. No.
13 Q. Did he get fired, too?
14 A. Eventually, yes.
15 Q. For the same incident?
16 A. I believe so.
17 Q. Okay. But did he get fired --
18 A. The same time I got fired, no.
19 Q. He didn't.
20 And who else did you say was
21 present? The truck driver?
22 A. The truck driver, Mr. Snow, and I
23 believe Tony Freeman, Tony Freeman.

Page 108

1 Q. What was the truck driver's
2 name? Do you know?
3 A. I read it.
4 Q. Do you recall it?
5 A. Not off the top of my head.
6 Q. Do you know why he was present?
7 A. From what I understand from what
8 I read, Ivey had asked him to be present.
9 Q. But Ivey didn't explain to you
10 why you were being fired other than he
11 thought you stole from the company?
12 A. Yeah, he said I stole from him.
13 Q. He said you stole from him?
14 A. Uh-huh (affirmative).
15 Q. And that was the only explanation
16 you were given?
17 A. Yeah.
18 (Defendant's Exhibit No. 3
19 marked for identification.)
20 Q. I'm going to show you a document
21 and ask that it be marked as Defendant's
22 Exhibit No. 3, please. And, Mr. Miles, I
23 want you to take a minute and look at this

27 (Pages 105 to 108)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 109

1  document and let me know if you've ever
2  seen it before?
3      A. Yes, I have.
4      Q. And what is this document?
5      A. This is a document that I went
6  over with my lawyer about an incident
7  with --
8      Q. Let me interrupt you. I don't
9  want you to tell me about any
10 conversations that you had with your
11 attorney, okay, because that's
12 privileged.
13     Have you reviewed this document
14 other than with your attorney?
15     MR. WINSTON: And I want you to
16 really look at the document.
17     Q. Yeah, take a minute and read it.
18     A. I know the document, yes.
19     Q. And what is this document, if you
20 know?
21     A. It's an explanation of how I did
22 not steal from Ivey Crump.
23     Q. Okay. Who is it signed by?

Page 110

1      A. William Snow.
2      Q. It appears to be signed by
3  William Snow, and is William Snow one of
4  the individuals that was present when you
5  were terminated?
6      A. Yes.
7      Q. Okay. And it looks like Mr. Snow
8  was saying that he was asked to witness a
9  conversation on October 25th, 2004; is
10 that correct?
11     A. Yes, ma'am.
12     Q. As far as you recall, is that the
13 date that you were terminated, do you
14 believe?
15     A. No, because it says incident on
16 10/27, but it's signed on the 25th.
17     Q. Right. Okay. So, you don't know
18 why it's dated 10/25?
19     A. No.
20     Q. Okay.
21     A. Because it's talking about an
22 incident after. So, this was pre-done?
23     Q. Well, it says on 10/25 he was

Page 111

1  asked to witness a conversation. So, is
2  it possible that he was asked to witness
3  the conversation on 10/25, but the
4  conversation didn't occur until 10/27?
5      MR. WINSTON: Object to the form.
6      A. I don't understand the question.
7      Q. It says, "On 10/25 I was asked to
8  witness a conversation between Ivey Crump,
9  Anthony Miles and Robert Dobbins," okay.
10 Is it possible that Mr. Snow was asked to
11 witness this conversation on October 25th
12 and told the conversation was going to
13 take place on October 27th?
14     A. I'm not sure.
15     Q. Okay. Why do you believe this
16 document shows that you didn't steal from
17 your employer?
18     A. According to the truck driver --
19     Q. Are you reading from the
20 document?
21     A. Yes.
22     Q. Okay. Go ahead.
23     A. According to the truck driver, I

Page 112

1  gave him a price, I let him know that his
2  truck was done, and Mr. Dobbins came out
3  and gave me a receipt that I gave directly
4  to the truck driver.
5      Q. Where are you reading?
6      A. I would say the second paragraph.
7      Q. It says, "On October 25th, 2004,
8  I was asked to witness a conversation
9  between Ivey Crump, Anthony Miles and
10 Robert Dobbins. The conversation was
11 about Robert and Anthony receiving money
12 from a third party carrier for unloading
13 his truck. At the beginning of the
14 conversation, Robert said he was not
15 involved and did not know anything about
16 what was going on. Then Anthony said he
17 was given a receipt by Robert, which he
18 gave to the driver. Robert then said he
19 had the money in his pocket, and he
20 thought it was money Anthony owed to him.
21 Robert and Anthony were sent home on this
22 day and told they would be told the
23 outcome of the investigation of above

28  (Pages 109 to 112)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 113

1  incident on October 27th, 2004."
2      A. Right.
3      Q. So, based on the statement, it
4  appears that when you were sent -- that
5  this did occur on October 25th and that
6  you were told that you would be told the
7  outcome of the investigation on October
8  27th. Does that sound correct?
9      A. No, he told me to get out right
10  then and there. This conversation that is
11  in here they had when I was gone.
12      Q. You weren't present for this
13  conversation?
14      A. This conversation right here?
15      Q. Yes.
16      A. No. When he got the $50 from
17  Robert, I wasn't there.
18      Q. Okay. Well, why does William
19  Snow say, "Then Anthony said he was given
20  a receipt by Robert which he gave to the
21  driver"?
22      A. I have no idea.
23      Q. So, you were not present during

Page 114

1  this conversation at all?
2      A. I was present with the
3  conversation with the driver.
4      Q. But you said William Snow was
5  present as well?
6      A. Yeah.
7      Q. So, are you saying that this
8  conversation contained in this statement
9  did not happen?
10      A. It's two different conversations.
11      Q. Okay. Were you present for the
12  one that I just read to you?
13      A. No.
14      Q. How would William Snow know and
15  be able to recount what you said? Are you
16  denying that you stated that you got a
17  receipt from Robert and gave it to the
18  driver?
19      A. No, the driver gave a statement,
20  and I believe that he's commenting on what
21  -- the statement from the driver.
22      Q. Oh, okay. So, the driver gave a
23  statement and you believe that William

Page 115

1  Snow's statement right here is just
2  commenting on the driver's statement?
3      A. Yes.
4      Q. You don't believe that William
5  Snow is commenting on what took place when
6  he witnessed the conversation with you and
7  Mr. Crump?
8      A. No, because it was me, Mr. Crump,
9  Tony Freeman, the driver, Robert Dobbins.
10      Q. And you said William Snow before?
11      A. Yeah, all of us were there. All
12  of us were standing there, and the driver
13  gave us his version of what the driver
14  wrote down.
15      Q. Okay.
16      A. Okay. And then I was asked to
17  leave. This particular conversation,
18  wherever the money and who owed who and
19  all that, I was not there for that. They
20  escorted me off the premises.
21      Q. So, when you were -- when you had
22  this conversation with everyone that you
23  just described, did you make any statement

