—

## FREEDOM COURT REPORTING

Page 177

1  give me my check.
2    Q. Your paycheck?
3    A. Yes.
4    Q. So payday was Wednesday?
5    A. Well, he was giving out checks on
6  Wednesday, and certain employees would
7  show you that they had their check, and
8  then laugh because they knew you couldn't
9  get yours.
10    Q. And you had to wait until Friday
11  to get yours?
12    A. When I asked about it, he told me
13  I had to wait until Friday; that's payday.
14    Q. All right. Any other
15  conversations or complaints that you made
16  to anyone within Southeast Unloading that
17  you were being discriminated against
18  because of your race?
19    A. In passing, Wayne.
20    Q. Wayne. What conversations did
21  you have with Wayne?
22    A. I asked Wayne if Ivey had a race
23  problem.

Page 178

1    Q. When did you have this
2  conversation with Wayne?
3    A. I would say that every time we
4  had an argument I'd ask him what was the
5  problem. It was frequent.
6    Q. And what was Wayne's response?
7    A. He said, "You know how Ivey is."
8    Q. Okay. And that was it?
9    A. Yeah. Wayne was kind of pissed
10  most of the time.
11    Q. He was?
12    A. Uh-huh (affirmative).
13    Q. Why?
14    A. Normally we had two people on the
15  dock, but when Wayne took over, Ivey had
16  him doing the other company business,
17  which did not include unloading, and it
18  had something to do with counting
19  everything that was going on. So, Wayne
20  did the counting, the secretarial work,
21  plus his job, and he had to do payroll and
22  then he had to run up and down the dock
23  and get his check docked if a driver drove

Page 179

1  off.
2    Q. So, Wayne had too much to do and
3  that's why he was mad?
4    A. He was being overwhelmed. I
5  mean, the dock had 55 doors, and you had
6  perishable, dairy, and then you had the
7  freezer.
8    Q. Right.
9    A. So if he was in the freezer and a
10  driver got tired of waiting, he'd drive
11  off because he got his paperwork, and then
12  they would charge Wayne with what the
13  driver should have paid him.
14    Q. Oh, you're talking about he'd
15  drive off before paying?
16    A. Yeah.
17    Q. Beginning September 2nd, 2004,
18  and the last couple of months you were
19  employed by Southeast Unloading, tell me
20  how you were compensated. Were you paid
21  hourly?
22    A. I was paid hourly about once.
23    Q. Okay. How were you paid from the

Page 180

1  beginning of September 2004 through the
2  end of October when you were terminated?
3    A. Just on what was done.
4    Q. So, it was a piece rate?
5    A. Yes, a piece rate.
6    Q. So, were you paid per load?
7    A. Yes.
8    Q. When you came to work in the
9  morning, did you always come in around the
10  same time?
11    A. Yes.
12    Q. What time would you come in?
13    A. I would come in about a quarter
14  till 6:00.
15    Q. Did you have a set schedule at
16  Southeast Unloading?
17    A. They want us on the dock by 7:00.
18    Q. Okay. And when you came in
19  the mornings, did you sign in --
20    A. No.
21    Q. -- on a sign-in sheet?
22    A. I didn't sign. I signed then, I
23  think, for about a week during that whole

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 181

1  year.
2  Q. I'm talking about from September
3  2004 until the time you were terminated, a
4  two-month period I'm talking about?
5  A. I signed in about a week.
6  Q. You signed in only a week of that
7  time?
8  A. About a week, because I didn't
9  sign in in October.
10  Q. You only signed in for one week?
11  A. About a week.
12  Q. And during the rest of the time,
13  you didn't sign in at all?
14  A. We never really had a sign-in
15  sheet. That came up during the lawsuit of
16  the other --
17  Q. I know, and I'm talking about the
18  time after the lawsuit.
19  A. That's what I'm saying. Right
20  around that time was when we actually got
21  a check between September and October.
22  Q. Right.
23  A. We got a check then, and we

Page 182

1  signed in for about a week.
2  Q. And then did you stop signing in
3  again?
4  A. They didn't have any forms for us
5  to sign.
6  Q. Okay. So, there was no sign-in
7  sheet? Because I have sign-in sheets I've
8  produced in this case during that time
9  frame with your signature on them. So are
10  you telling me you didn't sign in?
11  A. Those are not all my signatures.
12  Q. Okay. Who signed in for you?
13  A. I have no idea.
14  Q. You weren't signing in and
15  signing out, and you're telling me that
16  that is not your signature?
17  A. I said I signed in for about a
18  week.
19  Q. Do you remember the week?
20  A. But these signatures on those are
21  not mine.
22  Q. Do you remember the week you
23  signed in?

Page 183

1  A. It was on nine something.
2  Q. In September?
3  A. Uh-huh (affirmative).
4  Q. And then did you sign out as
5  well?
6  A. Some of them I might have.
7  Q. Okay. Just that one week in
8  September or other weeks as well?
9  A. He didn't have other weeks.
10  Q. So, just that one week in
11  September you signed out?
12  A. Well, if you had those forms, I
13  can show you which ones I signed and which
14  ones I didn't.
15  MS. DeGANCE: Do you have them?
16  MR. WINSTON: Do I have them?
17  Yeah. Your Rule 26 documents, yeah.
18  MS. DeGANCE: I'll have copies
19  made. Why don't we take a break for a
20  minute.
21  THE VIDEOGRAPHER: This marks the
22  end of Videotape No. 2. We're off the
23  record at 11:37.

Page 184

1  (Recess.)
2  THE VIDEOGRAPHER: Back on the
3  record 11:48. Begin Tape 3.
4  Q. (BY MS. DeGANCE:) Mr. Miles,
5  prior to the break, we were talking about
6  whether you signed in during those last
7  couple of months you were employed with
8  Southeast Unloading?
9  A. Yes, ma'am.
10  Q. And I'm going to show you what I
11  believe are daily sign-in sheets and ask
12  you to look at them and see if you
13  recognize them. And we'll mark this as
14  Defendant's Composite Exhibit No. 10.
15  (Defendant's Exhibit No. 10
16  marked for identification.)
17  Q. Take a look at that for me.
18  Your copies are over there,
19  Mr. Winston.
20  Now, if you'll notice, the first
21  one is dated September 5th, 2004. The
22  original documents had other names on
23  them, but for confidentiality reasons

46 (Pages 181 to 184)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 185

1  we've redacted them, so just your name
2  remains on each page.
3      A. Right.
4      Q. So, I want you to look at these,
5  and they're sequentially dated, and I want
6  you to tell me first on the September 5th,
7  2004, sign-in sheet, you see your name
8  that says Anthony Miles and it says that
9  you signed in at 7:00 o'clock.  Do you see
10  that?
11     A. Yes.
12     Q. And then it says you signed out
13  at 11:30.  And then there's a signature.
14  Is that your signature?
15     A. That looks like my scribble,
16  yeah.
17     Q. Okay.
18     A. It's not a full signature,
19  though, no.
20     Q. But does that look like -- do you
21  recognize that as being your signature?
22     A. That's my signature.
23         MR. WINSTON:  When you say that's

Page 186

1  your signature, could you just identify
2  what --
3         THE WITNESS:  Okay.  Exhibit --
4         MS. DeGANCE:  No. 9?
5         THE WITNESS:  9 has my full
6  signature.
7      Q. (BY MS. DeGANCE:)  Okay.
8      A. Exhibit No. 10 has initials and a
9  last name.
10     Q. Okay.  Do you know in looking at
11  the first page of Exhibit No. 10 that's
12  dated September 5th, do you know whether
13  you wrote this signature?
14     A. It looks like mine, but it's -- I
15  don't know if it's Xeroxed over or what
16  the situation is.
17     Q. It is Xeroxed over.  It's been
18  copied a bunch of times.  But I'm asking
19  you does this look like something that you
20  signed?
21     A. That looks like a signature, yes.
22     Q. Okay.  Mr. Miles, you've got to
23  work with me a little bit here.

