IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

ANTHONY MILES,

        Plaintiff,

v.                                     CASE NO.  2:05-cv-922-WKW

SOUTHEAST UNLOADING LLC,
and IVEY CRUMP, JR.,

        Defendants.

_____/

## SOUTHEAST UNLOADING LLC, AND IVEY CRUMP, JR.'S, MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

       Pursuant to Rule 56, Federal Rules of Civil Procedure, Defendants, Southeast Unloading LLC, ("Southeast Unloading" or the "Company") and Ivey Crump, Jr. ("Crump, Jr."), have filed a Motion for Summary Judgment on the claims raised by Anthony Miles ("Miles" or "Plaintiff") pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 1981, and the Fair Labor Standards Act, 29 U.S.C. §§ 201-219 ("FLSA").  Southeast Unloading and Crump, Jr., offer the following in support of the Motion:

## I.    INTRODUCTION AND BACKGROUND

       Southeast Unloading is a third party warehousing service company that provides a full range of services to its customers at various warehouses throughout the Southeast.[1]  Southeast Unloading employs approximately 210 individuals in locations throughout Alabama and Florida.[2]

       Miles began his employment with Southeast Unloading in November of 2001 as an

---

[1] October 24, 2006 Affidavit of Chris Spence (hereafter "Spence Affidavit") ¶ 2.
[2] Spence Affidavit ¶ 3.

unloader at Winn-Dixie Supermarket's ("Winn-Dixie") warehouse facility in Montgomery, Alabama.[3]  Miles worked for Southeast Unloading until November 1, 2004, when he was terminated for violating Southeast Unloading's Unauthorized Solicitation of Drivers Policy and because Southeast Unloading management determined that Miles had provided a customer with a bogus receipt in an apparent attempt to steal from the Company.[4]

On November 24, 2004, Miles filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") in which he alleged he was discriminated against by the Company based on his race and gender.[5]  The EEOC issued its Notice of Right to Sue on July 1, 2005.  Thereafter, Miles filed a three-count Complaint against Southeast Unloading and Crump, Jr., alleging that he was terminated based on his race in violation of Title VII, and 42 U.S.C. § 1981, in retaliation for his participation in a previous lawsuit against the Company[6] in violation of 29 U.S.C. § 215(a)(3), and alleging that Southeast Unloading violated the FLSA by failing to pay him wait time and overtime.[7]  Southeast Unloading and Crump, Jr., deny the allegations in the Complaint and, for the following reasons, request this Court grant summary judgment in their favor.

A.     **Southeast Unloading's Montgomery, Alabama, Facility Operations**

Southeast Unloading has an agreement with Winn Dixie in which it provides workers to load and unload trucks entering the warehouse facility.[8]  During the day, non-perishable and

---

[3]  July 25, 2006 Deposition of Anthony Miles (hereafter "Miles Depo.") P. 49, L. 11-18.

[4]  Miles Depo. Exh. "4."

[5]  Spence Affidavit Exh. "A."

[6]  In 2004, Miles opted in as a plaintiff to a lawsuit, *Johnson v. Southeast Unloading*, Case No. 3:03-cv-732-J-25HTS (hereafter the "*Johnson*" lawsuit), in which he alleged that the Company violated the FLSA by failing to pay him overtime and wait time.  The *Johnson* lawsuit was dismissed on November 17, 2004 pursuant to a settlement agreement entered into between the parties.

[7]  Complaint and Jury Demand (hereafter "Complaint") ¶ 15-24.  Although Southeast Unloading is named in every count, Miles has alleged claims against Crump, Jr., for race discrimination in violation of 42 U.S.C. § 1981 and for failure to pay overtime in violation of the FLSA only.

[8]  Miles Depo. P. 56, L. 3-19.

perishable cargo is unloaded from trucks and stored in the warehouse.[9]  Throughout the night, this cargo is loaded into distribution trucks which transport the cargo to various Winn-Dixie locations throughout the Southeast.[10]

The Winn-Dixie warehouse consists of two primary loading docks—a "dry" dock, in which non-perishable grocery goods are loaded and unloaded from trucks, and a "freezer" dock, in which perishable grocery goods are loaded and unloaded from trucks.[11]  Unloaders at the Montgomery location typically report to warehouse docks at around 7:00 a.m.[12]  Generally, truck drivers entering the warehouse have an option to unload their cargo themselves, or to pay Southeast Unloading employees to unload it for them.[13]  Because Southeast Unloading employees have the ability to use automated equipment to unload the trucks, most drivers obtain Southeast Unloading's assistance to unload their cargo.[14]  Interested drivers back their rig up to the appropriate warehouse dock where an authorized Southeast Unloading employee surveys the contents of the truck's container.[15]

After surveying the type and amount of cargo in the container, the authorized employee uses a standard company price sheet to provide a quote to the driver.[16]  If the price is acceptable to the driver, the truck is unloaded and an authorized Southeast Unloading employee receives payment from the driver.[17]  The payment received from the driver is then given to a dock supervisor, who in turn, writes a receipt for the driver.[18]  The receipt provided by the dock supervisor to the driver is written from a single receipt book, which remains at all times with the