Page 116

1  at all?
2      A. I asked him what was the problem
3  because I didn't have any money and no
4  receipt.
5      Q. Right.
6      A. And he just said, "You stole from
7  me, I want you out of here," and they
8  escorted me out of there.
9      Q. So that was the end of the
10  conversation?
11      A. They were still talking when they
12  escorted me out.
13      Q. So, do you know whether
14  Mr. Dobbins was terminated as a result of
15  this incident?
16      A. Later on that day.
17      Q. Do you know whether he's filed a
18  lawsuit against the company as a result?
19      A. No, I do not.
20          (Defendant's Exhibit No. 4
21          marked for identification.)
22      Q. I want to show you another
23  document and ask that it be marked as

29 (Pages 113 to 116)

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 117

1  Defendant's Exhibit No. 4. And I want you
2  to take a look at this for me, Mr. Miles,
3  and tell me if you recognize this
4  document?
5      A. Yes.
6      Q. What is this?
7      A. Employee Termination Notice.
8      Q. Is this a document that you
9  received?
10     A. When?
11     Q. I'm sorry. Did you receive this
12  document at this time that you were
13  terminated?
14     A. No.
15     Q. So, do you recognize this
16  document because you reviewed it in the
17  context of this lawsuit?
18     A. Yes.
19     Q. Okay. And the company's
20  statement states that, "On October 25th,
21  2004, a truck driver brought it to the
22  attention of management that you were part
23  of the unloading and giving a bogus

Page 118

1  receipt. These actions are against
2  company policy and you leave the company
3  with no choice except to discharge you
4  from Southeast Unloading for unauthorized
5  solicitation of a driver and failure to
6  follow company policy."
7      And you stated you never got a
8  copy of this, correct?
9      A. Correct.
10     Q. So, did you ever complain to the
11  company that the reason for discharging
12  you was incorrect?
13     MR. WINSTON: Object to the form.
14     Q. Did you ever complain to the
15  company that you thought your termination
16  was unfair?
17     A. I spoke to Kevin.
18     Q. You spoke to Kevin Crump?
19     A. Uh-huh (affirmative).
20     Q. When?
21     A. I think later on that day.
22     Q. Later on the same day you were
23  asked to leave?

Page 119

1      A. Uh-huh (affirmative).
2      Q. Did you call him?
3      A. Yeah.
4      Q. And did you call him in his
5  office in Yulee?
6      A. I called the 904 number.
7      Q. Okay. And what did you say to
8  him?
9      A. I told him that Ivey Crump was
10  harassing me for whatever reason, and he
11  had no reason to even be talking to me
12  about termination or anything else.
13     Q. Did you tell Kevin you thought
14  you were being fired because of your race?
15     A. I might have.
16     Q. Do you recall whether you told
17  Kevin?
18     A. I was pissed. I told Kevin about
19  his attitude, his remarks in reference to
20  ethnicity.
21     Q. Whose remarks?
22     A. Ivey's.
23     Q. Ivey Crump, Jr.?

Page 120

1      A. Yeah.
2      Q. What remarks has he made that
3  relate to ethnicity?
4      A. He talked about people
5  back-talking to him, and there was a time
6  where he put that leather to your backside
7  and you wouldn't talk back to me.
8      Q. He put what to your backside?
9      A. Leather to your backside and you
10  wouldn't talk to me like that. I don't
11  have to explain nothing to you, I'm Ivey
12  Crump, Jr., and he'd storm off.
13     Q. And did you feel like that was a
14  racial comment?
15     A. I took it that way, but I didn't
16  -- you know, I had a job, I had a family,
17  you know.
18     Q. Do you think he intended that to
19  be a racial comment?
20     A. Yes.
21     Q. You do?
22     A. Yes.
23     Q. You don't think that it was just

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 121

1 Ivey Crump having a bad attitude?
2    A. He said that frequently.
3    Q. Tell me exactly what he would say
4 again. Say that again.
5    A. There was a time you back-talk
6 me, I put that leather to your backside
7 and then you wouldn't ask me no questions
8 and talk back to me.
9    Q. Okay. Did you ever witness him
10 saying that to other folks besides
11 yourself?
12    A. He had different comments.
13    Q. What do you mean?
14    A. Comments similar to that one. I
15 mean, when he got mad, that's how he would
16 be.
17    Q. Okay. You don't recall when he
18 made that comment to you, do you?
19    A. Oh, that was, that was right
20 before he said he would get me.
21    Q. Okay. We're going to get into
22 that statement in just a minute.
23

Page 122

1        (Defendant's Exhibit No. 5
2        marked for identification.)
3    Q. Okay. I'm going to show you
4 another document first, and we're going to
5 mark this one as Defendant's Exhibit No.
6 5. I want you to take a look at this for
7 me, please, and tell me if you recognize
8 this document.
9    A. Yes.
10    Q. Okay. What is this?
11    A. This is what I saw on the way out
12 the door.
13    Q. What do you mean this is what you
14 saw?
15    A. When he had me escorted out.
16    Q. Okay. Where did you see it?
17    A. Ivey had it.
18    Q. Okay. Is this your handwriting?
19    A. No.
20    Q. Did you -- you did not fill this
21 receipt out?
22    A. No.
23    Q. Do you know who did?

Page 123

1    A. No.
2    Q. Do you know why Ivey believed
3 that you filled this receipt out?
4    A. He had said in front of Chris
5 Mormon, Brother-in-law and one other
6 person that he was going to get me.
7    Q. When did he make this statement?
8    A. On the way down to the frozen
9 side.
10    Q. That same day?
11    A. Door five.
12    Q. That same day?
13    A. It might have been that day or
14 the day before.
15    Q. Okay. Is this the statement you
16 were referring to a minute ago when you
17 said Ivey said he was going to get you?
18    A. Uh-huh (affirmative).
19    Q. Let's talk about that. Either
20 the day you were terminated or the day
21 before, Ivey made this statement?
22    A. Uh-huh (affirmative).
23    Q. And who was it in front of?

Page 124

1    A. Chris Mormon, and Chris Mormon's
2 brother-in-law.
3    Q. Who is that?
4    A. I don't remember. Everybody
5 calls him Brother-in-law.
6    Q. Is he an employee?
7    A. Yes, he's an employee.
8    Q. And who else?
9    A. I can't -- it's going to come to
10 me. Brother-in -- there was a gentleman
11 out of Luverne, Alabama that worked
12 closely with Brother-in-law. They were
13 like --
14    Q. Do you know his name?
15    A. I cannot remember his name. If
16 it hits me, I'll tell you.
17    Q. If you recall it, tell me, okay?
18    A. He was the other gentleman that
19 was allowed to price his own trucks and
20 all of that.
21    Q. The no name one that we've --
22    A. Yeah.
23    Q. Okay. If you recall his name,

31  (Pages 121 to 124)

# FREEDOM COURT REPORTING

Page 125

1 let me know.
2     A. Oh, I'm going to let you know.
3     Q. So, these three people, in any
4 event, witnessed Ivey Crump, Jr., making a
5 statement about you?
6     A. Yeah, said he would get me.
7     Q. Were you present when the
8 statement was made?
9     A. I had just pulled up on a
10 forklift where Chris, Ivey and
11 Brother-in-law were standing.
12     Q. Could you hear the comment?
13     A. I heard the comment and Chris
14 heard the comment and Brother-in-law heard
15 the comment.
16     Q. You heard the comment?
17     A. Yeah.
18     Q. What specifically did Ivey Crump,
19 Jr., say?
20     A. "I'll get you, Miles."
21     Q. "I'll get you, Miles"?
22     A. Uh-huh.
23     Q. That's it, nothing else?