Page 187

1      A. No, what I'm saying is that when
2  you say it's been Xeroxed over, I don't
3  know if it's been Xeroxed over and my name
4  has been put on there and somebody Xeroxed
5  a piece of paper on the top of it.
6      Q. No.  Okay.  You can assume for
7  purposes of this deposition that these
8  documents are authentic, meaning that we
9  haven't tampered with them as your
10  employer or anything like that, okay.
11        So, assuming that this is an
12  authentic sign-in sheet and hasn't been in
13  any way tampered with --
14     A. It looks like it's tampered with
15  to me; that's why I was asking.  But yeah,
16  that would be my signature.
17     Q. That is your signature, thank
18  you.
19        I want you to turn to the next
20  page.
21     A. That's not my signature.
22     Q. On September 6, 2004, that is not
23  your signature?

Page 188

1      A. No, it is not.
2      Q. Let's go to the next page.
3  September 7th, is that your signature?
4      A. No, it is not.
5      Q. September 9th is the next page.
6  That's very hard to read.
7         MR. WINSTON:  It's Bates stamped
8  76?
9         MS. DeGANCE:  Yes, Bates stamped
10  76.
11        THE WITNESS:  No way is that my
12  signature.
13     Q. (BY MS. DeGANCE:)  Okay.  Bates
14  stamp 77?
15     A. The same thing.
16     Q. That's not your signature?
17     A. No.
18     Q. Bates stamp 78?
19     A. I can't tell what that is.
20     Q. And let me say, if you can't tell
21  because of the --
22     A. I can't tell the date that's No.
23  11; I can't tell what that is.

47  (Pages 185 to 188)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 189

1    Q. And that's fine.
2    Go to the next one.
3    A. And I know that's not my
4 signature. On the 13th is not my
5 signature.
6    Q. Bates stamp 79. Okay. Turn to
7 Bates stamp 80.
8    A. I'm not sure of that one.
9    Q. It's difficult to tell?
10    A. I'm not sure of that one. It's
11 dated 9/15.
12    Q. Go to 9/17.
13    A. That's definitely not my
14 signature.
15    Q. 9/18?
16    A. No, that's definitely not my
17 signature.
18    Q. Okay. 9/20, it looks like Bates
19 stamp 83?
20    A. Let me get to it, let me get to
21 it. Again, that's not my signature.
22    Q. That's absolutely not yours?
23    A. Yes, ma'am, it's absolutely not

Page 190

1 mine.
2    Q. Okay. Go to the next one, 9/21.
3    A. That looks like it could be my
4 signature.
5    Q. 9/21 looks like it could be?
6    A. Uh-huh (affirmative).
7    Q. Okay. Go to 9/22.
8    A. That looks like it could be.
9    Q. Okay. 9/23, please.
10    A. That looks like it could be.
11    Q. Okay. 9/24?
12    A. I am not sure of that.
13    Q. Okay. 9/27?
14    A. I'm not sure of that either.
15    Q. 9/28?
16    A. That looks like it could be.
17    Q. Okay. 9/29?
18    A. It looks like it could be.
19    Q. Okay.
20    A. I just --
21    Q. That's fine, Mr. Miles. You
22 don't have to -- 9/30?
23    A. No, I'm not sure of that.

Page 191

1    Q. 10/1?
2    A. No.
3    Q. Okay. So, it looks like -- 10/4
4 is not even signed?
5    A. Right.
6    Q. 10/6?
7    A. I'm not sure.
8    Q. 10/7?
9    A. I'm not sure.
10    Q. 10/8 -- or 10/11, sorry?
11    A. 10/11 looks like it could be.
12    Q. Okay. What about 10/13?
13    A. And 10/13 looks like it could be.
14    Q. Yeah, 10/14?
15    A. That looks like it could be.
16    Q. 10/15?
17    A. No, I don't --
18    Q. 10/18?
19    A. I'm not sure of that.
20    Q. 10/20?
21    A. That's not mine.
22    Q. 10/21?
23    A. I don't know what that is.

Page 192

1    Q. 10/22?
2    A. That looks like it could be.
3    Q. 10/23?
4    A. I'm not sure, but it looks like
5 it could be.
6    Q. Okay. And 10/25, you can't even
7 see the signature because the copy wasn't
8 good. So, it looks like some of them are
9 your signature or look like they could be,
10 and some of them you know for sure are
11 not; is that correct?
12    A. Yes.
13    Q. Okay. The days that you signed
14 in -- well, I guess the days that you
15 signed these sign-in sheets, would you
16 sign in as you were leaving, or would you
17 sign them in the morning? Because it has
18 the date -- the time you came in and the
19 time you left.
20    A. Honestly, if you came in and
21 didn't sign in, Wayne would bring it to
22 you during the day and say you need to
23 sign in. So it could be 11:00 o'clock,

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 193

1  and he would bring it to you and you would
2  sign in at 7:00.
3      Q. You would just put the time that
4  you came in in the morning?
5      A. Uh-huh (affirmative).
6      Q. What about when you left in the
7  evening?
8      A. When you left in the evening, it
9  depends on who was there.
10     Q. Okay.
11     A. According to Wayne, he said Ivey
12  would sign me out a couple of times
13  because I had left without signing.
14     Q. Okay. Because sometimes you
15  would forget?
16     A. No, sometimes when we were done,
17  there was nobody there, so when you just
18  left, you left. There was no way to get
19  in the office to sign out.
20     Q. Were the sign-in sheets located
21  in the office?
22     A. They were in the office and Wayne
23  would go back and forth to the office.

Page 194

1      Q. So, you had to bring them --
2      A. If Wayne was gone, (Witness
3  shakes head.)
4      Q. Did you have set hours while you
5  were working at Southeast Unloading, or
6  were you able to come and go, meaning when
7  you came in to work --
8      A. During 2004, at the end?
9      Q. Those last two months. And for
10  purposes of this deposition, these
11  questions, I'm only talking about that
12  two-month time frame. Did you have set
13  hours?
14     A. I always came in, like I said,
15  about a quarter till 6:00.
16     Q. Okay. And then when would you
17  leave?
18     A. When the last truck was done.
19     Q. Okay. And would that time vary?
20     A. Yes.
21     Q. Sometimes?
22     A. It would vary.
23     Q. So, it was based on the number of

Page 195

1  trucks that happened to come in that day,
2  correct?
3      A. Yes.
4      Q. So, some days you'd work more
5  hours than other days?
6      A. Yes.
7      Q. Do you know whether you were paid
8  for the hours that were reflected on those
9  sign-in sheets? Do you have any idea?
10     A. I know I wasn't.
11     Q. You know you were not paid for
12  the hours that are on these sign-in
13  sheets?
14     A. Right.
15     Q. That were marked as Exhibit No.
16  10?
17     A. Right.
18     Q. How do you know that you weren't
19  paid for the hours marked on those sign-in
20  sheets?
21     A. This is the same time that Rester
22  had came in and was checking the hours and
23  the books and said that Ivey could get in

Page 196

1  trouble for not paying us wait time.
2      Q. So, you know because Rester made
3  a comment to you?
4      A. He made a comment to me, Chris,
5  Blue, Arlene.
6      Q. Okay. Why was Rester under the
7  impression that you were required -- do
8  you know why Rester was under the
9  impression that you were required to be
10  paid for wait time?
11     A. It had -- well, according to
12  Rester, they were doing it in Florida. It
13  wasn't being done here.
14     Q. They were paying for wait time in
15  Florida, but not here?
16     A. (Witness shakes head.)
17     Q. My understanding here is you were
18  paid based on the load?
19     A. Right.
20     Q. So, for example, you were paid a
21  percentage --
22     A. Right.
23     Q. -- based on each load that you

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 197

1 unloaded?
2     ,So if you unloaded ten trucks in
3 one day, you were going to get paid more
4 than if you unloaded five?
5     A. Right.
6     Q. How many hours per week would you
7 estimate you were working during that last
8 two-month period you were employed with
9 Southeast Unloading?
10     A. It varies. Can I explain?
11     Q. Of course.
12     A. Winn Dixie worked all night long
13 to load trucks. So, if we came in at 6:00
14 and they were not finished, you had to
15 wait for them to finish to clear the dock
16 before you could bring other trucks in.
17     Q. Right.
18     A. Ivey, Jr., refused to let us go
19 back home or to call us in the morning and
20 say, look, don't come in till 12:00
21 because they ain't going to be ready till
22 12:00. So, if you got there at 6:00 to
23 7:00 o'clock, you sat there from 7:00 to

Page 198

1 12:00, until the dock was cleared, which
2 would be wait time.
3     Q. And this was during that last two
4 months, correct?
5     A. During that last two months,
6 right.
7     Q. Okay.
8     A. Then at 12:00, they would start
9 bringing trucks in. So you worked until
10 it was done, going all the way into the
11 next shift.
12     Q. Okay. So, on days like that, you
13 would obviously work more hours than on
14 days when that didn't occur?
15     A. Right.
16     Q. The weeks that you worked over 40
17 hours per week during that last two months
18 that you were employed at Southeast
19 Unloading, were you paid overtime?
20     A. No.
21     Q. Were you paid overtime at all
22 during the last two months you worked at
23 Southeast Unloading?