---

[9]  Miles Depo. P. 56, L. 12-19.
[10] Miles Depo. P. 197, L. 12-13.
[11] Miles Depo. P. 56, L. 12-22.
[12] Miles Depo. P. 180, L. 15-17.
[13] Miles Depo. P. 57, L. 2-23, P. 58, L. 1-3.
[14] Miles Depo. P. 57, L. 19-23, P. 58, L. 1-12.
[15] September 22, 2006 Deposition of Arlene Barker (hereafter "Barker Depo.") P. 24, L. 7-15.
[16] Miles Depo. P. 59, L. 3-9; P. 86, L. 11-21.
[17] Miles Depo. P. 87, L. 5-9.
[18] Miles Depo. P. 87, L. 15-22; P. 88, L. 3-8.

dock supervisor.[19] The receipt contains the name of the Company on it and, once it is completed by the dock supervisor, a carbon copy is created, which remains in the book as a record of the transaction.[20] Since there are numerous trucks being unloaded simultaneously by many employees, Southeast Unloading requires the drivers who employed their services to present their receipt to a Winn-Dixie employee prior to exiting the warehouse to ensure that the proper Company receipt was provided.[21]

### B.    Miles' Employment at Southeast Unloading

Miles applied for a position as an unloader in November of 2001.[22] He was interviewed and subsequently offered an unloader position at the Montgomery warehouse facility by Crump, Jr. Later, Miles was transferred to the freezer dock where he remained until the time of his termination.[23] As an unloader, Plaintiff's job duties consisted primarily of using automated equipment to unload perishable cargo from trucks entering Winn-Dixie's warehouse, and storing that cargo in its appropriate location within the refrigerated section of the warehouse.[24]

Throughout his employment with Southeast Unloading, Miles received multiple verbal and written warnings for violating various Company policies.[25] In March of 2004, Plaintiff was given a verbal reprimand for abandoning his job without notifying his supervisor.[26] Additionally, in August 2004, Miles was given a written warning for failing to wear his safety-belt while operating a fork lift.[27] Three separate times in October 2004, Miles, was given written warnings for failing to report to work and for failing to call Southeast Unloading to inform the

---

[19] September 22, 2006 Deposition of Ken Hirneisen (hereafter "Hirneisen Depo.") P. 36, L. 2-15.
[20] Barker Depo. P. 23, L. 10-17; Barker Depo. P. 25, L. 15-19.
[21] Spence Affidavit ¶ 5.
[22] Miles Depo. P. 49, L. 11-14.
[23] Miles Depo. P. 75, L. 3-13.
[24] Miles Depo. P. 58, L. 6-17.
[25] Miles Depo. Exh. "11," Exh. "12," Exh. "13," Exh. "15," Exh. "16," Exh. "17," Exh. "18," Exh. "19."
[26] Miles Depo. Exh. "19."
[27] Miles Depo. Exh. "18."

Company that he did not intend to report to work.[28]

## C.    Incident Resulting in Miles' Termination From Southeast Unloading

On November 1, 2004, Miles was terminated from Southeast Unloading for violating Southeast Unloading's policy which prohibited unauthorized personnel from soliciting truck drivers and because he was involved in what appeared to be an attempt to steal from Southeast Unloading.[29] Southeast Unloading's policy entitled, "Unauthorized Solicitation of Drivers," which is both published and promoted, states:

> Unloaders are not allowed to approach drivers, dispatchers, customers or potential customers without prior authorization from management. Only supervisors are to negotiate rates/prices for the unloading services or any other service that Southeast Unloading L.L.C. provides or may provide.
> Any employee in violation of this policy will be subject to disciplinary action and/or terminate from the company.
> By signing below, I fully understand and agree to abide by the above policy.[30]

Miles received a copy of this policy and signed a statement acknowledging that he understood and agreed to abide by it.[31]

The Company retained a list of those employees who had been authorized to complete transactions with the drivers.[32] Miles was not one of them and, therefore, was not authorized to solicit drivers, price trucks, collect money from drivers, or issue receipts.[33] As a result, none of the carbon copies that remained in the receipt book after a receipt had been issued contain Miles' signature.[34]

On October 25, 2004, Rodney Brown ("Brown"), a truck driver delivering frozen goods the warehouse, approached Wayne Gemeinhardt ("Gemeinhardt"), who was a supervisor, and

---

[28] Miles Depo. Exh. "11," Exh. "16."
[29] Miles Depo. Exh. "4."
[30] Miles Depo. Exh. "24."
[31] Miles Depo. P. 240, L. 7-23; Exh. "24."
[32] Spence Affidavit Exh. "B."
[33] Spence Affidavit Exh. "B."
[34] Spence Affidavit ¶ 7.

informed Gemeinhardt that Miles had provided him with a quote of $50.00 to unload his truck.[35] Brown explained that after giving Miles $50.00 in cash, another unloader, Robert Dobbins ("Dobbins"), handed Miles a receipt, which Miles then in turn handed to Brown.[36] Brown told Gemeinhardt that as he was exiting the warehouse, he showed the receipt to Michael Johnson ("Johnson"), a Winn-Dixie employee, and was told that the receipt was not a valid Southeast Unloading receipt.[37] Brown's written statement reflects that Winn-Dixie employee Johnson informed him that he needed to return to the dock to discuss the matter with Gemeinhardt prior to leaving the facility.[38] The receipt in question looked different from a standard Southeast Unloading receipt and did not bear the Company's name.[39] Upon examining Brown's receipt, Gemeinhardt concluded that the receipt was not an authentic Southeast Unloading receipt.[40]