Page 126

1     A. That's it.
2     Q. Had anything happened that day
3 between the two of you that would have
4 prompted that comment to be made?
5     A. Not that I know of. Chris had
6 frequent conversations with Ivey in
7 reference to me.
8     Q. Okay. What kind of
9 conversations?
10     A. When we had a situation that
11 wasn't agreeable, I would call Florida and
12 ask them.
13     Q. Florida meaning Yulee?
14     A. Yeah.
15     Q. The office.
16     A. I would call his brother or his
17 daddy and ask him what the procedure was,
18 and he used to get mad about that.
19     Q. Okay. Had that happened on the
20 day you were terminated or the day before?
21     A. It happened sometime earlier that
22 day, in that month.
23     Q. So, sometime in October 2004, you

Page 127

1 made a phone call to the office in Yulee?
2     A. Yeah.
3     Q. Who did you speak with?
4     A. I spoke to his wife.
5     Q. You spoke to Ivey Crump, Jr.'s,
6 wife?
7     A. Yes.
8     Q. Okay. Did you speak to anyone
9 else?
10     A. No, I think Rester was going to
11 call me back, but Rester showed up.
12     Q. So, you left a message for
13 Rester to call you back?
14     A. Yeah.
15     Q. And Rester just showed up?
16     A. Well, he came to the site.
17     Q. Okay. Did he answer your
18 question?
19     A. Yes.
20     Q. But in any event, you left a
21 message with Mrs. Ivey Crump?
22     A. Uh-huh (affirmative).
23     Q. Jr.?

Page 128

1     A. Uh-huh (affirmative).
2     Q. Ivey Crump, Jr.'s wife?
3     A. Uh-huh (affirmative).
4     Q. Okay. There are a lot of Crumps,
5 so I want to make sure we keep them
6 straight.
7         You left a message with her. Do
8 you think that angered Ivey, Jr.?
9     A. He pulled up in the car and asked
10 me why I called.
11     Q. When, before this comment was
12 made?
13     A. Yeah.
14     Q. Ivey Crump, Jr., pulled up in the
15 car where?
16     A. We were sitting in the gazebo.
17     Q. On the premises?
18     A. On the premises. And he drove
19 straight up to the gazebo and asked me why
20 I called Florida.
21     Q. And what did you say?
22     A. I said I wanted to speak to your
23 brother.

32  (Pages 125 to 128)

# FREEDOM COURT REPORTING

Page 129

1    Q. And what did he say?
2    A. He said he was the supervisor on
3  site and he didn't want me calling Florida
4  and this, that, and the other.
5    Q. Do you remember when this
6  happened, when he walked up to you at the
7  gazebo?
8    A. No, he didn't walk up, he drove
9  up.
10    Q. I'm sorry, do you remember, do
11  you recall how --
12    A. It was all in October.
13    Q. So, that happened in October.
14  Then sometime after that, he made this
15  comment, "I'll get you, Miles"?
16    A. Uh-huh (affirmative).
17    Q. Do you believe he made the
18  comment, "I'll get you, Miles," because
19  you called -- tried to call his brother?
20    A. I believe he did it because of a
21  slip of the tongue, one of those things.
22  You know, when somebody wants to hurt you,
23  injure you -- Ivey has a problem, he has a

Page 130

1  tendency to let you know that he's going
2  to get you.
3    Q. Okay. But my question is, I'm
4  really trying to figure out why he was
5  trying to get you. Do you think he was
6  trying to get you because you were calling
7  his brother and that made him mad?
8    A. I don't know what -- it was a lot
9  of things. Between the slurs --
10    Q. When you say the slurs, do you
11  mean the comment that you just --
12    A. The comments.
13    Q. -- told me about?
14    A. Yes. It's comments like that
15  that if you're in that situation that
16  makes you uncomfortable. I mean, you can
17  take it.
18    Q. Do you believe that he had sort
19  of a personal problem with you?
20    A. He had problems with a lot of
21  people, but somewhat with me also.
22    Q. And why do you think he had a
23  problem with you?

Page 131

1    A. I don't know if it was the
2  complexion of my skin or that I would
3  question when I was lied to.
4    Q. Okay. You testified earlier --
5  and I know that the majority of employees
6  at that site are African-American; is that
7  correct?
8    A. Yes.
9    Q. Okay. So, why would Ivey Crump,
10  Jr., have a problem with the color of your
11  skin when most of the employees there were
12  African-American?
13    MR. WINSTON: Object to the form.
14    Q. You can answer that.
15    A. I don't understand the question.
16    Q. Okay. Bottom line. Why would
17  Ivey Crump, Jr., have a problem with the
18  color of your skin if he's going to employ
19  so many African-Americans on site at that
20  location?
21    A. He had no choice. I mean, those
22  were the only people that would work
23  basically with him. When he started, all

Page 132

1  of us worked for Winn Dixie freelance.
2  Ivey would buy liquor, steaks and cook out
3  and hang out with us, and then when he had
4  them incorporate OSHA --
5    Q. Hang on. He hung out with you,
6  you mean socially?
7    A. Not with me personally. I mean
8  with the people that -- we used to sit by
9  a garbage can and light it up and be on
10  radio and tell the truck drivers who
11  needed to unload trucks. When Ivey first
12  got there, he would ride up and get
13  buddy-buddy with the people that were
14  there, hang out with them, buy them liquor
15  and stuff like that.
16    Q. Were these African-American
17  people?
18    A. Yes.
19    Q. Okay. So, that receipt that I
20  previously showed you, Exhibit No. 5, this
21  is not something you filled out?
22    A. I did not fill that out.
23    Q. And had you seen this at all

33 (Pages 129 to 132)

# FREEDOM COURT REPORTING

Page 133

1  while you were employed at Southeast
2  Unloading?
3      A. Yeah, that day.
4      Q. The day you were terminated?
5      A. The day that they escorted me
6  out, he showed me this receipt.
7      Q. Do you have any idea who filled
8  this receipt out?
9      A. No.
10     Q. Does this look like a Southeast
11 Unloading receipt?
12     A. That's just a receipt like some
13 of the ones that's in there.
14     Q. What do you mean, some of the
15 ones that's in there?
16     A. There's a book with receipts in
17 it.
18     Q. Right.
19     A. But it's not a clear book, it
20 doesn't have a consistent year.  It's like
21 one or two months, like the exhibits that
22 you gave me.
23     Q. Right.