Page 199

1     A. No.
2     Q. You weren't paid any overtime?
3     A. No. I think I was paid wait
4 time; I'm not sure about overtime.
5     Q. You were not paid wait time and
6 you were not paid overtime?
7     A. No, I might have been paid wait
8 time; I'm not sure. I got paid wait time
9 once. I don't remember which check it
10 was.
11     Q. How did you know that you were
12 paid for wait time?
13     A. Because it was like the only
14 check where I had 36 hours -- I mean, $36.
15     Q. Was it just a separate random
16 amount?
17     A. It was -- yeah, it was different
18 from my check.
19     Q. Did it say wait time?
20     A. No, it didn't. It just had $36
21 on it.
22     Q. How do you know that wasn't
23 overtime?

Page 200

1     A. We were told it was wait time.
2     Q. Okay. But the check didn't say
3 whether it was wait time or overtime?
4     A. No.
5     Q. Okay. Did you ever complain to
6 your direct supervisor that you weren't
7 being paid overtime? And, again, I'm
8 talking about the time frame from the
9 beginning of September '04 until your
10 termination.
11     A. To Wayne, yes.
12     Q. To any supervisor?
13     A. Wayne, yeah.
14     Q. You complained to Wayne that you
15 weren't being paid overtime?
16     A. Wayne and Ivey. Wayne, the
17 supervisor, dock supervisor, and Ivey
18 Crump, Jr.
19     Q. You complained that you weren't
20 being paid overtime?
21     A. No overtime and no wait time.
22     Q. When did you complain to them?
23     A. Every time we sat around there

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 201

1   waiting.
2      Q.  How did you -- how much did you
3   feel like you should have been paid for
4   wait time?  I mean, if you're paid per
5   truck, per load, then what do you think
6   the company should have been paying you
7   during that wait time?
8      A.  The way they broke it down is
9   they take what you make during the week,
10  break it down into an hourly figure and
11  that hourly figure is what you get paid
12  during your wait time.  So, whatever you
13  made that particular week, they would
14  break it down to an hourly figure.
15     Q.  Right.
16     A.  So it depends on how much money
17  you made how that hourly figure came
18  about.
19     Q.  So, you felt like you should have
20  been paid an additional hourly amount for
21  the time you waited?
22     A.  Not an additional amount but just
23  an hourly wait time rate.

Page 202

1      Q.  For example, if you worked -- my
2   understanding is if you worked a 40-hour
3   week, okay, and you unloaded however many
4   trucks you unloaded during that week,
5   okay, you were paid a sum of money for all
6   of those trucks that you unloaded.  To
7   figure out your hourly wage, you would add
8   up all the money you were paid for all of
9   those trucks and you would divide it by
10  40, and that would give you the hourly
11  pay?
12     A.  Right.
13     Q.  Per hour?
14     A.  Right.
15     Q.  Well, that 40 hours would include
16  wait time, then.  It would include all the
17  time during the week unless you went over
18  40 hours; is that correct?
19     A.  No.
20     Q.  Why isn't that correct?
21     A.  Because the wait time would be
22  when you actually did piecework.  When you
23  do piecework is how you calculate your

Page 203

1   money.  So, you would have to take an
2   hourly rate during the time that you
3   actually waited as opposed to the 40
4   hours.
5      Q.  But the time you actually waited
6   was part of the 40 hours?
7      A.  No.
8      Q.  Why wasn't it?
9      A.  Because you didn't get paid for
10  that.  That didn't count.
11     MR. WINSTON:  You weren't
12  unloading trucks at that time, right?
13     Q.  You got paid, you got paid -- I'm
14  just going to throw out a number.  I know
15  you didn't get paid this much per truck,
16  but just to keep it round, say you got
17  paid $100 per truck, okay, and say you
18  only unloaded five trucks over the course
19  of a week.  I know this is not accurate.
20  Okay?  So, you would earn $500 that week,
21  correct?
22     A.  Go ahead.
23     Q.  Okay.  If you wanted to figure

Page 204

1   out how much you made per hour, you would
2   take that $500, you would divide it by 40
3   because 40 is what a workweek is, and that
4   number would be how much you made per
5   hour; is that correct?
6      A.  Go ahead.
7      Q.  And then if you worked over 40
8   hours, then overtime is calculated by time
9   and a half, by taking that hourly wage and
10  then giving you time and a half.  Is that
11  your understanding of how you were paid,
12  or not?
13     A.  No, I understand what you're
14  saying, but you can't calculate it on if
15  you worked over or not because there's not
16  a set hour between 7:00 o'clock and finish
17  time.
18     Q.  Right.
19     A.  So, you're talking from 7:00 to
20  3:00.
21     Q.  Right.
22     A.  Then you're telling me a work
23  period between 7:00 and 3:00, which would

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

| Page 205 | Page 207 |
|---|---|

Page 205

1  be eight hours.
2      Q. Right.
3      A. But if I get there at 7:00 and we
4  don't start till 12:00 and then I stay
5  until 8:00 o'clock at night.
6      Q. Right.
7      A. Okay. They're only counting from
8  12:00 to 8:00. They're not counting the
9  7:00 to 12:00.
10      Q. How do you know they're only
11  counting from 12:00 to 8:00?
12      A. Because when I stayed there until
13  8:00 o'clock at night, I only got paid for
14  the trucks that I did.
15      Q. Okay. But if you worked from
16  7:00 o'clock in the morning and waited
17  until 12:00 and worked til 8:00 o'clock at
18  night, you technically would have worked a
19  13-hour day that day; correct?
20      A. Exactly.
21      Q. So that 13 hours, then, could
22  have been factored into whether you worked
23  over 40 hours that week or not, and if you

Page 207

1  trying to get ready, and then Wayne comes
2  in and says the dock is full, we won't be
3  able to work until 1:00 o'clock. I say,
4  "Okay, Wayne, I'll go home and come back
5  at 1:00 o'clock." Ivey says, "You can't
6  go nowhere."
7      Q. Right.
8      A. I'm saying, "Well, then, are you
9  going to pay me for sitting around here
10  doing nothing?"
11      "No, but you can't leave because
12  if you leave that means you quit."
13      Q. Okay. And this occurred during
14  the two-month period?
15      A. Yes.
16      Q. During your time that you were
17  employed at Southeast Unloading, did you
18  ever have any disciplinary action taken
19  against you, meaning were you ever
20  reprimanded by the company?
21      A. They attempted to write me up two
22  or three times.
23      Q. They attempted to write you up or

Page 206

1  worked over 40 hours that week, then you
2  would have been entitled to overtime over
3  40?
4      A. I never got that either.
5      Q. You never got overtime?
6      A. No.
7      Q. All right. Let's just move on.
8      So, you said that you complained
9  to Wayne about not being paid for wait
10  time and overtime?
11      A. Yeah.
12      Q. How many times did you complain?
13      A. Whenever we had to sit around,
14  you know.
15      Q. You'd just complain?
16      A. It's one of those things. You
17  get in there at a quarter to 6:00.
18      Q. I understand.
19      A. Only because you want to get
20  ready for this freezer.
21      Q. I understand.
22      A. So we're sitting there and
23  thinking about the freezer and you're