After determining that Brown had been given what appeared to be a bogus receipt by Miles, Gemeinhardt informed his supervisor, Crump, Jr., and presented him with the copy of the receipt Miles had given to Brown.[41] Crump, Jr., instructed Miles to leave the premises and stated that he would discuss the matter with Miles after an investigation had been performed.[42] After performing an investigation, which consisted of obtaining statements from witnesses, the Company determined that Miles had solicited Brown in violation of Southeast Unloading's "Unauthorized Solicitation of Drivers" policy, had collected cash from Brown that was not turned over to Southeast Unloading, and had provided Brown with a bogus receipt.[43] As a result,

---

[35] Miles Depo. Exh. "6."
[36] Miles Depo. Exh. "6."
[37] Miles Depo. Exh. "6."
[38] Miles Depo. Exh. "6."
[39] Miles Depo. Exh. "5," Exh. "6."
[40] Miles Depo. Exh. "6," Exh. "7."
[41] Miles Depo. Exh. "7."
[42] Miles Depo. P. 106, L. 1-5.
[43] Miles Depo. Exh. "3," Exh. "4," Exh. "6," Exh. "7."

Miles was terminated from Southeast Unloading on November 1, 2004.[44]

**D.   Incident Involving Arlene Barker**

Plaintiff appears to allege as the basis of his discrimination claim that Arlene Barker ("Barker"), a Caucasian, was not terminated though she was also suspected of stealing.[45] Specifically, Miles argues that both he and Barker were accused of stealing from Southeast Unloading, and that while he was terminated from the Company, Barker was transferred to a different position and allowed to continue working.[46]   However, the circumstances surrounding the incident involving Barker's transfer were different from those involving Miles' termination. Therefore, she is not an appropriate comparator.

Barker began her employment with Southeast Unloading as an unloader but was later promoted to a fill-in supervisor position and was authorized to price trucks, collect money from drivers, provide receipts to drivers, and keep written records of the trucks which Southeast Unloading employees unloaded.[47]   A select list of other employees was authorized to price trucks and solicit drivers as well, including both African-American and Caucasian, males and females.[48]

During her employment, Barker's supervisor, Daniel Young ("Young"), noticed that Southeast Unloading had not received money for one of the trucks which, based on the paperwork, appeared to have been unloaded.[49]   After discovering this inconsistency, Young spoke with Barker about the missing money.[50]   Barker explained that a driver had requested the assistance of Southeast Unloading in unloading his truck, and as a result, she prepared the

---

[44] Miles Depo. Exh. "4." Dobbins was, likewise, terminated for the same offense. Miles Depo. P. 116, L. 13-16. However, he has not filed a lawsuit against the Company.
[45] Miles Depo. Exh. "20" at [unnumbered] 3.
[46] Miles Depo. Exh. "20" at [unnumbered] 3.
[47] Barker Depo. P. 17, L. 1-22.
[48] Spence Affidavit Exh. "B."
[49] Barker Depo. P. 29, L. 5-18.
[50] Barker Depo. P. 29, L. 5-18.

necessary paperwork associated with unloading the truck.[51]  Barker told Young that the driver then changed his mind and decided to unload his truck himself and that she had placed an asterisk on the paperwork to indicate that the driver's truck had not been unloaded by Southeast Unloading.[52]  Barker testified that while she drew a line through the paperwork, "apparently it wasn't dark enough for Mr. Young to see it."[53]  Barker was sent home for two days without pay pending an investigation.[54]

The Company concluded that it lacked sufficient evidence that Barker had stolen from the Company.[55]  However, Southeast Unloading did find that the paperwork completed by Barker to be erroneous and confusing; accordingly, Southeast Unloading made the decision to remove Barker from a supervisory role and to transfer her to an unloading position.[56]  Barker agreed.[57]

The circumstances surrounding the incident involving Barker's transfer are distinguishable from the circumstances surrounding Plaintiff's termination.  To begin, at the time of the incident giving rise to Plaintiff's termination, Plaintiff, unlike Barker, was not authorized to solicit drivers, collect money, and hand out receipts.[58]  Miles signed a statement acknowledging his understanding.[59]

Furthermore, the decision to terminate Plaintiff's employment was made based on information provided by Brown and Johnson regarding the bogus receipt, neither of whom are

---

[51] Barker Depo. P. 30, L. 14-16.
[52] Barker Depo. P. 30, L. 13-23; P. 31, L. 1-3; P. 32, L. 18-23; P. 33, L. 1-6.
[53] Barker Depo. P. 30, L. 23; P. 31, L. 1-3.
[54] Barker Depo. P. 32, L. 5-14.
[55] Spence Affidavit ¶ 8.
[56] Spence Affidavit ¶ 8.
[57] Barker Depo. P. 32, L. 15-17; P. 34, L. 16-19.
[58] Spence Affidavit ¶ 6.
[59] Miles Depo. Exh. "24."

- 8 -

employees of Southeast Unloading.[60]   Their status as disinterested third parties is notable in that the truck driver and Winn Dixie employee lacked any motivation to fabricate the story about the cash and receipt.  On the contrary, there were no witnesses to Barker's suspected theft.