Page 134

1      A. So, it doesn't have all the
2  receipts of different ones in there.
3      Q. Right.
4      A. But there are receipts without
5  Southeast Unloading's name on it, without
6  Southeast written on it.  It's just blank
7  receipts just like that.
8      Q. So, you're telling me that there
9  is a book of receipts that look just like
10 this one?
11     A. There's receipts like that.
12     Q. Just like this one?
13     A. I wouldn't say just like that.
14     Q. No, I want to know if you've ever
15 seen any other receipt that looks exactly
16 like this one?
17     A. Exact, no.
18     Q. I showed you receipts earlier
19 without Southeast Unloading on it, but
20 those receipts did not look like this one,
21 and I want to know whether you've ever
22 seen any other receipts ever that looked
23 like this one while you were working at

Page 135

1  Southeast Unloading?
2      A. Yes.
3      Q. You have seen receipts that
4  looked just like this one?
5      A. Not just like that, similar to
6  that.  Yeah.
7      Q. No.  I don't want to know --
8          MR. WINSTON:  Object to the
9      form.  How about identical?
10     Q. I want to know had you ever seen
11 a receipt while you were working at
12 Southeast Unloading that is identical to
13 this one?
14     A. I'm confused.
15     Q. I want to know -- I'll ask it
16 again.  While you were working at
17 Southeast Unloading, have you ever seen a
18 receipt before you were employed
19 there that looked identical to this one,
20 meaning exactly the same, not similar,
21 exactly the same?
22     A. I'm not sure.
23     Q. You're not sure?

Page 136

1      A. No.
2      Q. So, you don't know?
3      A. I don't know.
4      Q. Okay.  Thank you.
5          (Defendant's Exhibit No. 6
6          marked for identification.)
7      Q. I'm going to mark this as
8  Defendant's Exhibit No. 6.  Take a look at
9  that for me, please, and tell me if you've
10 ever seen this document before?
11     A. Yes, I have.
12     Q. You have?
13     A. Yes, I have.
14     Q. When have you seen this document
15 before?
16     A. I saw this document when I
17 reviewed different paperwork.
18     Q. In the context of this lawsuit?
19     A. Yes.
20     Q. Have you seen this document
21 outside the context of this lawsuit?
22     A. I don't believe so.
23     Q. What is the document?

34  (Pages 133 to 136)

## FREEDOM COURT REPORTING

Page 137

1    A. This is the truck driver's
2 interpretation.
3    Q. So, Rodney Brown was the truck
4 driver?
5    A. From what I understand, yes.
6    Q. And the document states, "On
7 October 25th, 2004, I, Rodney Brown,
8 talked with a man in orange jacket, turned
9 out to be Anthony Miles. We talked about
10 a price of $50 to unload a truck from" --
11    A. To unload.
12    Q. "To unload a load," sorry,
13 "from"?
14    A. Pilgrim Pride.
15    Q. "Pilgrim Pride Chicken." I'm
16 going to stop there.
17        Is that correct, did you talk
18 about a price of $50 with this man?
19    A. Yes.
20    Q. So, this is correct so far?
21    A. Yes.
22    Q. "I then went to my truck and
23 Anthony Miles came out to my truck, and I

Page 138

1 gave him $50 in cash, and a second came
2 with a receipt and handed it to Anthony
3 Miles, and Anthony hand it to me." Is
4 that correct?
5    A. No.
6    Q. Okay. Why is that not correct?
7    A. I went outside -- like I said,
8 it's 30 degrees below zero. I went
9 outside and told him his truck was done.
10 While I was talking to him about his truck
11 being done, Robert Dobbins walked up to me
12 and passed me a receipt that I passed to
13 the driver.
14    Q. Had you already collected the
15 money from the driver?
16    A. No.
17    Q. So, you have a receipt but you
18 haven't collected any money from the
19 driver?
20    A. Yes.
21    Q. Go on.
22    A. I passed it to her, she passed it
23 to you, that's how that went down, and I

Page 139

1 walked away. When I went to walk away, he
2 said, "Hold up, don't you want your
3 money?"
4    Q. Who?
5    A. Rodney Brown. He said, "Hold up,
6 don't you want your money?" And I turned
7 and looked at him and said, "Wayne didn't
8 collect it?" He said, "No, nobody
9 collected any money from me." Then he
10 handed me the $50.
11    Q. When you were handed the receipt
12 from Robert Dobbins, was the receipt
13 already filled out?
14    A. It was folded.
15    Q. Do you know whether it was the
16 receipt that we identified as Exhibit No.
17 5?
18    A. When they escorted me out, that's
19 the receipt that they said that was the
20 one I handed to the driver.
21    Q. But you're not sure because it
22 was folded?
23    A. Yes.

Page 140

1    Q. But it could have been the same
2 receipt that we identified as Exhibit No.
3 5?
4    A. Yes, it could. Yes, it could.
5    Q. In any event, whatever receipt
6 you handed the driver was already filled
7 out?
8    A. I didn't see. Like I said, it
9 went like that. I didn't see. It wasn't
10 open, it was -- I had gloves on. I've got
11 four pair of gloves on. It was folded. I
12 just passed it to him. He passed it to
13 me; I passed it to the driver.
14    Q. How much money did Rodney Brown
15 give you?
16    A. Rodney Brown gave me $50.
17    Q. Because the receipt we identified
18 as Exhibit No. 5 says $70.
19    A. Exactly.
20    Q. So, you don't know whether it was
21 the same receipt or not?
22    A. Exactly.
23    Q. But you were only handed $50?

35 (Pages 137 to 140)

# FREEDOM COURT REPORTING

Page 141

1    A. Exactly.
2    Q. "Dirty orange shirt which turned
3  out to be Robert Dobbs and we went outside
4  to get my" -- bills maybe? "And Winn
5  Dixie employee said that was not a lumper
6  receipt."
7    A. That's not accurate.
8    Q. Why is that not accurate?
9    A. His bills are inside, not
10  outside. There's no way you can get bills
11  outside. You have to go inside to get
12  them.
13    Q. But you don't know whether a Winn
14  Dixie employee said that was not a lumper
15  receipt, do you?
16    A. If it was, it would have been
17  Mike who's the only one they let give out
18  receipts -- I mean, paperwork for Winn
19  Dixie in the freezer.
20    Q. Mike who?
21    A. Oh, god. I can see him.
22    Q. That's fine.
23      But you don't know whether -- but