Page 208

1  they did write you up?
2      A. Attempted to write me up. I
3  think there was a document written up and
4  he had to take it out.
5      Q. Why?
6      A. Because it wasn't right.
7      Q. Okay. I'm going to show you some
8  documents. I'm going to ask that this be
9  marked as Defendant's Exhibit No. 11.
10          (Defendant's Exhibit No. 11
11          marked for identification.)
12      Q. Take a look at that for me. Have
13  you seen this document before?
14      A. Huh-uh (negative).
15      Q. You've never seen this document
16  before?
17      A. Huh-uh (negative), no.
18      Q. Do you remember on October 16th,
19  2004, being counseled or warned by Wayne,
20  your supervisor, that you were violating
21  the attendance policy?
22      A. I remember talking to Ivey about
23  an attendance problem, but the secretary

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 209

1   in question had it on tape where I called
2   up, so.
3      Q. I don't understand what you just
4   said. Do you remember talking to Ivey,
5   Jr., or Sr.?
6      A. Ivey, Jr., because they was in
7   Montgomery.
8      Q. Was it around October 2004 that
9   you talked to him about an attendance
10  problem?
11     A. Uh-huh (affirmative).
12     Q. Yes?
13     A. Yes. I'm sorry.
14     Q. You said a secretary recorded the
15  conversation?
16     A. Yeah, if you had come in late or
17  couldn't make it, there was basically no
18  one there to call, although we worked
19  around the clock counting and stuff. And
20  in his particular office, he has an
21  answering machine, so you leave a message
22  on the answering machine. When Wayne came
23  in, he was a little bit late, so he just

Page 210

1   came in and went straight to work. So
2   when he didn't see me, he assumed that
3   this was a situation.
4      Q. That's what this day was about?
5      A. That's what this day was about.
6   And when I came in, he said that he was
7   going to write me up. But then when the
8   secretary came and opened the office and
9   played the recording, I had called in.
10     Q. Okay. So, but this was still in
11  your file. Do you know whether they told
12  you -- do you know whether they tried to
13  give you a copy of it, because it's
14  checked at the bottom that you refused to
15  take a copy of it. It says down here at
16  the bottom, "This form was refused by
17  employee," and it was checked. Do you
18  know whether they tried to give you this
19  form?
20     A. When I talked to Ivey, he said
21  he'd take it out of my file. That's why
22  there's no signature on it.
23     Q. Okay. Let me show you another

Page 211

1   document. This is going to be --
2      A. And there's not even a
3   signature. Ivey should have signed this
4   or somebody should have signed this as a
5   witness.
6      Q. Wayne is your supervisor and it
7   doesn't have a signature space for
8   witness, so I don't know that the company
9   requires a witness to sign it.
10     A. Two supervisors, that's our
11  policy.
12     Q. Okay. Is that a written policy?
13     A. You're supposed to have another
14  supervisor or someone else present.
15     Q. Who told you that?
16     A. Ivey told us that when we filled
17  the forms out on January 15th, 2004, and
18  then there's another signature down here
19  for another supervisor.
20     Q. Okay. I'm going to show you
21  another document, and this is going to be
22  Defendant's Exhibit No. 12.
23

Page 212

1         (Defendant's Exhibit No. 12
2           marked for identification.)
3      Q. Have you seen this document
4   before? It's dated October 18th, 2004.
5      A. Huh-uh (negative).
6      Q. You've never seen this document
7   before?
8      A. No, but I remember the incident.
9      Q. It states, "On October 10th,
10  2004, employee did not report" -- is that
11  yours?
12     MR. WINSTON: Yeah.
13     Q. "Did not report on a scheduled
14  Sunday to work. He did not bother to call
15  either. I talked to him on 10/11/04 about
16  this." And then it says, "On 10/16/04
17  employee did not report on a scheduled
18  Saturday. Did not call or report." Do
19  you recall receiving a copy of this?
20     A. No, I didn't get a copy of this.
21     Q. Did Wayne talk with you about
22  this incident?
23     A. We talked prior to, because both

53  (Pages 209 to 212)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 213

1  of these are basically the same.
2      Q. Right.
3      A. They're just the same thing.
4      Q. So, you talked prior to --
5      A. Yes.
6      Q. -- this incident about it?
7      A. Yes.
8      Q. But you didn't receive a copy of
9  this?
10     A. Yeah, like I said, we talked
11 about it on 10/10.
12         (Defendant's Exhibit No. 13
13         marked for identification.)
14     Q. I'm going to show you another
15 document and ask that it be marked as
16 Defendant's Exhibit No. 13. This is dated
17 10/11/04. Do you recognize this document?
18     A. No.
19     Q. You don't recognize it?
20     A. Huh-uh (negative).
21     Q. It states on 10/11/04 that you
22 left to go to a doctor's appointment and
23 did not return to work after the

Page 214

1  appointment. Do you remember this
2  incident?
3      A. I'm not sure.
4      Q. If you don't, you can say that.
5      A. I'm not sure.
6      Q. That's fine.
7      A. This is all during, right before
8  I was terminated.
9          (Defendant's Exhibit No. 14
10         marked for identification.)
11     Q. Okay. Take a look at Exhibit No.
12 14, please. Do you recognize this
13 document?
14     A. I remember the conversation.
15     Q. This is dated 10/11/04. It says,
16 "Anthony Miles asked about going to
17 therapy for one hour out of each day. I
18 agreed to this if he came back after
19 therapy. He never returned. He states
20 they (sic) he called Chris Mormon and
21 Robert Dobbins and asked them if there was
22 anything left to do. Both say he did not
23 call."

Page 215

1      A. Uh-huh (affirmative).
2      Q. Okay. And it says "refused to
3  sign". Were you asked to sign this?
4      A. I remember the incident, but I
5  don't know if I was asked to sign it.
6      Q. Okay. Did you receive a copy of
7  this?
8      A. I don't have a copy of this.
9      Q. Okay.
10     A. But I do remember the incident.
11     Q. Okay. Do we need to stop?
12     A. I do remember the incident.
13         MR. WINSTON: (Shakes head.)
14         (Defendant's Exhibit No. 15
15         marked for identification.)
16     Q. Take a look at this one. This
17 will be Defendant's Exhibit No. 15. Do
18 you recognize this document? This one is
19 dated 10/10/04. It says, "Anthony was
20 told on Wednesday and Thursday that we
21 would not work on Saturday but on Sunday.
22 He did not call in or report to work on
23 Sunday, 10/10/04."

Page 216

1      A. This looks like Exhibit 13, 12
2  and 15 are the same.
3      Q. Okay. But this is a different
4  document, and I'm asking you --
5      A. It's all the same dates.
6      Q. That's fine, Mr. Miles, but it's
7  a different document. My question is:
8  Did you receive a copy of it?
9      A. No, I don't have a copy of this.
10     Q. You didn't receive a copy of it.
11 Were you asked to sign it, ever?
12     A. All this is the same incident.
13 We talked about it, but I wasn't asked to
14 sign anything because nothing was written
15 up at the time.
16     Q. Thank you.
17         (Defendant's Exhibit No. 16
18         marked for identification.)
19     Q. (BY MS. DeGANCE:) This will be
20 Defendant's Exhibit No. 16.
21         MR. WINSTON: 16?
22         MS. DeGANCE: 16.
23     Q. Tell me, sir, if you recognize

54  (Pages 213 to 216)

# FREEDOM COURT REPORTING

Page 217

1  this warning. This isn't signed by a
2  supervisor.
3      A. This is a good one because it's
4  not signed by anybody. I don't know
5  nothing about it.
6      Q. You don't know anything about it?
7      A. No.
8      Q. It appears to be a warning for
9  not reporting to work on 10/2/04?
10     A. By who?
11     Q. I'm just asking if you've seen it
12 before?
13     A. No. There's no signature,
14 nothing.
15     Q. So, you haven't seen it before?
16     A. No, it's not signed and I don't
17 know who wrote that.
18     Q. I didn't ask you if it was
19 signed. I just want to know if you've
20 seen it?
21     A. No.
22         (Defendant's Exhibit No. 17
23         marked for identification.)