### E.   Plaintiff's Alleged Complaints Regarding Racial Comments and Discriminatory Treatment

When asked whether any discriminatory remarks were made to him during his employment by Crump, Jr., Miles testified, "He talked about people back-talking to him, and there was a time where he put that leather to your backside and you wouldn't talk back to me."[61] Plaintiff alleges that Crump, Jr., made this comment to him "three or four times" throughout his employment with Southeast Unloading.[62] Miles claims that Crump, Jr., once made a comment that Miles' "black ass trying [sic] to get me fired."[63]   Miles also offers vague testimony alleging that Crump, Jr., made other statements to him which he found to be racially derogatory, although he could not provide specific examples.[64]

In addition to allegations that Crump, Jr., discriminated against him, Miles alleges in his answers to interrogatories that Gemeinhardt also discriminated against him on the basis of his race.[65]   However, during his deposition, Plaintiff failed to mention any alleged discriminatory conduct on the part of Gemeinhardt.[66]   Moreover, Miles' EEOC Charge dated November 24, 2004 is, likewise, devoid of these allegations.[67]

Although Barker testified that she, too, is aware of instances in which Crump, Jr., discriminated based on race, when asked for examples, her testimony reveals she is mistaken.

---

[60] Miles Depo. Exh. "6."
[61] Miles Depo. P. 120, L. 2-7.
[62] Miles Depo. P. 169, L. 21-23; P. 170, L. 1-7.
[63] Miles Depo. P. 170, L. 8-23; P. 171, L. 1-23; P. 172, L. 1-16.
[64] Miles Depo. P. 172, L. 17-23; P. 173, L. 1-6.
[65] Plaintiff's Answers to Defendant's First Interrogatories at 3.
[66] Miles Depo. P. 173, L. 7-11.
[67] Spence Affidavit Exh. "A."

Specifically, Barker testified that she, along with Ken Hirneisen, a co-worker, were both discriminated against by Crump, Jr., based on their race.[68]  However, they are both Caucasian.[69]  Moreover, Barker admitted that Crump, Jr., did not treat black employees any worse than he treated white employees.[70]

### F.    Plaintiff's Complaints Regarding Unpaid Wages

Miles' FLSA claims are based on his assertions that Southeast Unloading "failed to pay him overtime in the few weeks before his termination."[71]  Specifically, Plaintiff alleges that during the last two months of his employment with Southeast Unloading, he was not compensated for time he allegedly spent waiting for trucks being loaded to clear the dock area.[72]  Plaintiff alleges that if he arrived in the morning and the distribution trucks were not finished being loaded, he was required to wait on the dock until the dock was ready to receive incoming trucks.[73]

Southeast Unloading required its unloaders to sign in and out as they arrived for and left from work.[74]  An examination of the daily sign-in sheets for the time period in question shows that Plaintiff routinely signed in at 7:00 a.m. each day he worked but signed out at varying times.[75]  A review of the Company's corresponding wage summaries for the same period reflects that Miles was compensated for all hours set forth on the sign-in sheets.[76]  Moreover, the Company wage summaries reveal that Miles was properly compensated with overtime during the

---

[68] Barker Depo. P. 47, L. 20-23; P. 48, L. 1-23; P. 49, L. 1-20.
[69] Barker Depo. P. 49, L. 11-14.
[70] Barker Depo. P. 64, L. 2-9.
[71] Miles Complaint ¶ 18.
[72] Miles Depo. P. 197, L. 12-23; P. 198, L. 1-2.
[73] Miles Depo. P. 197, L. 12-23; P. 198, L. 1-2.
[74] Miles Depo. Exh. "10."
[75] Miles Depo. Exh. "10."
[76] Spence Affidavit ¶ 9, Exh. "C."

weeks within which he worked over forty hours.[77]    Other than his own conclusory allegations, Miles has offered no evidence to suggest that Southeast Unloading's sign in sheets or wage summaries are incorrect or inaccurate.  Therefore, his claim must fail for that reason alone.

Likewise, summary judgment on Miles' claim for overtime compensation is appropriate because during Miles' previous lawsuit against the Company for failure to pay overtime and wait time, the U.S. Department of Labor ("DOL") initiated an investigation and audit of Southeast Unloading's operation and method by which the Company was calculating and paying its employees.[78]  Following the DOL investigation, which included interviews with employees, the Company changed the manner in which it was compensating its employees.[79]

Southeast Unloading pays its workers on a piece rate basis.[80]  However, as a result of the DOL investigation, the Company began better tracking the hours worked by its employees and using the number of hours worked along with the piece rate amount to calculate a "regular rate" of pay.[81]  By calculating the "regular rate," Southeast Unloading is able to ensure that it is meeting the minimum wage requirements of the FLSA.[82]  In instances where employees work over forty (40) hours in a workweek, the Company uses the "regular rate" to determine the overtime rate and pays its employees overtime compensation, accordingly.[83]    Southeast Unloading's wage summaries reflect that it has complied with both the minimum wage and overtime provisions of the FLSA by paying for all hours worked, including the hours Miles characterizes as "wait time."[84]  Accordingly, Miles' FLSA claims against Southeast Unloading and Crump, Jr., are without merit.