Page 142

1  you're not sure whether this happened,
2  whether a Winn Dixie employee pointed out
3  that the receipt wasn't a lumper receipt,
4  do you?
5    A. No, because I was still working
6  on the trucks.
7    Q. All right. Then let's keep
8  going. "That I needed to talk with
9  Wayne. I went and found Wayne. Wayne
10  said that was not his receipt of payment
11  for service." And then he signs it Rodney
12  Brown?
13    A. Uh-huh (affirmative).
14    Q. Did you ever have a conversation
15  with Rodney Brown about this incident?
16    A. You mean after this day?
17    Q. Yes, sir.
18    A. No.
19    Q. What about during this day?
20    A. The only conversation I had with
21  Rodney was I priced like five trucks that
22  day, and I had a check in one pocket for
23  $250, some cash from another truck, and I

Page 143

1  was working on his truck, and me and Kevin
2  were working on another truck.
3    Q. Okay. So, just in the course of
4  your work that day?
5    A. He had a small truck. You know,
6  we knocked that out in between doing all
7  of this.
8    Q. Okay. During the time that you
9  were terminated and all of those people
10  were present, you said the truck driver
11  gave a statement. Is this basically what
12  the truck driver said?
13    A. Basically.
14    Q. Okay. After you were given that
15  $50 from Rodney Brown, did you turn it
16  over to anyone?
17    A. Yeah, I gave it to Robert.
18    Q. Why did you give it to Robert and
19  not Wayne?
20    A. Wayne wasn't there.
21    Q. He wasn't on site that day?
22    A. No. No, he was there, but he
23  wasn't in the freezer.

Page 144

1    Q. Okay. Why did you give it to
2  Robert instead of -- you said that you had
3  a check for $250 in your pocket and you
4  were collecting money?
5    A. Right.
6    Q. You guys are working. Why did
7  you give that $50 to Robert?
8    A. He gave me the receipt. So, when
9  Wayne comes down there, Wayne's going to
10  -- he goes to everyone who he gave a
11  receipt to or everyone who has whatever it
12  is. Nobody was going up front.
13    Q. Okay. So, you gave -- the reason
14  you gave the money to Robert is because
15  he's the one that gave you the receipt?
16    A. Yeah. So I assume he's going to
17  go up front and take all the money up
18  front.
19      (Defendant's Exhibit No. 7
20      marked for identification.)
21    Q. Okay. So, at the time you were
22  terminated, you didn't have the money or
23  the receipt?

36  (Pages 141 to 144)

# FREEDOM COURT REPORTING

Page 145

1    A. No.
2    Q. I'm going to mark this as Exhibit
3  No. 7 and ask you to please take a look at
4  it. I want you to tell me if this is
5  something that you've seen before?
6    A. No, I have not.
7    Q. You've never seen this before?
8    A. No.
9    Q. Even in the context of the
10 lawsuit?
11   A. I don't recall seeing this one.
12   Q. Okay. This is a document, it
13 looks like a Document It notice. Do you
14 know whether these Document It notice
15 forms were used when an employee was
16 disciplined or reprimanded by the company?
17   A. These documents?
18   Q. Yeah.
19   A. All these things are new.
20   Q. So, you've never seen even this
21 form before?
22   A. No, all these things were new.
23   Q. Okay. New meaning after you were

Page 146

1  terminated?
2    A. New meaning as of January 15th,
3  '04.
4    Q. Okay. So, it would have been in
5  play while you were there, then, wouldn't
6  it?
7    A. Well, I was there from 2001.
8    Q. I know, but you were terminated
9  in October -- you were terminated in
10 October of '04?
11   A. Right. So, all of these
12 documents, they're all new. So, I didn't
13 see all the documents that they had. They
14 never had them before.
15   Q. Had you ever seen this form
16 before?
17   A. No.
18   Q. Okay. One of your claims in this
19 case, Mr. Miles, is that you feel like
20 you've been retaliated against, and I want
21 to sort of get an idea of what facts you
22 have to support that belief. I'm not
23 asking for a legal opinion, obviously, but

Page 147

1  in your own words, why do you feel like
2  Southeast Unloading has retaliated against
3  you?
4    A. Everyone that signed that lawsuit
5  was subsequently fired for bogus reasons,
6  including mine.
7    Q. Okay. I want you to take me
8  through and tell me each person that you
9  know of that's been fired that was
10 involved -- and when you say --
11   A. I can't give you everybody's
12 name.
13   Q. Then how do you know?
14   A. Well, I was kind of present with
15 some of the firing that didn't make any
16 sense.
17   Q. Who were you present for?
18   A. Oh, God, I was present from
19 everybody all the way except Robert
20 Dobbins. I wasn't there --
21   Q. What do you mean? If you're
22 going to say everybody, I need names. I
23 need to know what firings you were there

Page 148

1  for.
2    A. If I had the sheet in front of
3  me, I could tell you the names and explain
4  to you the incident of the people. I
5  could explain them all.
6    Q. You could explain all of them,
7  but you're unable to explain them without
8  a piece of paper in front of you?
9    A. I don't have the names.
10   Q. Okay. Then just tell me.
11   A. Dave -- Barlow.
12   Q. Donnie Barlow?
13   A. Barlow, whatever his first name
14 is.
15   Q. I know who he is.
16   A. Barlow tooted his horn when he
17 went through a plastic door that you
18 cannot see through, and a Winn Dixie
19 employee ran into him. But he was one
20 that was on there. And then he got
21 terminated for that.
22   Q. It was a car accident?
23   A. It wasn't a car accident. They

37  (Pages 145 to 148)

# FREEDOM COURT REPORTING

Page 149

1  hit each other on a pallet jack.  Nobody
2  was subsequently injured.
3     Q.  Were you present for when he was
4  in the accident?
5     A.  What accident?
6     Q.  When they hit each other on the
7  pallet jack, were you present?
8     A.  Yeah, right there in the doorway.
9     Q.  You were there?
10    A.  Yeah, I saw it.
11    Q.  So you saw it and you believe he
12  was terminated for that reason?
13    A.  He was just terminated because he
14  needed a reason to terminate him.
15    Q.  Who needed a reason to terminate
16  him?
17    A.  Ivey.
18    Q.  Ivey Crump, Jr.?
19    A.  Yes.
20    Q.  Okay.  Who else was fired?
21    A.  When he got rid of Peck.
22    Q.  Who?
23    A.  Andrew Peck.