Page 219

1  your supervisor, Wayne. It appears to be
2  a seat belt violation. Do you remember
3  this?
4      A. It's possible. I'm not sure.
5      Q. Did you sign this?
6      A. Did I sign this? No.
7      Q. That's not your signature?
8      A. No, it's not my signature.
9      Q. Well, Mr. Miles, sometimes I sign
10 things and I'll sign fast and you can't
11 read it all. Sometimes I'll take my time
12 like on an official document and you can
13 read it. So, people's signatures look
14 different depending on if they're mad at
15 the time or in a hurry.
16     A. Yeah, I don't draw a line.
17     Q. That's not your signature?
18     A. Yeah, I'm sloppy, but I don't
19 draw lines.
20     Q. Okay. Thank you.
21         (Defendant's Exhibit No. 19
22         marked for identification.)
23     Q. This will be Defendant's Exhibit

Page 218

1      Q. This will be Defendant's Exhibit
2  No. 17. Tell me if you've seen this
3  document before? This is dated 9/23/04.
4  It says, "Anthony waited about an hour to
5  start work (shipping was late). After
6  that he became sick and had to leave." Do
7  you remember this?
8      A. It's possible. I'm not sure.
9      Q. Okay.
10         (Defendant's Exhibit No. 18
11         marked for identification.)
12     Q. And this will be --
13     A. Wait a minute, wait a minute.
14     Q. Go ahead.
15     A. There was a day when my pressure
16 went up and I went to see my doctor and it
17 was at 174.
18     Q. Your blood pressure?
19     A. Yeah. I don't remember what date
20 that was.
21     Q. Okay. Take a look at this one,
22 Defendant's Exhibit No. 18. It's another
23 warning dated August 3rd, 2004, signed by

Page 220

1  No. 19. Take a look at this one, please.
2  Here you go. Tell me if you recognize
3  this document. This one is dated March
4  7th, 2004. It says, "Anthony left the
5  Winn Dixie property for the day without
6  telling the supervisor. He was given a
7  verbal reprimand and told to be sure to
8  inform his supervisor before leaving."
9  It states that you refused to sign it. Do
10 you remember this incident?
11     A. I remember the incident. It was
12 -- we talked, but there was no
13 documentation because we was on the dock.
14     Q. Who talked? You and who?
15     A. Me, Ivey and Wayne.
16     Q. About you leaving the property?
17     A. About -- well, all of us talked,
18 everybody on the dock talked about it, and
19 I also talked to Ivey and Wayne about this
20 particular incident.
21     Q. Okay. And, but you didn't
22 receive a copy of this?
23     A. No, there was no written copy at

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 221

1  that time.
2  Q. Okay. So, you don't recall being
3  asked to sign it?
4  A. No. Like I said, we were all
5  talking at the time on the dock. So, when
6  this was written up, it wasn't at that
7  time.
8  Q. I understand that, but were you
9  asked to sign it?
10  A. No.
11  Q. Okay.
12  (Defendant's Exhibit No. 20
13  marked for identification.)
14  Q. You filed a charge of
15  discrimination in this case with the EEOC,
16  and in filing that charge, you filled out
17  a charge questionnaire. And I'm going to
18  show you Defendant's Exhibit No. 20 and
19  ask you if you recognize this document as
20  being the charge questionnaire that you
21  filled out?
22  A. That's definitely my handwriting.
23  Q. This is your handwriting?

Page 222

1  A. Yes, ma'am.
2  Q. On the last page which is Bates
3  stamped 32, is that your signature?
4  A. Next to 11/24 on Page 4?
5  Q. Yes, sir.
6  A. Yes, ma'am.
7  Q. Is this a document that you
8  filled out?
9  A. Yes, ma'am.
10  Q. Okay.
11  (Defendant's Exhibit No. 21
12  marked for identification.)
13  Q. I'm going to show you a document
14  we'll mark as Defendant's Exhibit No. 21.
15  When you were employed at Southeast
16  Unloading, do you recall whether you
17  received an employee handbook?
18  A. When I was employed, I did not
19  get an employee handbook until 1/15/04.
20  Q. Okay. I want you to flip through
21  this stack of documents and tell me if you
22  remember whether this looks like the
23  handbook that you received? Do you recall

Page 223

1  whether it is?
2  A. It looks familiar.
3  Q. Could it have been the handbook
4  that you received?
5  A. It looks like the one that we
6  were filling out on January 15th of '04.
7  Q. Okay. Since leaving Southeast
8  Unloading, have you had any contact with
9  any current employees of the company?
10  A. All the witnesses that I have
11  listed.
12  Q. Okay. Which ones do you know
13  that are current employees that you've had
14  contact with? Chris Mormon is probably
15  one.
16  A. It's small, Montgomery is small.
17  I've bumped into -- okay, let me get it
18  right, get all the names. Jerry Price,
19  Jeff Martin.
20  Q. They're both current employees?
21  A. Yes.
22  Q. Have you discussed the lawsuit
23  with either one of them?

Page 224

1  A. Oh, for witnesses, yes.
2  Q. Have you discussed this lawsuit
3  with Jerry Price or Jeff Martin?
4  A. I spoke on it. I don't know
5  exactly -- I didn't go in no details or
6  anything like that.
7  Q. Okay. Who else?
8  A. Jeff Martin, Jerry Price,
9  Dominique Barlow.
10  Q. Is Dominique Barlow still an
11  employee?
12  A. No.
13  Q. I said current employees.
14  A. Oh, current employees, I'm sorry.
15  Q. Yes, sir.
16  A. I am so sorry.
17  Q. Are Jerry Price and Jeff Martin
18  current employees?
19  A. No, none of those people are.
20  Q. I want to know current.
21  A. I don't know if Darnell Bennett
22  is still a current employee, because he
23  called me.

56 (Pages 221 to 224)

# FREEDOM COURT REPORTING

Page 225

1    Q. Okay. Why did he call you?
2    A. I don't remember the whole
3  incident.
4    Q. Did you talk to him about the
5  lawsuit?
6    A. He talked to me about it, and
7  then we ended up -- I told him, I said, I
8  don't really know anything, but if you
9  know anything, I'll let you talk to my
10  lawyer and you tell him whatever you know.
11    Q. Okay. Darnell Barnett and who
12  else?
13    A. Bennett.
14    Q. I'm sorry, Bennett.
15    A. Ken. But from what I understand,
16  Ken no longer works there.
17    Q. Okay. Any current employees?
18    A. I'm trying to remember who's
19  current and who's not current.
20    Q. That's fine.
21    A. I haven't spoken to Terrence
22  Bell, DeForest, Calvin Smith. I talked to
23  Calvin Smith, Smitty.

Page 226

1    Q. Is he current?
2    A. He's a current employee. But it
3  was a long time ago when I talked to him.
4    Q. Okay. Anyone else that you can
5  think of?
6    A. I'm picturing while I'm trying to
7  remember names. I apologize. I've got to
8  remember -- if you could tell me who's
9  there, I could tell you.
10    Q. Okay. If you don't remember,
11  that's okay.
12    A. They closed one warehouse and
13  moved everybody from one warehouse all
14  into one. So, everybody that I know is at
15  the same warehouse, but I don't remember
16  all of them.
17    Q. Okay. You are, as you know,
18  requesting back pay in this case as an
19  element of your damages. Do you know,
20  maybe you don't, how much you claim that
21  you're owed in back pay?
22    A. Not off the top of my head. You
23  mean like what I used to make? I'm trying

Page 227

1  to get the correct question. I'm not --
2    Q. I'm just asking you how much you
3  contend, how much you claim Southeast
4  Unloading owes you in back pay, meaning
5  it's one of your elements of damages in
6  this case. If you don't know the answer
7  to that, that's okay.
8    A. I don't have -- is there a
9  figure?
10    MR. WINSTON: A calculation,
11  we'll provide you with a calculation.
12    MS. DeGANCE: That's fine.
13    Q. (BY MS. DeGANCE:) Do you have
14  any kind of record or documents of the
15  overtime hours you claim you worked but
16  were not paid for while at Southeast
17  Unloading?
18    MR. WINSTON: Since September
19  2004, right?
20    MS. DeGANCE: Yes.
21    THE WITNESS: You're talking from
22  September -- pay stubs just basically.
23    Q. (BY MS. DeGANCE:) But you don't