---

[77] Spence Affidavit Exh. "C."
[78] Spence Affidavit ¶ 10.
[79] Spence Affidavit ¶ 10.
[80] Spence Affidavit ¶ 11.
[81] Spence Affidavit ¶ 11.
[82] Spence Affidavit ¶ 11.
[83] Spence Affidavit ¶ 11.
[84] Spence Affidavit Exh. "C."

## II.    LEGAL ARGUMENT

### A.    Miles' Race Discrimination Claims

In the Complaint, Plaintiff alleges that "Southeast's and Crump's decision to terminate [his] employment was racially discriminatory," in violation of Title VII and 42 U.S.C. § 1981.[85] As an initial matter, Southeast Unloading notes that "both Title VII and § 1981 'have the same requirements of proof and use the same analytical framework,'" and that the same analysis that applies to Miles' Title VII claim applies to his § 1981 claim as well. *Davis v. Management Technology*, No. 05-15983, 2006 WL 2356142, at *1 (11th Cir. Aug. 16, 2006) (quoting *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998)); *Wright v. Sanders Lead Co., Inc.*, No. Civ.A.2:05CV371-ID, 2006 WL 905336, at *11 (M.D. Ala. April 7, 2006) ("The same standards governing liability under Title VII apply to § 1981 claims").  A plaintiff bringing a discrimination claim pursuant to Title VII must first establish a *prima facie* case of discrimination through one of three ways: "(1) statistical proof; (2) direct evidence of discriminatory intent; or (3) by meeting the burden-shifting scheme set forth in *McDonnell Douglas Corp. v. Green*." 411 U.S. 792, 93 S. Ct. 1817 (1973); *Crosdale v. Indian River Mem'l Hosp.*, 299 F. Supp. 2d 1247, 1249-50 (S.D. Fla. 2003).

In this case, Miles alleges that "three or four times" during his employment with Southeast Unloading, Crump, Jr., made a comment to him that there was a time when he would have "put leather to [Miles'] backside and [he] wouldn't talk back to [him]."[86]  However, the alleged comment does not rise to the level of being direct evidence of discrimination.[87]  Indeed, "only the most blatant remarks, whose intent could be nothing other than to discriminate" will

---

[85] Complaint ¶ 29.
[86] Miles Depo. P. 120, L. 2-7; P. 169, L. 21-23; P. 170, L. 1-7.  Confusingly, Miles also claims that Crump, Jr., made this comment to him "frequently."  Miles Depo. P. 121, L. 2-8.
[87] Southeast Unloading and Crump, Jr., deny that this remark was made.  However, for purposes of the Motion, Defendants will assume it to be true.

constitute direct evidence. *Carter v. City of Miami,* 870 F.2d 578, 581-82 (11th Cir. 1989); *Tran v. The Boeing Company*, No. 05-13076, 2006 WL 2167329, at *3 (11th Cir. Aug. 3, 2006) (quoting *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529, n6 (11th Cir. 1987) (holding that "[d]irect evidence is evidence, which if believed, proves [the] existence of fact in issue without inference or presumption") (internal quotations omitted)). The comment allegedly made by Crump, Jr., is not a remark whose intent could be "nothing other than to discriminate." *Ali v. Stetson Univ., Inc.*, 340 F. Supp. 2d 1320, 1325 (M.D. Fla. 2004); *see Jones v. Bessemer Carraway Medical Center*, 151 F.3d 1321, 1323 (11th Cir. 1998) (holding that the 11th Circuit "has marked severe limits for the kind of language to be treated as direct evidence of discrimination").

Finally, any such remark was unrelated to the decision to terminate Plaintiff's employment, and thus, does not constitute direct evidence of discrimination. *See Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1227-28 (11th Cir. 2002) (noting that "to be direct evidence, the remark must indicate that the employment decision was motivated by race," and finding that remark made by plaintiff's future supervisor that '[w]e'll burn his black ass' was not direct evidence of discrimination in part because the comment was not directly related to the employee's termination). Accordingly, Miles' direct evidence argument fails.

Where no direct evidence of discrimination exists, the burden shifting framework set forth in *McDonnell Douglas* and in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089 (1981) is appropriate. To establish a *prima facie* case under § 1981, a plaintiff must show that he is a member of the protected class, that the alleged discrimination was related to one or more activities identified in the statute, and that plaintiff was treated less favorably than other similarly situated persons who are outside of plaintiff's protected class.

*Stetson Univ.*, 340 F. Supp. 2d at 1325.

Under Title VII, a plaintiff who has been disciplined for misconduct must establish that he is a member of the protected class, he was qualified for the position, the misconduct for which he was disciplined was "nearly identical" to conduct engaged in by an employee who is not in the protected class and who was not disciplined.[88] *Nix v. WLCY Radio/Rahall Comm.*, 738 F.2d 1181, 1185 (11th Cir. 1984).

If a *prima facie* case is established, the employer must articulate a legitimate and nondiscriminatory reason for its actions. If the employer is able to do so, the plaintiff must "prove that the legitimate reason offered was a mere pretext for an illegal motive." *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1528 (11th Cir. 1992). It is not enough for the plaintiff to prove that the employer's proffered reason is contrived; the fact finder must also believe that intentional discrimination occurred. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142, 120 S. Ct. 2097, 2106 (2000). Indeed, "[d]iscrimination is about actual knowledge and real intent, not constructive knowledge and assumed intent." *Walker v. Prudential Prop. and Cas. Ins. Co.*, 286 F.3d 1270, 1274 (11th Cir. 2002) (quoting *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1262 (11th Cir. 2001)). Under *McDonnell Douglas/Burdine*, proof of discriminatory intent is an essential element of every claim for discrimination, and the ultimate burden of proving that element remains at all times with the plaintiff. *Burdine*, 450 U.S. 248, 101 S. Ct. 1089.