Page 150

1     Q.  Why was that a bogus reason?
2     A.  Well, when David Gilbert came up
3  positive and ran a hole through the
4  forklift, the pole, he wasn't fired, but
5  he came up positive for drugs.
6     Q.  So, you're saying another
7  employee tested positive for drugs and was
8  permitted to keep his job?
9     A.  He was made safety coordinator.
10  The only difference was their color.
11    Q.  Andrew Peck, is he
12  African-American?
13    A.  Yes, he is.
14    Q.  He tested positive for drugs and
15  was fired and you feel like it was because
16  of his previous involvement in a lawsuit?
17    A.  That and his color.
18    Q.  Okay.  Who else?
19    A.  I'd have to get all the names.
20  The other gentleman that was over there
21  with us.  I'd have to see the names.  I
22  can tell you the incidents if I --
23    Q.  Go ahead.  Well, can you remember

Page 151

1  the incidents without the name?
2     A.  There were different incidents.
3  Another gentleman had a situation where he
4  was subsequently fired for supposedly
5  stealing.
6     Q.  Someone else was fired for
7  stealing?
8     A.  They claimed he was stealing.
9  But when they said that Arlene was
10  stealing and she was going to be
11  terminated, all they did was transfer her
12  to the freezer and allowed her to collect
13  money again.
14    Q.  So, Arlene was treated pretty
15  favorably?
16    A.  Yes.
17    Q.  Arlene was a plaintiff in that
18  lawsuit, wasn't she?
19    A.  Yes, she was.
20    Q.  Why wasn't she terminated?
21    A.  I have no reason.  The only
22  difference between her and everybody else.
23    Q.  Who else?

Page 152

1     A.  I don't have all of the names in
2  front of me.
3     Q.  Do you have any other incidents
4  that you know of?  There were 20 something
5  plaintiffs.  Certainly you have more than
6  three incidents?
7     A.  I'd have to see the names so I
8  can tell you the incidents.  I have to put
9  a face with the --
10    Q.  Also in the interrogatory.
11       Any other facts that you know of
12  supporting your claim that you were
13  retaliated against?
14    A.  It's right here.
15    Q.  By this company?
16    A.  Right here.
17    Q.  When you say right here, you're
18  pointing to Defendant's Exhibit No. --
19    A.  6 and 3.
20    Q.  6 and 3.  You think those support
21  your reason or your --
22    A.  Yeah, Exhibit 6 says that I
23  collected $50, and Exhibit 3 says he got

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 153

1    the $50 out of Robert's pocket, not mine.
2    Exhibit 6 says, "I was given a receipt by
3    Robert, but I was the one fired for
4    stealing." Nor did I have the cash or the
5    receipt. I was given the receipt by
6    somebody else, and that person is the one
7    that actually had the cash, so I never had
8    it --
9        Q. Because you gave it to him?
10       A. I never had the receipt or the
11   cash.
12       Q. You collected the cash, you
13   testified --
14       A. He didn't get it from me.
15       Q. You testified you collected the
16   cash?
17       A. Yes, I collected all the cash
18   from all different doors.
19       Q. So, do you feel like Rodney
20   Brown, the truck driver, and William Snow,
21   a Winn Dixie employee, are part of a
22   conspiracy against you to have you fired?
23           MR. WINSTON: Object to the form.

Page 154

1        A. No, I don't think it's a
2    conspiracy. I believe what it says here
3    in Exhibit 6. Someone handed me a piece
4    of paper, I handed it back. They took
5    some cash. I gave them -- cash to the
6    gentleman that handed me the receipt, like
7    we always do. The same thing with Exhibit
8    3 where it looks like he read this and
9    wrote this.
10       Q. What do you mean it looks like --
11   who, who?
12       A. It looks like he read Exhibit 6,
13   William Snow, and wrote what he saw.
14       Q. So, you think William Snow was
15   being dishonest when he wrote this?
16           MR. WINSTON: Object to the form.
17       A. No, I just think he's just
18   dealing with whatever he wrote.
19       Q. I mean, you're questioning
20   whether William Snow wrote down what he
21   witnessed?
22       A. He witnessed Ivey getting or he
23   witnessed somebody getting money from

Page 155

1    Robert.
2        Q. I mean, he states what he
3    witnessed?
4        A. He witnessed Robert and not
5    Anthony.
6        Q. Okay. Do you have any other
7    facts supporting your claim of retaliation
8    besides what you just discussed?
9           MR. WINSTON: Object to the form.
10       Q. Any other facts supporting your
11   claim of retaliation?
12       A. Witness testimony.
13       Q. Who?
14       A. Everyone that we've given you on
15   the forms.
16       Q. I'm asking you.
17       A. From Chris to Ken.
18       Q. Chris who?
19       A. Chris Mormon.
20       Q. Who else?
21       A. Kenneth, Wayne, Arlene.
22       Q. You have a witness statement from
23   Arlene?

Page 156

1        A. She's going to testify.
2        Q. Do you have a witness statement
3    from Arlene Barker?
4        A. Not at this time.
5        Q. Okay. Have you spoken with
6    Arlene Barker about this lawsuit?
7        A. I've spoken to just about every
8    witness on that list.
9        Q. Okay. I want to know the content
10   of your conversation with Arlene Barker
11   about this lawsuit. I want to know
12   everything you talked about with her.
13       A. I can't tell you everything I
14   talked about with her.
15       Q. Why not?
16       A. Because I don't remember
17   everything that we talked about in
18   reference to this case.
19       Q. I want to know everything you
20   remember that you talked about with Arlene
21   Barker about this lawsuit.
22       A. I can't tell you everything
23   because I don't remember everything.

39 (Pages 153 to 156)

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 157

1   Q. I want to know everything you
2   remember --
3       A. Okay.
4       Q. -- that you talked with Arlene
5   Barker about regarding this lawsuit.
6       A. We talked about this incident
7   here.
8       Q. You've got to explain it. The
9   court reporter is transcribing what you're
10  saying.
11      A. I'm sorry. We talked about the
12  incident of Wayne asking me to write up
13  and collect cash as well as hand out
14  receipts, how we would send Robert up
15  front because he liked to talk and all
16  that, so we would send him up front so he
17  could go over and play with Wayne or
18  whatever he did to get out of our hair so
19  we could work. Whoever went up front, in
20  different situations, depending on who was
21  there, if Robert wasn't there, then it
22  would either be Chris, myself or Arlene
23  at that time.

Page 158

1       Q. What else did you talk about?
2       A. We talked about the fact of him
3   accusing me of stealing when he had
4   accused her of stealing. All he did was
5   transfer her and then give her back the
6   books. He accused me of stealing, but no
7   money ever left the warehouse.
8       Q. How many conversations have you
9   had with Arlene Barker regarding this
10  lawsuit?
11      A. In the beginning, three or four.
12      Q. How many total?
13      A. About maybe five.
14      Q. Five?
15      A. Maybe five.
16      Q. When was the last time you spoke
17  with her?
18      A. About this suit?
19      Q. Yes.
20      A. Oh, God. About a week and a half
21  ago.
22      Q. You spoke with her a week and a
23  half ago about this lawsuit?

Page 159

1       A. Uh-huh (affirmative).
2       Q. How often do you talk to her?
3       A. About as much as I speak to
4   Chris.
5       Q. Which is?
6       A. Two or three times a month.
7       Q. You talk to Chris Mormon and
8   Arlene Barker a couple of times --
9       A. Chris Mormon, Arlene Barker,
10  Terrence Bell.
11      Q. A couple of times a month?
12      A. Yeah, but we don't talk about the
13  lawsuit; we just talk.
14      Q. Are you friends with them?
15      A. I know them. We talk about
16  business, trying to make some money. Some
17  of them want to get new jobs, work --
18      Q. Where does Arlene Barker work
19  now?
20      A. She was working at -- I can't
21  remember the name. She was putting in
22  satellites, I can tell you that.
23      Q. Do you have her current address?