Page 228

1  have --
2    A. There's no hourly -- there's no
3  hours or anything.
4    Q. You've never kept any kind of
5  record yourself of hours that you worked?
6    A. Handwritten hours.
7    Q. You have a handwritten hour log?
8    A. Yeah, you know, when you go to
9  work and come home, I have like, you know,
10  what time I left, what time I got there.
11    Q. You wrote that down?
12    A. Yeah, I wrote it down
13  subsequently, yes.
14    Q. Where?
15    A. On a little notepad.
16    Q. Do you still have it?
17    A. I have the book. I've looked
18  through it and -- to see what dates are
19  out there, because on a daily basis, you
20  write down the date, what truck you did,
21  and what time you would go home.
22    Q. And this is something that you
23  kept for yourself?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 229

1    A. I always had a log to know what
2 you did and the date.
3        MS. DeGANCE: That's obviously
4 responsive.
5        MR. WINSTON: I agree. You've
6 got to give it to me.
7    Q. (BY MS. DeGANCE:) Okay. So, any
8 information related to the hours would be
9 in that?
10    A. (Witness nods head.)
11    Q. Do you have any other record
12 other than this book?
13    A. No, just --
14    Q. You also seek reimbursement for
15 medical bills in this case, okay, and I'm
16 going to show you -- I'll have you
17 identify some documents for me, and we'll
18 just Bates stamp this as composite Exhibit
19 No. 22.
20        (Defendant's Exhibit No. 22
21        marked for identification.)
22    Q. I want you to take a look at
23 these. These are documents that you

Page 230

1 produced. And they appear to be medical
2 bills. And I want you to take a minute
3 and look through them and tell me whether
4 these are all the medical bills that you
5 claim Southeast Unloading owes you money
6 for?
7    A. Yes.
8    Q. Okay. And some of these appear
9 to be past due. Has any physician that
10 you've seen forgiven any of these bills or
11 reduced them --
12    A. They increased them.
13    Q. -- for you?
14        Okay. So, no physician has
15 forgiven or reduced any of the bills?
16    A. (Witness shakes head.)
17    Q. Okay.
18    A. I wish.
19    Q. Some of these bills appear to be
20 during the time frame where you testified
21 you had health insurance, so I'm wondering
22 did you submit these claims to be paid by
23 your insurance company?

Page 231

1    A. Some of them I did. But from
2 what I understand, the insurance company
3 wasn't going to pay them.
4    Q. Why not?
5    A. I don't remember.
6    Q. Okay. Why do you think it's
7 Southeast Unloading's obligation to pay
8 what your insurance company won't pay?
9    A. Well, all of these occurred
10 through Southeast.
11    Q. What do you mean through
12 Southeast?
13    A. When I was injured and no one
14 knew how to fill out a worker's comp form,
15 and then they refused to give me one and
16 let me come back to work and all of that,
17 that's when I had the knee, the knee
18 surgery and ankle, and that's when they
19 tested me for everything in the world.
20    Q. So, are you claiming Southeast
21 Unloading should pay these medical bills
22 because all of these bills were due to an
23 injury that you received at work?

Page 232

1    A. I started -- it started at work
2 with the knee and the ankle.
3    Q. Is that why you're claiming
4 Southeast Unloading should pay these
5 bills?
6    A. That's part of it, yes.
7    Q. What other part is there? I'm
8 wondering why you think Southeast
9 Unloading is responsible for these medical
10 bills?
11    A. Most of these happened because of
12 that incident, and the other one happened
13 when I got terminated for no reason and
14 they cut all of my benefits and everything
15 else.
16    Q. Okay.
17    A. When they cut my benefits, they
18 didn't pay it.
19    Q. Right. But you testified that
20 you subsequently received health insurance
21 from other employers and through the
22 State, so I'm wondering why those
23 insurance companies did not pay?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 233

1    A. Well, at this time I didn't have
2 it.
3    Q. You didn't have insurance?
4    A. No, I did not, for some of these
5 bills.
6    Q. You also have a claim in this
7 case for mental anguish. Have you seen,
8 since your termination, have you seen a
9 psychotherapist or any other kind of
10 mental health counselor?
11    A. No, I just sought a different
12 doctor that told me to get a different job
13 in reference to what I was going through.
14 They wanted to know -- actually, Doctor
15 Eric Cunningham.
16    Q. While you were employed with
17 Southeast Unloading?
18    A. While I was employed with
19 Southeast Unloading. All of the arguments
20 and all that sort of stuff was kind of --
21 for some reason, out of the blue I started
22 getting headaches and lightheaded and
23 dizzy. And being macho, I didn't want to

Page 234

1 go to see a doctor.
2    Q. Right.
3    A. And when I got there, it was a
4 stress related problem in reference to
5 work. They put me on some pills.
6    Q. What kind?
7    A. Benicar, a high blood pressure
8 pill, and some other kind of pill.
9    Q. So, they diagnosed it as being
10 stress related?
11    A. Yes.
12    Q. And they told you to find another
13 job?
14    A. They told me to take a day off
15 and come back so they can find out what
16 the level was. When I wasn't -- when I
17 came back that day, it was almost down to
18 normal, and then they had me come back
19 after I went to work. And when I went to
20 work and came back, it was back up to
21 154. Then Ivey went to my doctor.
22    Q. Okay. Did you -- but you've
23 never seen a psychotherapist or mental

Page 235

1 health counselor?
2    A. Not that I know of.
3    Q. Okay. Have you ever in your
4 life?
5    A. Seen who?
6    Q. Have you ever been to see a
7 mental health counselor or mental
8 professional at any time in your life?
9    A. In my life?
10    Q. Yeah, in your life.
11    A. Not that I know of. I think I
12 had an EKG at one time, whatever that is.
13    Q. Okay. How has being terminated
14 affected your emotional well-being?
15    A. I was injured, and it's kind of
16 -- it affected it a lot. It hurt me. And
17 for someone to be stealing and accuse me
18 of stealing and I've devoted numerous
19 years, I was just -- I was seriously hurt
20 and injured to the point that it was hard
21 to find another job.
22    Q. When you say hurt and injured,
23 what do you mean?

Page 236

1    A. Mentally, stress related, not
2 being -- I couldn't get motivated,
3 couldn't get to work. It was hard to try
4 to find a job. I couldn't get hired
5 anywhere because I was -- the last job
6 that I had for the last three or four
7 years, I was terminated for stealing.
8 Unemployment compensation, I wasn't
9 allowed to get any money until after that
10 hearing went through. And unemployment
11 said that I didn't steal, and the only way
12 I could get a job was to take that notice
13 to the job and show them that I did not
14 steal, even though it says I stole, in
15 order to get a job.
16    Q. Okay. So, you're describing
17 essentially stress related symptoms as a
18 result of being terminated?
19    A. Yes. I mean, it affected me, it
20 affected my family, it affected all of the
21 bills.
22    Q. Okay. You also have a claim for
23 attorney's fees in this case. Have you

# FREEDOM COURT REPORTING

Page 237

1  paid your attorney any money to date?
2     A. No.
3     Q. No.
4        Do you know what type of fee
5  arrangement you have with your attorney?
6  Is it a contingency fee?
7     A. I believe so.
8     Q. Okay. You also ask for
9  reinstatement. Do you want Southeast
10 Unloading to give you your job back?
11    A. I wanted the right to go ahead
12 and resign if they wanted to do me that
13 way as opposed to being left out that I
14 was a thief.
15    Q. Okay. Well, I'm asking you today
16 what you want. I mean, do you still want
17 the right to resign from them? Would you
18 like to see, you know, your job be given
19 back to you? Would you --
20    A. I would like the right to resign
21 as opposed to being labeled a thief.
22    Q. So, you would like the right to
23 resign?