        1.    **Plaintiff is unable to establish a *prima facie* case of race discrimination under § 1981 or under Title VII and, therefore, his claims fail as a matter of law**

Miles is unable to meet the elements for a *prima facie* case of race discrimination under

---

[88] In the alternative, a plaintiff may show that he was terminated and replaced by someone outside of the protected class. *Id.* However, Miles has made no such allegation in this case. *Reeves,* 530 U.S. at 142.

either § 1981 or Title VII.   Miles has not shown that there are other "similarly situated" individuals outside of the protected class who were treated more favorably.   Miles attempts to name Barker as a comparator, but the circumstances surrounding the disciplinary action taken against her were different.   Barker, unlike Miles, was expressly authorized to solicit drivers.   In addition, although Barker was suspected of stealing, the Company lacked sufficient evidence that she was doing so; however, she was demoted and she was stripped of any supervisory responsibility as a result of the paperwork deficiencies.   On the contrary, two third party witnesses provided information that Miles produced a bogus receipt.   In addition, it is uncontested that the cash Miles obtained from the truck driver was not turned over to the Southeast Unloading dock supervisor.   Based on those facts, Southeast Unloading had a good faith belief that Miles had solicited a driver in violation of the Company's policy and had stolen from the Company.

Similarly, Miles is unable to establish a *prima facie* case of disparate treatment under Title VII because, although he is member of the protected class and was otherwise qualified for the position, he cannot establish that the circumstances of the misconduct for which he was terminated were "**'nearly identical'** to conduct engaged in by an employee outside the protected class, who was not disciplined."   *Ingalsbe v. Chertoff*, No. Civ.A. 1:05-CV-1465, 2006 WL 908678, at *9 (N.D. Ga. April 6, 2006) (citing *Nix*, 738 F.2d at 1185) (emphasis supplied).   In fact, there are no appropriate comparators because there are not other employees outside of the protected class who engaged in the same misconduct but were not terminated.   Therefore, Miles cannot establish a *prima facie* case of improper discharge under Title VII.

2.    **Southeast Unloading has Offered a Legitimate, Nondiscriminatory Reason for its Decision to Terminate Miles and Miles is Unable to Show That Reason is Pretext**

Furthermore, Southeast Unloading is entitled to summary judgment because it has offered a legitimate and nondiscriminatory reason for terminating Miles, and Miles is unable to show that Southeast Unloading's reason is a pretext for discrimination. In this case, the Company had evidence through statements from witnesses and unaccounted for cash, that Miles had solicited a driver and stolen money from the Company.

It is well-established in the Eleventh Circuit, that "an employer may terminate an employee for 'a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.'" *Stallworth v. SourceCorp*, No. 2:05CV385-WHA, 2006 WL 1817058, at *4 (M.D. Ala. June 30, 2006) (quoting *Nix*, 738 F.2d at 1178). Miles may not agree with the Company's decision to terminate him, but his unsupported allegations that the decision was somehow due to his race are not enough to overcome summary judgment. *See Breech v. Alabama Power Co.*, 962 F. Supp. 1447, 1458 (S.D. Ala. 1997) (holding that "it must always be remembered that '[c]onclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [an employer] . . . has offered evidence of legitimate, non-discriminatory reasons for its actions'") (quoting *Mayfield v. Patterson Pump, Co.*, 101 F.3d 1371, 1376-77 (11th Cir. 1996) (citations omitted)).

B.    **Miles' Retaliation Claim**

In the Complaint, Miles asserts that he was terminated in retaliation for opting in as a plaintiff in the *Johnson* lawsuit.[89] "In analyzing FLSA retaliation claims, the Eleventh Circuit applies the shifting burden of proof scheme initially articulated in *McDonnell Douglas Corp. v.*

---

[89] Miles Complaint ¶ 3.

- 16 -

Green." *Hill v. Manning*, 236 F. Supp. 2d 1292, 1299, 1307 (M.D. Ala. 2002).  In order to

establish a *prima facie* case of retaliation under the FLSA a plaintiff must show that "(1) he

engaged in activity protected under [the] act; (2) he subsequently suffered adverse action by the

employer; and (3) a causal connection exists between the employee's activity and the adverse

action." *Baker v. Alabama Dept. of Public Safety*, 296 F. Supp. 2d 1299, 1307 (M.D. Ala. 2003)

(quoting *Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1342-43 (11th Cir. 2000)).  In this case, Miles

cannot establish a causal connection between his participation in the *Johnson* lawsuit and his

termination.

   In order to demonstrate the causal connection element, a plaintiff must show that the

adverse action would not have happened "but for" the assertion of FLSA rights.  *Hill*, 236 F.