Page 160

1       A. I know her address.
2       Q. What is it?
3       A. That's not her current address,
4   but I know her mother's address.
5       Q. Do you know her address?
6       A. Her current address I do not
7   know.
8       Q. Do you know her telephone number?
9       A. I know her cell number.
10      Q. What is it?
11      A. You need it?
12      Q. I do need it.
13      A. 334 --
14      Q. Excuse me?
15      A. 334-415-8980.
16      Q. Is this the only telephone number
17  you have for Arlene Barker?
18      A. That's her cell phone number.
19      Q. Is this the only telephone number
20  you have for Arlene Barker?
21      A. Yes.
22      Q. It's the only one?
23      A. Uh-huh (affirmative).

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 161

1    Q. And you don't know her address?
2    A. No. I know her mother's address.
3    Q. Does she live with her mother?
4    A. No.
5    Q. She doesn't?
6    A. No.
7    Q. Why do you know her mother's
8 address?
9    A. Before her mother's husband died,
10 he had asked me for some parts for a
11 transmission.
12    Q. Okay. Do you know Chris Mormon's
13 address? He's still employed with
14 Southeast Unloading, isn't he?
15    A. Yeah.
16    Q. What about Terrence Bell?
17    A. Still employed.
18    Q. He's still employed?
19    A. Uh-huh (affirmative).
20    Q. Terrence Bell was a plaintiff in
21 that lawsuit, wasn't he?
22    A. I'm not sure.
23    Q. Okay.

Page 162

1      (Defendant's Exhibit No. 8
2      marked for identification.)
3    Q. I'm going to show you a document
4 I'll mark as Defendant's Exhibit No. 8,
5 and I want you to tell me if you recognize
6 that, Mr. Miles.
7    A. Yes.
8    Q. Is this a statement that you
9 prepared?
10    A. This is one that was typed, yes.
11    Q. Who typed it?
12    A. Either I or the attorneys at the
13 office where I got this notarized.
14    Q. Was this a handwritten statement
15 that was then later typed?
16    A. We were all there.
17    Q. Was this a handwritten statement
18 that was then later typed?
19    A. I believe it was.
20    Q. Who hand wrote the statement
21 before it was typed?
22    A. Everybody that's in this piece of
23 paper.

Page 163

1    Q. Who physically took a pen and
2 hand wrote the statement before it was
3 typed?
4      MR. WINSTON: Object to the form.
5    A. I don't know the secretary's
6 name.
7    Q. So, a secretary hand wrote the
8 statement for you?
9    A. Not hand wrote the statement.
10 She took notes on what was said on this
11 piece of paper before we formulated it.
12      MR. WINSTON: You know what --
13    Q. Was this a statement --
14      MR. WINSTON: I don't think he
15 can comment on what -- it wasn't in my
16 office, but if it was another lawyer --
17 it's my understanding it was in a lawyer's
18 office, and how they prepared the
19 statement and who said what to whom, I
20 would tell him not to answer what
21 conversations you had with employees of
22 law firms.
23    Q. What law firm was this, what law

Page 164

1 firm office were you at?
2    A. It's off of South Decatur.
3    Q. Was this an attorney that you
4 retained to represent you?
5    A. No, I didn't retain them.
6    Q. Did anyone whose signature is on
7 this piece of paper retain a lawyer in
8 that office to represent them?
9    A. No.
10    Q. Did you sign any contract with
11 any attorney in this office?
12    A. No.
13      MS. DeGANCE: Okay. Then there
14 is no attorney-client privilege and I'm
15 going to ask him about it.
16      MR. WINSTON: I don't know. I
17 don't think that you need an actual
18 contract. If people went seeking legal
19 services -- I don't remember exactly what
20 it is, but I think if you seek legal
21 services, it would be -- the privileges
22 would attach. Like if I call you and I
23 say I need a lawyer to talk about X, Y and

41 (Pages 161 to 164)

# FREEDOM COURT REPORTING

Page 165

1  Z, and even though I haven't signed any
2  formal fee agreement with you, I think
3  that -- I mean, I'd have to go check, but
4  I think conversations would be protected.
5      MS. DeGANCE:  There were at least
6  three or four, five people in the room,
7  these other people there.  I don't see
8  where there's any privilege when you have
9  other people not --
10     MR. WINSTON:  Maybe you could get
11 them to waive it.
12     Q.  (BY MS. DeGANCE:)  Were you
13 interviewing this person to be your
14 attorney?
15     A.  Yeah.
16     Q.  You were.  I want to know his
17 name.
18     A.  I don't have it in front of me.
19     Q.  Okay.  But you were interviewing
20 someone to be your attorney; you can't
21 tell me his name?
22     A.  It was everybody on that lawsuit.
23     Q.  I don't understand what that

Page 166

1  means.
2      A.  On the lawsuit with -- the first
3  lawsuit.  It was a bunch of those people
4  and myself that were talking to an
5  attorney, a lawyer.
6      Q.  And that's when the statement was
7  prepared?
8      A.  Uh-huh (affirmative).
9      Q.  Okay.  So, someone typed it for
10 you, obviously?
11     A.  Uh-huh (affirmative).
12     Q.  And who -- and did the three of
13 you -- it looks like it's signed by
14 Kenneth Hirneisen?
15     A.  Yeah.
16     Q.  And then yourself?
17     A.  Uh-huh (affirmative).
18     Q.  Did the three of you have input
19 into what went into this statement?
20     A.  Yes.
21     Q.  Do you remember the date this
22 statement was created?
23     A.  11/21 -- well, not 11/21,

Page 167

1  whatever date that --
2      Q.  11/21/07.
3      A.  That's the expiration.
4      MR. WINSTON:  Yeah --
5      MS. DeGANCE:  I'm going to ask
6  the questions, Mr. Winston.  I'm going to
7  ask the questions.
8      Q.  (BY MS. DeGANCE:)  11/21/07 is a
9  notary date?
10     A.  No, that's not it.  I don't
11 remember what date that was.  It would
12 have had to have been after I was
13 terminated.
14     Q.  So, it was sometime after?
15     A.  Around the same time.
16     Q.  Shortly after you were
17 terminated, I believe?
18     A.  Uh-huh (affirmative).
19     Q.  Yes?
20     A.  Yes.
21     Q.  After you were terminated, did
22 you contact all of the individuals who
23 were parties in the previous lawsuit?