Page 238

1     A. Yes.
2     Q. So, when you say you're seeking
3  reinstatement, you're not really asking
4  for your job back?
5     A. Not anymore, no.
6     Q. You wouldn't go back?
7     A. No way.
8     Q. Have you ever been a party in a
9  lawsuit before other than the previous one
10 that I'm aware of against Southeast
11 Unloading?
12    A. Have I been a party to a lawsuit?
13    Q. Yeah, have you either sued
14 someone or have you been sued by someone
15 before?
16    A. I've been sued by someone and --
17    Q. Who were you sued by?
18    A. Lord, it's been a lot of years.
19 An insurance company, a car accident.
20    Q. Okay. Just give me one second.
21 Did you identify all the previous lawsuits
22 you were involved with in your answers to
23 interrogatories?

Page 239

1     A. Yeah.
2     Q. Okay. We'll go through that. I
3  don't want to make you remember.
4        (Defendant's Exhibit No. 23
5        marked for identification.)
6     Q. Okay. I'm going to show you just
7  a few more documents. This will be
8  Defendant's Exhibit 23. There's two pages
9  to this, and I want you to take a look at
10 both of them. This is a tax document that
11 you produced. I just want you to tell me
12 if this looks like your 2004 W-2?
13    A. I believe it might -- it should
14 be, yes.
15    Q. And the document attached to it,
16 is that also some type of earnings
17 statement?
18    A. As of -- yeah, that's a stub as
19 of 10/22.
20    Q. Okay. Thank you. I just want
21 you to authenticate that for me.
22    A. My W-2 is wrong, though.
23    Q. Why is it wrong?

Page 240

1     A. It doesn't have the 9,000 that
2  they paid me.
3     Q. What 9,000?
4     A. From the lawsuit, the overtime,
5  back pay.
6     Q. Okay.
7        (Defendant's Exhibit No. 24
8        marked for identification.)
9     Q. I show you another document and
10 ask that it be marked as Defendant's
11 Exhibit 24. Take a look at that -- take a
12 look at that document and tell me if you
13 recognize it?
14    A. Yes, I do.
15    Q. Okay. And it's titled the
16 Unauthorized Solicitation of Drivers?
17    A. Right.
18    Q. Is that your signature at the
19 bottom?
20    A. Yes, it is.
21    Q. Okay. And did you sign it on
22 1/15/04?
23    A. Yes, I did.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 241

1    Q. And that was the date I think you
2 said the handbook was given to you?
3    A. Exactly.
4        (Defendant's Exhibit No. 25
5        marked for identification.)
6    Q. And we'll mark this as
7 Defendant's Exhibit 25.  Take a look at
8 that.  That's the Equal Employment
9 Opportunity policy for the company.  Is
10 this a document that you remember
11 receiving?
12    A. I remember receiving this
13 document.
14    Q. And you dated this -- is this
15 your signature?
16    A. Yes, it is.
17    Q. And it's dated 11/7/02, so was
18 this something that you received prior to
19 the handbook?
20    A. Yeah.
21    Q. Okay.
22    A. Yeah.
23

Page 242

1        (Defendant's Exhibit No. 26
2        marked for identification.)
3    Q. We'll mark this as Defendant's
4 Exhibit 26.  Have a look at that, please.
5 This is the Southeast Unloading Equal
6 Opportunity Policy.  I want you to take a
7 look at this and tell me if you've seen
8 this before or whether you remember if
9 you've seen it before?
10    A. I remember him talking to me
11 about this.  I actually spoke to Kevin
12 about this.
13    Q. About this.
14    A. But I'm not sure if I've seen it.
15    Q. When you look back at Exhibit No.
16 25, which is the acknowledgment --
17    A. Right.
18    Q. -- do you recall whether you
19 received this equal employment opportunity
20 policy at the time you signed this
21 acknowledgment?
22    A. No, because the original
23 documents that I had had First Pallet on

Page 243

1 them.
2    Q. First Coast Pallet?
3    A. First Coast Pallet.  So that's
4 the handbook I actually got, was First
5 Coast Pallet.
6    Q. In 2002?
7    A. Yeah, not Southeast Unloading.
8    Q. Do you know whether the Equal
9 Employment Opportunity Policy for First
10 Coast Pallet was the same as this one?
11    A. I believe it was the same.
12    Q. Thank you.
13        And then earlier in this
14 deposition you were talking about ways in
15 which the company could tell whether or
16 how many trucks had come through.  We were
17 talking about how the company keeps track
18 of how many loads are unloaded, and you
19 mentioned some -- you pointed to some
20 documents that your attorney had that he
21 actually produced to the defendant today.
22 And I'm going to give you what I believe
23 to be those documents and mark them as

Page 244

1 Exhibit 27 and have you tell me what they
2 are, okay?
3    A. Yes, ma'am.
4        (Defendant's Exhibit No. 27
5        marked for identification.)
6    MS. DeGANCE:  Do these three go
7 with them?
8    MR. WINSTON:  Yeah.
9    MS. DeGANCE:  They go together?
10    MR. WINSTON:  As far as I know.
11 You can ask him.
12    MS. DeGANCE:  Here you go.
13 Here's Exhibit 27.
14    MR. WINSTON:  I think those other
15 two goes with it, too.
16    MS. DeGANCE:  I know, but it's
17 different.
18    MR. WINSTON:  All right.
19    MS. DeGANCE:  I mean, it's --
20    MR. WINSTON:  Okay.  All right.
21 You can ask him as to how they can tell.
22    MS. DeGANCE:  And I am going to
23 get you copies.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 245

1    MR. WINSTON: Is this for me?
2    MS. DeGANCE: You already have a
3  copy of it, but I'm going to get you the
4  last two pages because, remember, she
5  didn't copy the last two pages, so I'm
6  going to get you those.
7    Q. (BY MS. DeGANCE:) So, Mr. Miles,
8  can you tell me what these documents are?
9    A. These are entitled breakdowns of
10 how Winn Dixie wants their pallets stacked
11 with the product I generally take off the
12 truck.
13   Q. Okay. This is the first time
14 I've been looking at this document, so
15 bear with me for a minute, but the first
16 one is dated 5/8/03. It says receiving
17 date. Is that the date the truck is going
18 to come in and be unloaded? Is that what
19 that means?
20   A. No.
21   Q. What does that date mean, what is
22 the receiving date?
23   A. The actual date the truck is in

Page 246

1  is on top with the time.
2    Q. Oh, so it would be 5/9/03?
3    A. Yeah.
4    Q. 1819 would be the time?
5    A. The receiving date would have
6  been when they called up and said they
7  were coming.
8    Q. Is this everything that was on
9  the truck?
10   A. No, this is -- this can't be
11 everything.
12   Q. Okay. So, what is this? It
13 looks like there's a description of
14 products. Spearmint, Doublemint gum?
15   A. Yeah, you can have two POs. This
16 is a purchase order. So basically what it
17 is is this purchase order would go with
18 another purchase order. So, you could
19 have two POs, two different companies on
20 one truck.
21   Q. So, this is just the PO, and, so,
22 this product is on the truck along with a
23 bunch of other products probably?

Page 247

1    A. Along with the other, the rest --
2    Q. Are there POs for every single --
3    A. Every truck that comes in, yes.
4    Q. So, this is the only way to track
5  what was being unloaded, correct?
6    A. To a certain extent, yeah. It's
7  a law of averages.
8    Q. How is it a law of averages?
9    A. Basically the way I used to do it
10 would be if -- let's go with this
11 warehouse in particular, these tie high
12 sheets that you have in front of you. On
13 that particular day, we'd have 108 trucks
14 that we had to unload in a ten or
15 eight-hour period. Out of 108 trucks we
16 could tell which ones were contracted
17 loads, and then, of course, you had an
18 average of the trucks you normally would
19 do. So, you would average -- if you had
20 108 trucks, you knew you were going to do
21 at least 85 of them.
22   Q. Okay.
23   A. Okay, and then the rest -- when

Page 248

1  one driver sees you doing a good job, they
2  all fall in line, so you knew you'd do 85
3  percent of what came in.
4    Q. Okay. I understand.
5    You answered some interrogatories
6  in this case for me.
7    A. Okay.
8    Q. And they were previously sent,
9  but today your attorney has produced a
10 notarized, verified copy of them, and I
11 haven't seen this before, and I understand
12 there are some differences?
13   MR. WINSTON: There's a couple of
14 additional witnesses.
15   Q. Okay. So I'm just going to kind
16 of go through this with you quickly and
17 maybe ask you questions about it.
18   MR. WINSTON: I think the back
19 pay amount changed.
20   Q. You state that Kenneth Hirneisen
21 and Chris Mormon, I guess they're
22 witnesses for you in this case, and
23 they're aware that you were assigned job