Supp. 2d at 1300.  Miles has alleged that immediately prior to his termination, Crump, Jr., said,

"I'll get you, Miles."[90]  Miles testifies that he is unsure of Crump, Jr.'s. motivation in making the

alleged comment but his testimony suggests it may have stemmed from his anger at Miles for

complaining to the corporate office about the way Crump, Jr., was running the Montgomery

operation.[91]  Miles explained that he called the corporate office to complain about Crump, Jr.,

either the same day or at least during the same month that the comment was allegedly made.[92]

Miles further testified that Crump, Jr., became angry when Miles usurped his authority and

called to inquire about Company procedures.[93]

   The fact that Crump, Jr.'s, alleged comment appears to have been motivated by Miles'

telephone calls to Southeast Unloading's home office just prior to the events giving rise to his

termination, negates any inference of a causal connection between Plaintiff's protected conduct

[90] Miles Depo. P. 123, L. 4-18; P. 125, L. 18-20.
[91] Miles Depo. P. 126, L. 2-23; P. 127, L. 2-23; P. 128, L. 1-23; P. 129, L. 1-4.
[92] Miles Depo. P. 126, L. 19-22.
[93] Miles Depo. P. 128, L. 18-23, P. 129, L. 1-4.

and his termination. Moreover, there is no evidence connecting that alleged remark to Miles' participation in the *Johnson* lawsuit or his membership in any other protected category. Accordingly, it is insufficient to establish a *prima facie* case.

Southeast Unloading is, likewise, entitled to summary judgment because it has offered a legitimate, non-retaliatory reason for terminating Miles and Miles is unable to show that Southeast Unloading's reason is a pretext for discrimination. In *Hill*, plaintiff, an Alabama State Trooper, was instructed by his supervisor to prepare two written reports but failed to do so. 236 F. Supp. 2d at 1294-95. Six (6) days later, plaintiff joined an existing FLSA suit against the Alabama Department of Public Safety ("DPS"). *Id.* Shortly after joining the lawsuit, plaintiff was terminated and filed suit against the Alabama DPS, alleging retaliation under the FLSA. *Id.* at 1299.

Summary judgment was granted because defendants had articulated a legitimate, non-discriminatory reason for issuing plaintiff two citations just a day after he become involved with the suit and for terminating him just two (2) weeks after his involvement in the suit. *Id.* at 1301. The court concluded that plaintiff failed to introduce "any evidence into the record that challenge[d] the defendants' stated grounds." *Id.* The court reasoned that although plaintiff stated reasons why he did not obey his supervisor's request, he did "not offer any proof supporting the contention that they were pretextual justifications for his dismissal." *Id.*

Likewise, in this case, Southeast Unloading has articulated a legitimate, non-retaliatory reason for terminating Plaintiff's employment and Miles has failed to show those reasons were pretextual. There is no evidence to suggest that the third party individuals who provided the information which ultimately lead to Miles' termination were involved in some sort of conspiracy or concerted attempt to have him fired based on his participation in the *Johnson* lawsuit. More

- 18 -

importantly, the record is devoid of evidence to suggest that Crump, Jr., had anything but a good faith belief that Miles committed the offense for which he was terminated. *See Sweeney v. Alabama Alcoholic Beverage Control Board,* 117 F. Supp. 2d 1266, 1272-73 (M.D. Ala. 2000) (holding that where an employer relies on second hand information in forming a good faith belief that an infraction occurred is not liable for discriminatory conduct. What is material in making the decision to terminate is whether the employer believed the allegations to be true, not whether they were true).

To find Miles' argument persuasive would mean he is immune from discipline by the Company. However, Miles was expected to follow the Company's policies as is every other employee. *See Griffith v. City of Des Moines,* 387 F.3d 733, 738 (8th Cir. 2004) (holding that "anti-discrimination statutes do not insulate an employee from discipline for violating the employer's rules or disrupting the workplace").

### C.    Plaintiff's Claim for Unpaid Overtime

Miles' FLSA claims are not entirely clear. In the Complaint, Miles alleges that Southeast Unloading and Crump, Jr., "failed to pay him overtime in the few weeks before his termination."[94] However, he also alleges that he should have been compensated for wait time.[95] On the contrary, the record evidence makes clear that Miles was properly compensated for all time worked and, therefore, Southeast Unloading and Crump, Jr., request summary judgment in their favor on this claim.

The FLSA generally requires that employees receive overtime compensation for all hours worked in excess of forty (40) hours per workweek. 29 U.S.C. § 207(a). The FLSA "has long sanctioned piecework, as long as the piece rate equates to the minimum wage, and overtime

---

[94] Complaint at 4.
[95] Complaint at 4.

when appropriate." *Hodgson v. Bern's Steak House, Inc.,* No. 70-301-Civ. T, 1971 WL 843, at *10 (M.D. Fla. Oct. 1, 1971). Regulations promulgated by the DOL set forth the appropriate method for calculating overtime compensation for workers paid on a piece rate basis and require that:

> When an employee is employed on a piece-rate basis, his regular hourly rate of pay is computed by adding together his total earnings for the workweek from piece rates and all other sources....This sum is then divided by the number of hours worked in the week for which such compensation was paid, to yield the piece-worker's "regular rate" for that week. **For his overtime work the piece-worker is entitled to be paid, in addition to his total weekly earnings at this regular rate for all hours worked, a sum equivalent to one-half this regular rate of pay multiplied by the number of hours worked in excess of 40 in the week.**