Page 168

1      A.  No, I did not contact all of
2  them.
3      Q.  You didn't?
4      A.  No.
5      Q.  Did you contact some of them?
6      A.  Some of them contacted me.
7      Q.  After you were terminated?
8      A.  Yeah.
9      Q.  Okay.  Why did they contact you?
10     A.  They wanted to know what
11 happened.
12     Q.  Why you were terminated?
13     A.  Uh-huh (affirmative).
14         (Defendant's Exhibit No. 9
15         marked for identification.)
16     Q.  I'm going to mark this as
17 Defendant's Exhibit No. 9.  Take a look at
18 that for me, please.  Do you recognize
19 this document?
20     A.  Yes.
21     Q.  What is it?
22     A.  It's a statement.
23     Q.  Who prepared this statement?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 169

1    A. I prepared this one.
2    Q. Did you type it?
3    A. Yes, I did.
4    Q. You prepared it, and then did you
5    ask Chris Mormon and Kevin Hirneisen to
6    sign it?
7    A. Kenneth, yes.
8    Q. I'm sorry, Kenneth Hirneisen to
9    sign it?
10   A. Yes.
11   Q. It's dated November 22nd, 2004.
12   Is that the date you prepared it?
13   A. Yes.
14   Q. You've also made an allegation in
15   this case of race discrimination. I think
16   we've talked about it a little bit. But
17   just sort of tell me the facts that
18   support your belief that you were treated
19   differently by Southeast Unloading because
20   of your race.
21   A. Well, like I said, it was just
22   the different slurs and attitudes in
23   reference to leather being on your

Page 170

1    backside that kind of -- that kind of
2    closed the door for me.
3    Q. How many times, if you know, did
4    Ivey Crump, Jr., make a comment like that
5    to you?
6    A. To me personally, about three or
7    four times.
8    Q. Other than the comment regarding
9    the leather on your backside that you
10   previously described, did Ivey Crump, Jr.,
11   make any other comments to you that you
12   found to be racially derogatory?
13   A. Yeah.
14   Q. What?
15   A. Your black ass trying to get me
16   fired.
17   Q. Who said that? Ivey Crump, Jr.?
18   A. Uh-huh.
19   Q. Said your black ass is trying to
20   get me fired?
21   A. He said his black ass trying to
22   get me fired, not your, his; it was in
23   walking away.

Page 171

1    Q. What?
2    A. It was in walking away and we had
3    an argument because I had called up
4    Florida to ask them why I couldn't come
5    back to work.
6    Q. When was this?
7    A. I got injured on the job and the
8    gentleman in question didn't have a
9    workmen's comp form. So, I went to see a
10   doctor.
11   Q. Okay. When was this? Do you
12   know?
13   A. It's got a date and the form is
14   in there.
15   Q. It's going to be around the time
16   that you filed the worker's comp claim?
17   A. I didn't file it.
18   Q. It's going to be around the
19   time --
20   A. I was off work for about -- I had
21   surgery.
22   Q. This is going to be around that
23   time?

Page 172

1    A. Three -- March. March, what is
2    it, March 2003 or 2002. It was March.
3    Q. Okay. And tell me exactly what
4    did Ivey Crump say to you?
5    A. As he was walking away, his black
6    ass trying to get me fired.
7    Q. He said black ass trying to get
8    me fired?
9    A. Uh-huh (affirmative). But he
10   was huffing and puffing and walking fast,
11   so --
12   Q. You heard him say that?
13   A. We were about this close. We
14   were this close when we was arguing; we
15   was about that close as he was walking
16   away.
17   Q. Can you recall any other
18   statements Ivey made that you found to be
19   racially derogatory?
20   A. He made different slurs that
21   could do that, but it wasn't as pertinent
22   as walking away huffing and puffing and
23   saying that or talking about leather on

43 (Pages 169 to 172)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 173

1  your backside. It wasn't as strong as
2  that.
3      Q. Okay. Well, were there any
4  others that you can specifically recall?
5      A. Not off the top of my head right
6  now.
7      Q. Besides Ivey Crump, Jr., is there
8  anyone else within Southeast Unloading
9  that you believe discriminated against you
10 because of your race?
11     A. Not off the top of my head, no.
12     Q. While you were employed by
13 Southeast Unloading, did you ever complain
14 to anyone within the company that you felt
15 you were being discriminated against
16 because of your race?
17     A. I spoke to Rester.
18     Q. Rester Brown -- Bryan?
19     A. Bryan.
20     Q. Bryan. When did you talk to him?
21     A. Him or -- this was right after --
22 right before I got fired.
23     Q. You spoke with him. What did you

Page 174

1  say to him?
2      A. I asked him why we're having so
3  many problems with -- why am I having so
4  many problems with Ivey, because another
5  gentleman had called Florida about our
6  checks, and Ivey assumed it was me because
7  I had a pattern of doing that. And when
8  he raced in there with the attitude
9  yelling and cursing and all that kind of
10 stuff, I didn't have a chance to tell him
11 that I did not call. Chris Mormon told
12 him three weeks later you owe Anthony
13 Miles an apology because he is not the one
14 that called, the guy you fired is the one
15 that called.
16     Q. Okay. But I want to talk about
17 the conversation you had with Rester.
18     A. Okay. The conversation I had
19 with Rester was how come we're still not
20 being paid overtime, wait time.
21     Q. Here's the question. Let's just
22 go back for a minute.
23     A. You said the conversation.

Page 175

1      Q. But I want you to be clear on
2  what I'm asking you. I'm asking you did
3  you ever complain to anyone while you were
4  employed at Southeast Unloading that you
5  were being discriminated against because
6  of your race, and you said you had a
7  conversation with Rester Bryan. I want to
8  know what conversation you had with him
9  where you complained you were being
10 discriminated against because of your
11 race. We're going to talk about overtime
12 later. I want to talk about this claim
13 right now.
14     A. This is all part of the
15 conversation. Do you want to hear all of
16 the conversation or do you just want to be
17 specific?
18     Q. No, go ahead.
19     A. I was asking him about that, and
20 he said he didn't know why Ivey wasn't
21 paying us this, that, and the other,
22 because he could get put in jail because
23 of that and he could get in trouble for

Page 176

1  telling us that. And I said, "Well, we're
2  not worried about that." I said, "I just
3  have one little problem. Why is it that
4  Ivey is giving everyone a check but me,
5  making me wait until Friday afternoon.
6  Has he got a problem with my color or just
7  me?"
8      Q. And what did Rester say?
9      A. He said he'll look into it; he
10 doesn't know.
11     Q. Did he look into it?
12     A. I was subsequently fired about a
13 week and a half later. So --
14     Q. When you say everyone was getting
15 a check and you had to wait until Friday,
16 what did you mean by that?
17     A. Later on I found out what it was,
18 but the date in question when Ivey drove
19 up and asked me if I called Florida,
20 that's when I stopped getting my check on
21 a Wednesday. Everybody would get their
22 check but me, and I had to wait until
23 Friday afternoon before he would actually

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**