62  (Pages 245 to 248)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 249

1  duties including pricing and things like
2  that?
3      A.  Yes.
4      Q.  Did you tell me -- I'm sorry if
5  you did -- whether you have contact
6  information for Kenneth Hirneisen?
7      A.  If he's still here, I can find
8  him.  He called me from Pennsylvania to
9  let me know what his new number was, and
10 then he called me and told me he was back.
11     Q.  Do you have his current telephone
12 number?
13     A.  I have a number he gave me, but
14 he hasn't answered.
15     Q.  Okay.  What about Chris Mormon,
16 do you know how to contact him?
17     A.  Yeah.
18     Q.  Do you have his number with you?
19     A.  354-2971.
20     Q.  Area code?
21     A.  334.  I'm sorry.
22     Q.  That's Chris Mormon's number.
23 Okay.  When you say Ivey Grump, Jr., you

Page 250

1  mean --
2          MR. WINSTON:  That's Crump,
3  that's a misspelling.
4          MS. DeGANCE:  That's a Freudian
5  slip.
6      Q.  (BY MS. DeGANCE:)  You state that
7  you've been treated by Montgomery Internal
8  East Internal Medicine and that you were
9  referred to see Doctor Michael Fallon with
10 the Kirklin Clinic?
11     A.  Yes.
12     Q.  And that you've been treated at
13 Jackson Hospital?
14     A.  Yes.
15     Q.  Can you recall any other places
16 where you've been treated?
17     A.  They sent me to rehab somewhere,
18 Rehab Associates.
19     Q.  Okay.  Other than that?
20     A.  (No response.)
21     Q.  And you've given me the medical
22 bills?
23     A.  Yeah, I don't think -- they just

Page 251

1  sent me everywhere trying to find out what
2  was wrong.
3      Q.  Okay.
4      A.  Happily, there was nothing
5  terminal.
6      Q.  Okay.  You previously sued
7  Federal Express; is that correct, in New
8  York?
9      A.  There was a lawsuit filed.
10     Q.  Did you sue Federal Express?
11     A.  Me personally, yes.
12     Q.  You did, and do you remember what
13 year?
14     A.  Oh, God.  I filed a Federal
15 suit --
16     Q.  Okay.
17     A.  -- with Federal Express.
18     Q.  For what?
19     A.  I got fired once every two years,
20 and then they rehired me.
21     Q.  Okay.
22     A.  So that kind of --
23     Q.  What did you sue them for?

Page 252

1      A.  For getting fired once every two
2  years and rehiring me.  I don't remember
3  exactly the details.
4      Q.  Did you sue them for race
5  discrimination?
6      A.  I might have sued them for
7  discrimination.  I don't know about race.
8  I don't know how you would classify -- I
9  classified it -- however they told me to
10 classify it when I filled the forms out,
11 that's how I classified it.  Because I
12 didn't understand why every two years I
13 got fired for no reason.  And then we took
14 it to a guaranteed fair hearing treatment,
15 like kind of sitting here, with all the
16 big wigs.  And we presented the evidence,
17 and I presented the evidence, and they
18 said he didn't do anything wrong, and they
19 would send me to a different warehouse.
20     Q.  What was the outcome of that
21 case?
22     A.  They shafted me.  I mean --
23     Q.  Did you get any money?

63  (Pages 249 to 252)

# FREEDOM COURT REPORTING

Page 253

1    A. Worker's comp, I had a worker's
2  comp case.
3    Q. Was this case right here in New
4  York -- in the Southern District of New
5  York, that wasn't a worker's comp case,
6  was it? You said it was a Federal case?
7    A. It was a Federal case, but
8  somehow the judge says you cannot mix a
9  civil case in with a worker's comp case.
10  But they did.
11    Q. So you didn't get any money?
12    A. I got money from worker's comp.
13    MR. WINSTON: I think we need to
14  amend the answer. There's a parallel
15  worker's comp case that goes with the
16  Federal Express case.
17    Q. Okay. You didn't get any money
18  from the Federal case, you just got money
19  from the worker's comp case?
20    A. Right.
21    Q. And then you had automobile
22  accident litigation in Alabama. Did you
23  sue someone, or did they sue you?

Page 254

1    A. An insurance company got a
2  judgment against me.
3    Q. Oh, following an accident?
4    A. Yes.
5    Q. Okay. Do you owe money?
6    A. No.
7    Q. How come?
8    A. The man said it was -- what do
9  you call this? Oh, God. No fault state.
10    Q. And it says you filed a state
11  court case in Florida for a business
12  dispute?
13    A. Oh, Lord, yes.
14    Q. How long ago?
15    A. '95, '96, something like that.
16    Q. Who did you sue?
17    A. An attorney I was working with.
18    Q. You sued an attorney?
19    A. Yeah.
20    Q. Did you get any money?
21    A. No.
22    Q. You sued an attorney. Do you
23  remember his name?

Page 255

1    A. Yeah, John Roger Snow.
2    Q. John Rogers?
3    A. Roger.
4    Q. Snow?
5    A. Snow.
6    Q. S-N-O-W?
7    A. Yes, ma'am.
8    Q. You sued him personally?
9    A. Yes.
10    Q. So, it was Miles versus Snow?
11    A. I don't remember the exact
12  paperwork. I have it somewhere.
13    Q. Do you know what court you sued
14  him in?
15    A. I don't remember. I have the
16  paperwork. I don't --
17    Q. You were in Orlando at the time?
18    A. I lived in Deltona, but he was an
19  attorney in Orlando.
20    MS. DeGANCE: Okay. Okay. And
21  back pay has changed a little bit?
22    MR. WINSTON: Yeah.
23    MS. DeGANCE: Okay. If you'll

Page 256

1  give me five minutes, I think I'm done. I
2  just want to make sure.
3    THE VIDEOGRAPHER: Off the record
4  12:47.
5    (Recess.)
6    THE VIDEOGRAPHER: Back on the
7  record 12:51.
8    (Defendant's Exhibit No. 28
9    marked for identification.)
10    Q. (BY MS. DeGANCE:) Mr. Miles, I
11  just want to hand you a couple of
12  documents that you've produced in this
13  case and ask you to take a look at it.
14  That's going to be Defendant's Exhibit 28,
15  and it appears to be some tax documents,
16  and I just want you to verify that that's
17  what they are and that they are, in fact,
18  your W-2's from 2005 from a few different
19  companies that you worked for?
20    A. Give me a minute.
21    Q. Sure.
22    A. Okay.
23    Q. They are your tax documents?

64 (Pages 253 to 256)

# FREEDOM COURT REPORTING

Page 257

1     A. Yes.
2         (Defendant's Exhibit No. 29
3         marked for identification.)
4     Q. One more. I show you Exhibit 29
5  and I ask you the same question. This
6  appears to be a tax return from H & R
7  Block for 2005. I just want to make sure
8  this is accurate.
9     A. That's what this one is?
10    Q. Yeah.
11    A. Okay.
12    Q. Does that appear accurate?
13    A. Yes, I believe it does.
14        (Defendant's Exhibit No. 30
15        marked for identification.)
16    Q. Okay. And then the last one,
17 this is your 2004 tax return that you
18 produced in this case. I just want you to
19 verify that that's correct, that that is
20 your 2004 tax return prepared by H & R
21 Block? A. Yes, it is. I believe it is.
22    A. Yes, it is. I believe it is.
23        MS. DeGANCE: Okay. I have no

Page 258

1  further questions.
2         MR. WINSTON: No questions.
3         THE VIDEOGRAPHER: This marks the
4  end of Videotape No. 3 and concludes the
5  deposition. We are off the record at
6  12:54.
7
8         FURTHER DEPONENT SAITH NOT
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

65  (Pages 257 to 258)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660