29 CFR 778.111(a). Miles was compensated in a manner consistent with this regulation.

To prove a violation of the FLSA, a plaintiff employee bears the burden of proving that he performed the work for which he was not properly compensated. *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687-88 (1946) *superseded by statute on other grounds as stated in Carter v. Panama Canal Co.,* 463 F.2d 1289, 1293 (D.C. Cir. 1972); *Santelices v. Cable Wiring,* 147 F. Supp. 2d 1313, 1318 (S.D. Fla. 2001). During the relevant period in which Plaintiff claims Southeast Unloading failed to pay him overtime, Plaintiff signed a sign-in sheet each day he reported to work.[96] These sign-in sheets contained a space for Miles to enter what time he reported to work, took a lunch break, returned from his lunch break, and ultimately left for the day.[97] In calculating Plaintiff's wages, Southeast Unloading added up the total number of hours reflected on Plaintiff's time sheets in any given week, and divided that number by forty (40) to yield his "regular rate."[98] For any hours over forty in which Plaintiff worked, he was

---

[96] Miles Depo. Exh. 10.
[97] Miles Depo. Exh. 10.
[98] Spence Affidavit Exh. "C."

compensated his "regular rate" plus half his regular rate.[99]

An examination of Southeast Unloading's wage summaries makes it clear that Miles was in fact compensated in this manner, pursuant to the requirements of the FLSA.[100]   Accordingly, summary judgment is proper. *See Simmons v. Wal-Mart Assoc., Inc.*, No. 2:04-cv-51, 2005 WL 1684002, at *10 (S.D. Ohio July 19, 2005) (holding that plaintiff's "bald assertion that from 1999-2003 he worked off the clock over 200 times on unspecified days is not enough to create genuine issues of material fact as to whether he is owed any additional compensation").

Miles also generally claims that Southeast Unloading failed to pay him for wait time on the occasions where he had to wait for incoming trucks to arrive at the dock or for trucks to clear the dock.  However, Miles signed in and out and was compensated for **all of the time**, including the wait time, that was reflected on those sign in sheets.

Miles has offered no evidence suggesting that the Company's records are incorrect or inaccurate.  *Sniscak v. Borough of Raritan,* 86 Fed. Appx. 486, 487 (3d Cir. Ct. App. 2003) (holding that no genuine issue of material fact existed and summary judgment was "entirely proper" where plaintiffs failed to connect their claims that overtime was owed to a single payroll record or other documentary evidence).

Moreover, as a result of the DOL investigation, the Company made changes in the way in which it compensated its workers thereby ensuring that the employees were properly compensated for all hours worked, including wait time, in accordance with the minimum wage and overtime requirements of the FLSA.  *See McLaughlin v. Stineco, Inc.,* 697 F. Supp. 436, 450 (M.D. Fla. 1988) (holding that DOL "[c]ompliance officers have an extensive familiarity with the facts of a case which can be extremely helpful to a court in determining whether a violation

---

[99] Spence Affidavit Exh. "C."
[100] Spence Affidavit Exh. "C."

of the FLSA has occurred . . .).  In sum, Miles has been properly compensated consistent with the requirements of FLSA; therefore, Miles' claims are without merit and summary judgment is appropriate.

## III.    CONCLUSION

For the foregoing reasons, Southeast Unloading and Crump, Jr., respectfully request summary judgment in their favor as to all claims.

Respectfully submitted,

**HOLLAND & KNIGHT LLP**

Mark G. Alexander, Esquire
Florida Bar No. 434078
mark.alexander@hklaw.com
Kelly L.  DeGance, Esquire
Florida Bar No. 0606022
kelly.degance@hklaw.com
Jonathan E. O'Connell
Florida Bar No. 0016841
jonathan.oconnell@hklaw.com
50 N. Laura Street, #3900
Jacksonville, FL  32202
(904) 353-2000
(904) 358-1872 (Facsimile)


**MAYNARD, COOPER & GALE, P.C.**
Warren B. Lightfoot, Jr.
1901 Sixth Avenue, North
Suite 2400, AmSouth/Harbert Plaza
Birmingham, AL 35203
Direct Dial: 205-254-1085
Fax: 205-254-1999


*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on **October 26, 2006** I electronically filed the foregoing Motion for Summary Judgment and Supporting Memorandum of Law on behalf of Defendants, with the Clerk of the Court by using the CM/ECF system which will send notice of electronic filing to the following: Lee D. Winston, Winston Cooks, LLC, 319 7th Street North, Birmingham, Alabama 35203.

**HOLLAND & KNIGHT LLP**

Mark G. Alexander, Esquire
Florida Bar No. 434078
mark.alexander@hklaw.com
Kelly L. DeGance, Esquire
Florida Bar No. 0606022
kelly.degance@hklaw.com
Jonathan E. O'Connell
Florida Bar No. 0016841
jonathan.oconnell@hklaw.com
50 N. Laura Street, #3900
Jacksonville, FL 32202
(904) 353-2000
(904) 358-1872 (Facsimile)

**MAYNARD, COOPER & GALE, P.C.**
Warren B. Lightfoot, Jr.
1901 Sixth Avenue, North
Suite 2400, AmSouth/Harbert Plaza
Birmingham, AL 35203
Direct Dial: 205-254-1085
Fax: 205-254-1999

*Attorneys for Defendants*

# 4144723_v1

- 23 -